# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

JOSEPH L. FOWLER, SR.,          )

   Plaintiff,                   )

VS.                             ) CAUSE NO. 1:13-CV-515

TIMBER ROCK RAILROAD,           )

L.L.C.,                         )

   Defendant.                   )


**********************************************************

ORAL DEPOSITION OF

JOSEPH L. FOWLER, SR.

March 18, 2014

**********************************************************

   ORAL DEPOSITION OF JOSEPH L. FOWLER, SR., produced
as a witness at the instance of the DEFENDANT, and duly
sworn, was taken in the above-styled and numbered cause
on March 18, 2014, from 9:34 a.m. to 12:40 p.m., before
Gina Medley, RPR, CSR No. 2379, in and for the State of
Texas, reported by machine shorthand, at the Jack Brooks
Federal Building Videoconferencing Room, 300 Willow
Street, Beaumont, Texas, pursuant to the Federal Rules
of Civil Procedure and the provisions stated on the
record or attached hereto.

```
 1                    A P P E A R A N C E S

 2

 3        FOR THE PLAINTIFF:

 4              KIMBERLY BANDOH

 5              Georgia Bar No. 142232

 6              Law Office of Kimberly Bandoh, L.L.C.

 7              1745 Phoenix Boulevard, Suite 480

 8              Atlanta, Georgia 30349

 9        FOR THE DEFENDANT:

10              CAROLYN RUSSELL

11              SBOT NO. 24003913

12              Ogletree, Deakins, Nash,

13              Smoak & Stewart, P.C.

14              500 Dallas Street, Suite 3000

15              Houston, Texas 77002

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2                                                    PAGE

3    Appearances                                       2

4    Stipulations                                      5

5

6    JOSEPH L. FOWLER, SR.

7

8    EXAMINATION BY MS. RUSSELL                        5

9

10   Changes and Signature                           143

11   Reporter's Certification                        145

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 45

1       Q.   Were you a two-man crew?

2       A.   Right, that's correct.

3       Q.   What position did that person have?

4       A.   He was the conductor.

5       Q.   He was the conductor.  Did you work for him

6   throughout your employment with Timber Rock?

7       A.   No.

8       Q.   When did you start working for him?

9       A.   I couldn't tell you.

10      Q.   Who was your supervisor?

11      A.   Charles -- Bubba Douglas.

12      Q.   For how long was he your supervisor?

13      A.   I don't know.

14      Q.   Did you have a supervisor before Bubba Douglas?

15      A.   I don't know.

16      Q.   Mr. Douglas was your supervisor at the time

17   your employment ended?

18      A.   That's correct.  Can I inject something?

19      Q.   Yes.

20      A.   He was the -- he was over the train crew.

21      Q.   Was there someone else in charge as well?

22      A.   No, he was just -- just Bubba.

23      Q.   Just Bubba.  And he was over the train crew?

24      A.   The train crew, yes.

25      Q.   Was -- who else was out there in a supervisory

1   away with it?

2       A.   No.

3       Q.   Okay.  I must have misheard you.

4       A.   No, I did not.

5       Q.   You didn't violate the rule?

6       A.   I violate a rule.

7       Q.   You did violate the rule?

8       A.   Violate a rule.

9       Q.   Okay.  And you didn't get away with it?

10      A.   No, I did not.

11      Q.   Is it your belief that others who violated

12  rules did get away with it?

13      A.   Yes, I do.

14      Q.   Who are they?

15      A.   Oh, I can name -- George Yellott is one.

16  George Yellott.

17      Q.   George Yellott?

18      A.   Yes.

19      Q.   Anybody else?

20      A.   No, that's it.

21      Q.   What was the rule that you violated?

22      A.   The rule was -- just like what I did, I voided

23  a track warrant while the train was outside the

24  restricted limits.  The train was outside the restricted

25  limits.

1    Q.    Was what?

2    A.    The train --

3    Q.    Uh-huh.

4    A.    -- was outside the restricted limits.

5    Q.    The train was outside the restricted limits?

6    A.    Yes.

7    Q.    So, the train was where it was supposed to be?

8    A.    No.

9    Q.    All right.  And you said that it was somewhere

10   else?

11   A.    Yes.  See, let me explain it to you.  This is

12   the track (indicating).  This is the track (indicating).

13   Now, this is restricted limits (indicating).  Once this

14   train -- this is the train (indicating) -- gets here

15   (indicating), it's automatically protected.  Out here

16   (indicating) it's not automatically protected.  So, when

17   I voided the track warrant, the train was unprotected.

18   Q.    So, the train was unprotected when you voided

19   the warrant; but it wasn't in the protected area?

20   A.    This was not in the protected area; that's

21   correct.

22   Q.    But you said that it was?

23   A.    Yes.  I just -- when I voided the track

24   warrant, that released other trains to come in that

25   area.

1      Q.   Another train could come and hit that train?

2      A.   Right.

3      Q.   That was a rules violation?

4      A.   Yes.

5      Q.   It was a serious rules violation?

6      A.   It was a serious rule violation.

7      Q.   So, you're not sitting here today and saying

8 that you didn't do what Timber Rock thought you did?

9      A.   I don't understand what you mean.

10      Q.   All right.  That wasn't very good.

11        You're not sitting here today and saying that

12 you didn't commit a serious rules violation?

13      A.   Yes, I didn't -- I'm -- I'm not denying -- I'm

14 not denying that I didn't commit a rule violation,

15 serious rule violation.

16      Q.   So, put another way, you did commit a serious

17 rule violation?

18      A.   Yes, I did.

19      Q.   You did commit a serious rules violation?

20      A.   That's correct.

21      Q.   You also believe that if you had been a

22 different color, you wouldn't have been held

23 responsible?

24      A.   Oh, no.

25      Q.   Okay.

Page 52

1       A.    No.

2       Q.    So, how does color come into it?

3       A.    Because there are other people did similar or

4    worse things than that.

5       Q.    That would be George Yellott?

6       A.    It's another guy.  I can't remember his name;

7    but was worse than that, what I did.

8       Q.    You resigned your employment after this serious

9    rules violation?

10      A.    I was asked -- I was given a choice.

11      Q.    You were given a choice whether to resign or

12   not?

13      A.    Yes.

14      Q.    You opted to resign?

15      A.    Yes.

16      Q.    As a result of your resignation, your

17   employment ended?

18      A.    Yes.  I tell you -- ask me -- can you just ask

19   me why I resigned?

20      Q.    You said you were given a choice.

21      A.    Yes.

22      Q.    Okay.

23      A.    So, the --

24            THE WITNESS:  Can I explain it to her?

25      Q.    (BY MS. RUSSELL)  If you didn't resign, what

Page 53

1    was going to happen?

2         A.   I would have left with a bad record.

3         Q.   Based on the violation?

4         A.   Yes.   By resigning I kept a good record.

5         Q.   You were able to keep your good record by

6    resigning?

7         A.   Yes, by resigning.

8         Q.   That's true?

9         A.   That's true.

10        Q.   Sitting here today, you have a good record?

11        A.   Yes.   That was what -- what Mr. Douglas told

12   me.

13        Q.   Do you believe he was telling you the truth?

14        A.   Yes, I did.

15        Q.   Sitting here today, do you believe he was

16   telling you the truth?

17        A.   Yes.

18        Q.   You would have had to go through a hearing if

19   you didn't resign?

20        A.   That's correct.

21        Q.   You could have lost your license?

22        A.   Yes.

23        Q.   Your certification?

24        A.   Yes.   Ask me what they told me.

25        Q.   You're talking about Bubba?

Page 58

1   the days off because it was his fault.

2        Q.   He asked what?

3        A.   He should have the days off, the conductor, for

4   running through the switch.

5        Q.   So, are you saying that wasn't your

6   responsibility?

7        A.   No.

8        Q.   Whose responsibility was it?

9        A.   The conductor's.

10        Q.   Any other violations?

11        A.   Yes.

12        Q.   What other violations?

13        A.   Derail, I ran over a derail.

14        Q.   You ran over a derail?

15        A.   Yes.

16        Q.   Now, was that a serious violation?

17        A.   It was a violation, a rule violation; and the

18   same emphasis, it was the same thing.  It was the

19   conductor's responsibility for the derail.

20        Q.   And do you know whether that's a serious rules

21   violation or not?

22        A.   No, it's not a serious rule violation.

23        Q.   It's not?

24        A.   Not as compared to the one where the train was

25   left out on the track unprotected.

Page 59

1      Q.   So, it's not as serious --

2      A.   No, no.

3      Q.   -- as the voiding the track warrant?

4      A.   No, it's not.

5      Q.   Do you know whether it's serious or not,

6   though?

7      A.   It's serious.

8      Q.   It's serious?

9      A.   Yeah.

10     Q.   Okay.  Now, what happened as a result of the

11  derail?

12     A.   Derailment?

13     Q.   Yes, sir.

14     A.   I don't remember.  I don't remember.

15     Q.   Did you agree to waive your hearing?

16     A.   With Bubba?

17     Q.   Yes, sir.

18     A.   Yes, I did.

19     Q.   Did you take a suspension?

20     A.   For which one?

21     Q.   The derail, the derailment.

22     A.   I don't remember if I did or not.

23     Q.   Do you take any responsibility for the

24  derailment?

25     A.   No, I do not.  No, I do not.

1     Q.   And that's when he gave you the choice about

2  resigning?

3     A.   Yes.

4     Q.   Or going forward with the hearing?

5     A.   Yes.

6     Q.   And you chose to resign?

7     A.   Resign.

8     Q.   He didn't force you, right?

9     A.   No.  He just made it clear what would happen if

10  I didn't resign.

11     Q.   By saying it didn't look good?

12     A.   Yes.

13     Q.   Did he say anything else?

14     A.   Just said it didn't look good.

15     Q.   Okay.  Did you ask him what he meant by that?

16     A.   Yes.

17     Q.   What did he say?

18     A.   He told me that if I resigned, I keep my good

19  record.  If I go through an investigation, you leave

20  with a bad record.  Anyway it was, I would no longer be

21  a Timber Rock employee.

22     Q.   What?

23     A.   Anyway it went, I went through an investigation

24  or if I resigned, I was not going to be a Timber Rock

25  employee any longer.

Page 63

```
 1      Q.   He said you would not be a Timber Rock
 2  employee, or that's what you interpreted?
 3      A.   That's what I interpreted.
 4      Q.   That's what you interpreted --
 5      A.   Yes.
 6      Q.   -- by "it doesn't look good to me"?
 7      A.   Yes, because I was -- what he said, you can
 8  leave with a good record or be -- go through an
 9  investigation and leave with a bad record.
10      Q.   That's what you interpreted it to mean?
11      A.   That's right.  That's right.
12      Q.   He didn't say that?
13      A.   No, that's what he said -- not the -- I
14  interpret the interpretation, but I assumed what he was
15  saying.
16      Q.   I hear you, sir.
17           So, he said it didn't look good; and that's
18  what you interpreted it to mean?
19      A.   If I tell you to resign, keep a good record; go
20  through investigation, you have a bad record -- you
21  leave with a bad record.
22      Q.   He said that?
23      A.   Yes.
24      Q.   I thought you told me he just said it didn't
25  look good?
```

Page 64

1      A.   It didn't look good.  You go -- you resign, you

2   keep a good record.  You go through investigation, it's

3   not looking good.

4      Q.   All right.

5      A.   You can leave with a good record, resign with a

6   good record; termination, bad record.

7      Q.   All right.

8      A.   Bad record -- termination, bad record.

9      Q.   All right.

10     A.   Okay.

11     Q.   So we're clear, he offered you the opportunity

12   or the choice to resign?

13     A.   That's correct.

14     Q.   Where you could leave with a good record?

15     A.   That's correct.

16     Q.   And then he told you if you didn't resign --

17     A.   I would leave with a bad record.

18     Q.   Did he say that, or did he say it didn't look

19   good?

20     A.   He said I would leave -- I didn't make up the

21   word bad record.  He told me, he said, "You'll leave

22   with a bad record."

23     Q.   He didn't say he didn't know what was going to

24   happen?

25     A.   He said, to me, I would leave with a bad

```
                                                        Page 65
 1    record.
 2         Q.    That's your testimony under oath?
 3         A.    Yes.
 4         Q.    He said if you went through with a hearing, you
 5    would leave with a bad record?
 6         A.    With a bad record.
 7         Q.    Did he say if the hearing didn't go in your
 8    favor?
 9         A.    He just -- if I went to a meeting, I would
10    leave with a bad record.  If I resign, I would leave
11    with a good record.
12         Q.    Was he in control of the hearing?
13         A.    Yes, he was.
14         Q.    He was?  He was going to be the hearing
15    officer?
16         A.    He was the only one in -- he and I was the only
17    one in the office.
18         Q.    If you went to hearing, would Mr. Marshall be
19    the hearing officer?
20         A.    I don't know.
21         Q.    Did you feel like he controlled the hearing?
22         A.    I don't know.  He just gave me -- just gave me
23    an option.  I took the option to keep my good record.
24         Q.    It was your choice?
25         A.    Right.
```

1    A.    I didn't understand; but yes, there it is, yes.

2    Q.    Any reason to dispute this document?

3    A.    No.

4    Q.    You signed this document voluntarily?

5    A.    Yes.

6    Q.    You resigned voluntarily?

7    A.    Yes.

8    Q.    Had you not signed this document, you would

9    have gone forward with the hearing?

10    A.    That's right.

11    Q.    Earlier I asked you if you thought Bubba

12    Marshall was a fair person?

13    A.    Yes.

14    Q.    And you told me about the heater in the

15    train --

16    A.    Yes.

17    Q.    -- and this conversation about it not looking

18    good?

19    A.    Uh-huh.

20    Q.    Is there any reason other than those two

21    reasons that makes you think he's not a fair person?

22    A.    Yes, there's more reasons; but those are the

23    two that I could verify through me.

24    Q.    What are your other concerns about him not

25    being a fair person?

1       A.    The way he talked to people.

2       Q.    How did he talk to people?

3       A.    If he had a bad day, he would just talk rude.

4  Lots of -- I know how -- I just know, as far as my -- as

5  far as I'm concerned, we was good -- we were good

6  friends.

7       Q.    He was a good friend?

8       A.    Yeah, never had any -- any problems.

9       Q.    No problems?

10      A.    No.  He -- but, you know, he -- a normal

11  investigation, they call them a test.  They call it a

12  test.  They watch you -- they come out and watch you

13  while you're doing -- while you're working, that kind of

14  stuff.

15      Q.    Is that something that he was supposed to do as

16  a supervisor?

17      A.    Yes.

18      Q.    Did he watch everybody?

19      A.    I couldn't -- I don't know.

20      Q.    Do you believe he watched some people more than

21  others?

22      A.    Yes.

23      Q.    Who did he watch more than others?

24      A.    I don't know.  I don't have a clue who he

25  watched.  I just know that was part of his job

1    description.  And also he could call Shane, have Shane

2    to do it, Shane the yardmaster.

3         Q.   So, do you feel like watching you was somehow

4    unfair?

5         A.   Well, no, I don't, because it's part of his

6    job.

7         Q.   Okay.  You said sometimes he seemed rude?

8         A.   Yes, he was.

9         Q.   How often?

10        A.   I don't know.  I don't know what -- he have

11   people -- he have people that was intimidated --

12   intimidated him.

13        Q.   People intimidated him?

14        A.   No.  He intimidated the employees.

15        Q.   Who would he intimidate?

16        A.   The employees, all of us.

17        Q.   Did you ever talk about it with anybody?

18        A.   Huh-uh.  They would say, "Bubba's coming," you

19   know, "Bubba is coming" and everybody will get straight;

20   but I say I just -- he would just intimidate people.

21        Q.   Do you think he intended to intimidate people?

22        A.   I don't know.

23        Q.   Any other issues with Mr. Marshall?

24        A.   Huh-uh, no, I don't have any.

25        Q.   So, even though you found him to talk rude

Page 77

1      sometimes --

2          A.   Yes.

3          Q.   -- you still thought that he was a good friend,

4     and you had no problems with him?

5          A.   I didn't have any problems with him.

6          Q.   Sitting here today, do you have any problems

7     with him?

8          A.   Today, now?

9          Q.   Yes.

10         A.   No.

11         Q.   Do you have any problems with anyone at Timber

12    Rock?

13         A.   Yes.

14         Q.   Who?

15         A.   Can't think of his name right now.  I can't

16    think of his name.

17         Q.   Is it just one person?

18         A.   Yeah, he was like one of the main persons.

19         Q.   You have a problem with one person at Timber

20    Rock?

21         A.   No, it was more than one; but he was the main

22    person.

23         Q.   Okay.  Tell me everyone at Timber Rock that you

24    have a problem with.

25         A.   No problems, just him.  I have no -- we didn't

1    that's true.

2         Q.    It's true that you received 15 days deferred?

3         A.    I didn't know of 15 days -- no, that's not

4    true.  15 days deferred, no.

5         Q.    Is it true that you failed to stop the

6    locomotive short of the fixed derail --

7         A.    Yes.

8         Q.    -- and you caused the locomotive to derail?

9         A.    Yes.

10        Q.    That's true?

11        A.    That's true.

12        Q.    Your question is whether you received the

13   15 days deferred?

14        A.    Yes.  My question is I didn't know I had --

15   they gave 15 days deferred.

16        Q.    I'm sorry?

17        A.    Yes, that's my question; but employee is

18   receiving 15 days deferred.

19                   (EXHIBIT NO. 9 MARKED)

20        Q.    (BY MS. RUSSELL)  I've handed you a Waiver of

21   Hearing that we've marked as Exhibit No. 9.  It's Bates

22   labeled TIBR 91 (tendering).  If you'd take a look at

23   that, please.

24        A.    Yes.

25        Q.    Is that your signature?

Page 93

1   to work as a conductor.  And that's the more severe than

2   what I did.

3        Q.   Okay.  Is this John Grant?

4        A.   All I know is John.  All I know is John.  See,

5   he worked -- I worked in Silsbee.  He worked up in

6   Jasper.

7        Q.   How do you know what happened to him?

8        A.   Because Tony Williams (sic), the track

9   supervisor, called the dispatcher, wanting to get a

10  track warrant to go towards Kirbyville because he

11  told -- and the dispatcher told Tony -- Tony Williams

12  (sic) that the train was in Kirbyville; but Tony said,

13  "No, it's not.  It's in Jasper."

14           See, when something like that happen, it goes

15  through all out.  We get -- we have like a more

16  efficient rule testing, if something happen like that.

17  We have -- we have the supervisor, Bubba, come out and

18  talk to a bunch of the crews.  Because he ran -- that's

19  why.

20       Q.   So, you're talking about the violation?

21       A.   Yes, the violation.

22       Q.   How do you know what happened to him in terms

23  of discipline?

24       A.   Because everybody -- because it's a small

25  company.  Everybody know what happens.  Plus I was

1    there.  I saw him.  I talked to him.  I was there when

2    he came in as a conductor.  I was there when he got laid

3    off.  I was there when he lost his engineering license.

4    I was there when he came on the train as a conductor.

5    Not engineer, he came as a conductor.

6         Q.   So, he took a demotion?

7         A.   Yes -- for a certain length of time.

8         Q.   I'm sorry?

9         A.   For a certain length of time.

10        Q.   Okay.  And based on your understanding of the

11   violation and the discipline that resulted, you feel

12   like he was treated better than you?

13        A.   Yes, because of the -- if -- for example, if

14   Tony -- if Tony Williams (sic), the supervisor of the

15   track, would have been on the track around the curve,

16   figured out that they were safe, and here comes the

17   engine around that curve, think about the severity, the

18   lives could have been -- lives and -- and the damage to

19   the equipment.

20        Q.   Who else do you feel was treated better?

21        A.   The same guy again.

22        Q.   That was John Grant?

23             What happened?

24        A.   They had a special order.  It was a crossing --

25   I don't know where the crossing was at -- to stop and

1   flag the crossing.  And it was a guy that works --

2   working on the bell that goes down, and they went

3   through the crossing.  That was a rule violation.

4        Q.   Was he disciplined?

5        A.   No.  No, he was not.

6        Q.   When did that happen?

7        A.   I don't know.

8        Q.   Did the company know about the violation?

9        A.   Yes.

10       Q.   Who knew about it?

11       A.   I don't know.  I just know that the guy -- the

12   signal maintainer reported it.

13       Q.   Who is that?

14       A.   I don't know.

15       Q.   Did you report it?

16       A.   No.  I wasn't there.

17       Q.   You heard about it?

18       A.   That's right.

19       Q.   And based on what you heard, you feel like he

20   was treated better?

21       A.   Yes.  That's a rule violation also.  A car

22   would have been coming, then there could have been a

23   catastrophe.

24       Q.   Okay.  Who else?

25       A.   Okay.  Let me think of his name.

1      Q.    Actually let me give you your charge of

2    discrimination.  I think this may help things along a

3    little bit.  We're marking it as Exhibit 11.  It's Bates

4    labeled TIBR 236 through 237.

5                    (EXHIBIT NO. 11 MARKED)

6                    MS. RUSSELL:  I've got a copy for your

7    lawyer (tendering).

8      Q.    (BY MS. RUSSELL)  We were talking about John

9    Grant.

10     A.    Yes.

11     Q.    And then you also talk about Chad.  Is that

12   Chad Davis?

13     A.    Uh-huh.

14     Q.    What's your concern about Chad?

15     A.    Well, he was coming to work intoxicated; and

16   then he would take a call from the dispatcher and

17   wouldn't show up to work.

18     Q.    So, no show; and when he did show, he would be

19   intoxicated?

20     A.    Yes, on numerous occasions.

21     Q.    Did you report him?

22     A.    No.

23     Q.    You didn't?

24     A.    No.

25     Q.    Even though you knew he was intoxicated?

1       A.    I didn't report him.  The report came because I

2   went with him -- he was like in Jasper.  I was in

3   Silsbee.

4       Q.    Well, how did you know he was intoxicated?

5       A.    It was -- everybody knew he intoxicated.

6       Q.    How do you know?

7       A.    Because the conductor that worked with him

8   knew.

9       Q.    How?

10      A.    He smelled it on him.

11      Q.    Who is that?

12      A.    I can't remember the conductor name.  And then

13  as far as taking a call, not showing up, they had to

14  call in another conductor to -- to take his spot.

15      Q.    Did you report that?

16      A.    No.

17      Q.    Now, it's against the safety rules to show up

18  intoxicated?

19      A.    Yes.

20      Q.    Didn't you have a duty to report that?

21      A.    I'm not there when he showed up.

22      Q.    Well, then how do you know it happened?

23      A.    Because the conductor that relieved him told --

24  talked about it.

25      Q.    Who is that?

Page 98

1      A.   I can't remember his name.

2      Q.   And then is Cooter Creed, Todd Creed?

3      A.   Yes.

4      Q.   And your concern about Mr. Creed is that he

5  went 10 miles over the speed limit and was not

6  terminated?

7      A.   Not terminated.  He got -- he got -- well, they

8  knew he did it.

9      Q.   When did that happen?

10     A.   I don't know.

11     Q.   Did you report him?

12     A.   No.  He was reported, but I didn't report him.

13     Q.   He was reported?

14     A.   Yes.

15     Q.   Who reported him?

16     A.   I don't know, but Bubba knew about it.

17     Q.   How do you know?

18     A.   Mr. Douglas knew about it.

19     Q.   How?

20     A.   Because the conductor -- the conductor.

21     Q.   A conductor --

22     A.   Uh-huh.

23     Q.   -- reported him?

24     A.   That was with him, yes.

25     Q.   Who was that?

1       A.   I don't know who it was.

2       Q.   Did you witness him going too fast?

3       A.   No, I did not.

4       Q.   Did you witness Chad Davis drunk?

5       A.   No, I didn't.

6       Q.   Did you witness the violations that you feel

7  John Grant committed?

8       A.   No, I didn't.

9       Q.   George Yellow, is that George Yellott?

10      A.   Yellott.

11      Q.   Looks like your concern is that he violated the

12  policies at work literally every day by driving over the

13  speed limit?

14      A.   Yes.

15      Q.   Sitting here today, your testimony is that

16  George Yellott violated the policies at work every day

17  by driving over the speed limit?

18      A.   That's right.

19      Q.   Did you work with him every day?

20      A.   No.

21      Q.   So, this was every day you saw him?

22      A.   No, I didn't see him every day.

23      Q.   So, how can you say he violated the policies

24  every day?

25      A.   Well, I can't say that; but I know he did it.

1      Q.   What's that?

2      A.   I didn't -- I can't -- I didn't say I -- I

3   didn't see him do it every day, but I saw him do it.

4      Q.   You saw him do it.  How often did you see him

5   do it?

6      A.   When he'd come out the yard and Mr. --

7   Mr. Clark was the one that -- where that paper?

8   Mr. Clark, he talked to him about it.

9      Q.   Now, are you talking about driving a train?

10     A.   Yes, yes.

11     Q.   Did you ever report him?

12     A.   No, I did not.

13     Q.   Did you ever say anything to him?

14     A.   This what happen, if I say something to him

15  about it, he would go to Mr. Douglas and then -- I

16  didn't say anything to him.  No, I did not.

17     Q.   Did you ever say anything to Cooter Creed about

18  driving 10 miles over the speed limit?

19     A.   No, I did not.

20     Q.   Did you ever say anything to Chad Davis about

21  coming to work intoxicated?

22     A.   No, I did not.

23     Q.   Did you ever say anything to Chad Davis about

24  being no call/no show?

25     A.   No, I did not.

1      Q.   All right.  Is this your signature on the

2   second page?

3      A.   Yes, it is.

4      Q.   Everything in here true?

5      A.   Yes.

6      Q.   Do you see where it's typed:  When I asked

7   Bubba Douglas why the second policy rule -- why doesn't

8   the second policy rule apply to me, five days off with

9   no pay, he simply replied it didn't look good, is that

10   what you told me earlier?

11      A.   Uh-huh.

12      Q.   Is that a "yes"?

13      A.   Yes, he said it didn't look good.

14      Q.   And that you had the choice to resign with a

15   good record or go to a formal meeting and get fired with

16   a bad record?

17      A.   Right.

18      Q.   And that it was a no-win situation?

19      A.   No-win situation for me.

20      Q.   And the statement about the second policy rule

21   and why it didn't apply to you with five days off with

22   no pay, that was based on your understanding of the

23   Accountability and Development policy?

24      A.   Yes.

25      Q.   So, what's the basis for your age

Page 104

1    discrimination claim?

2        A.    Because at this -- at that point in time, I

3    only had like two -- 2013, so, I was 59.  I only had

4    three years left, and I would draw full retirement.  At

5    the age of 62, I would be able to retire.

6        Q.    If you had made it to 62?

7        A.    Yes.

8        Q.    Now, don't your years of service in the

9    railroad have something to do with it?

10       A.    Yes.

11       Q.    How do they factor in?

12       A.    They factor in the amount of money, how long --

13   the amount of money that you have in your retirement

14   and -- and it's based on how much money, how much you

15   get per month.

16       Q.    Are you 62 now?

17       A.    No, I'm 60.

18       Q.    You're 60?

19       A.    Yes.

20       Q.    So, is it your understanding that you had to be

21   employed in the railroad until you turned 62?

22       A.    Yes.  Yes.

23       Q.    To get the full retirement?

24       A.    In other words, I would get the retirement -- I

25   was able to retire with my full -- keep all my insurance

1    benefits and more money at the age of 62.

2        Q.    Now, are the benefits that you're getting going

3    to increase when you turn 62?

4        A.    I don't know.  I don't -- I just -- I don't

5    know.

6        Q.    And there isn't a factor of you add your years

7    of service to your age?

8        A.    Add it to my --

9        Q.    Have you heard of that, where you add your

10   years of service --

11       A.    Yes, to your age, yes.

12       Q.    And what does that number have to be?

13       A.    I think it's got to be 60 -- I don't know.  I

14   don't know.

15       Q.    Does it have to be 90?

16       A.    Not no 90 years, no.  Not no 90 years.

17       Q.    Years of service plus age?

18       A.    Yeah, something similar to that.  I don't know.

19   I think you got to have -- I know you have to be of a

20   certain age and certain amount of years, the more -- the

21   more you worked, the more money you would get.

22       Q.    So, what's the basis for your statement that

23   "The company did not want to pay me full retirement"?

24       A.    It will cost them more money.

25       Q.    That's the basis for your age discrimination

Page 107

1     Q.   What else do you base your claim for age

2  discrimination on?

3     A.   I would have got anywhere from six to $800 or

4  even more than that per month.  I'm just saying anywhere

5  from six to eight or nine more per month, compared to me

6  taking that early resigning.

7     Q.   And that's the retirement piece -- retirement

8  benefits piece?

9     A.   I don't know what you mean.

10    Q.   That's what we talked about --

11    A.   Yes.

12    Q.   -- right?

13    A.   Yes.

14    Q.   The retirement --

15    A.   The money that I lost having resigned early.

16    Q.   Oh, you mean if you had kept working, you would

17  have earned more money?

18    A.   Oh, yes.  Yes, I would have.

19    Q.   So, if you hadn't resigned and you stayed

20  working at Timber Rock, you would have continued to earn

21  money for the work you did?

22    A.   That's right, for my age when I resigned, from

23  59, that's three more years.  It'd have been more -- I

24  would have got more money per month that I would be

25  getting.

Page 108

1       Q.    Because you would be working?

2       A.    Right, that's correct.

3             MS. BANDOH:  Can we go off record?

4             MS. RUSSELL:  Yes.

5             (OFF THE RECORD)

6       A.    At the age of 59, I had three years left to

7   work.  So, those three years, I lost money.  If I had

8   continued to work, went to work for the last three

9   years, I would have made more money than I will when I

10  retire now.

11      Q.    (BY MS. RUSSELL)  Now, you told me you hadn't

12  looked for a job since you resigned.

13      A.    No, I have not.

14      Q.    Mr. Fowler, it's your belief that John Grant,

15  Chad Davis, Cooter Creed, George Yellott, and Ricky

16  Paine were treated better than you --

17      A.    Yes.

18      Q.    -- is that right?

19      A.    Yes.

20      Q.    Was anyone else treated better than you?

21      A.    Well, yes.  There were -- there are more.  For

22  example, Mr. Kyle Mitchell, the union representative,

23  didn't bother to show up; and I know he knew about the

24  meeting.

25      Q.    He didn't bother to show up where?

16.70

Local File

# Application for Employment
**Watco Companies      315 W. 3rd St.      Pittsburg, KS 66762**

The Watco Companies, Inc. considers all applicants for all positions without regard to race, color, national origin, religion, age, creed, gender, marital or veteran status, disability, handicap, or any other legally protected status.

PLEASE PRINT

Position Applied For: Engineer or brakeman          Date of Application: 5-24-04

Name: Fowler                 Joseph
        LAST              FIRST              MIDDLE

Social Security Number: 450 / 02 / 5910      Telephone Number (409) 899-2509

Address: 5780 Sunbird Lane  Beaumont  Texas  77708
          STREET ADDRESS        CITY        STATE    ZIP

Previous Addresses if present address represents less than three years:

| STREET ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
|  |  |  |  |
| STREET ADDRESS | CITY | STATE | ZIP |

Date available to begin work to / 6 / 04      Desired Salary: $ 14.00 hourly $ hr monthly $ annually

Have you ever been employed by this Company  or any of its subsidiaries or affiliated companies?.............. ☐ Yes  ☒ No

If yes, dates employed and position(s) held:      Dates Employed _____ To: _____ Position(s) Held: _____

Are you able to meet the attendance requirements of the position for which you are applying?.............. ☒ Yes  ☐ No

Will you work overtime if required?.............. ☐ Yes  ☐ No

Are you legally eligible for employment in the United States?.............. ☒ Yes  ☐ No
(Proof of U.S. Citizenship or immigration status will be required upon employment)

Are you at least 18 years of age?.............. ☒ Yes  ☐ No

Have you ever been convicted of a felony?.............. ☐ Yes  ☒ No

If you answered "yes" to the above, please explain: _____
(Answering "Yes" does not automatically bar an applicant from employment.  Factors such as date of the offense, severity and nature of the violation, and position applied for are taken into consideration. )

Please provide the following information regarding your last former employers, beginning with the most recent, to cover a ten-year time frame.  Attach additional pages if necessary.

| Dates Employed: | Employer Name: Trans Global Solution | Starting Pay: $ 7.70 per hr |
|---|---|---|
| From: 1986  To: Present | Address: Nederland | Ending Pay: $ 7.50 |
| Starting Job Title: Switchman | City, State Zip: | Ending Pay: $ 13.10 per hr |
| | Immediate Supervisor/Title: Jack Campbell | Reason for Leaving: Still Working |
| Ending Job Title: Foreman | Phone Number: (409) 957-1038 | |
| | May We Contact? ☒ Yes ☐ No ☐ Later | |
| Dates Employed: | Employer Name: Santa Fe RR | Starting Pay: $ 11.80 per hr |
| From: 1977  To: 1985 | Address: Silsbee | |
| Starting Job Title: Brakeman | City, State Zip: | Ending Pay: $ 14.00 per hr |
| | Immediate Supervisor/Title: C. W. Lee | Reason for Leaving: Laid off |
| Ending Job Title: Conductor | Phone Number: ( ) | |
| | May We Contact? ☒ Yes ☐ No ☐ Later | |
| Dates Employed: | Employer Name: Kirby Lumber Co | Starting Pay: $ 5.50 per hr |
| From: 1973  To: 1977 | Address: Silsbee | |
| | City, State Zip: Closed down | Ending Pay: $ 8.00 per hr |
| Starting Job Title: Switchbar | Immediate Supervisor/Title: | Reason for Leaving: Better Job |
| Ending Job Title: Labour | Phone Number: ( ) | |
| | May We Contact? ☐ Yes ☐ No ☐ Later | |

Watco Companies Application for Employment



FOWLER
Exhibit No. 1
Gina Medley

TIBR 138

Local File

## Skills and Qualifications

Summarize any specialized training, licenses, skills and/or certificates you have received that may qualify you as being able to perform job-related functions in the position for which you are applying.

This is all I have did for the last 26 years

## Education (if job related)

| Name and Location | Years Completed | Course of Study / Degree or Diploma |
|---|---|---|
| High School Kirbyville High | 4 year | Auto Mechanic Math |
| College | | |
| Trade School or Other | | |

## If driving is an essential function of the job, complete this section

Driver's License D744lo46         State Issued Tx     D.O.B. 11-21-53
Expiration Date
**Traffic Convictions and Forfeitures for the past three years (Other than parking violations)**

Speeding
Beaumont

| (Location) | (Date) | (Charge) | (Penalty) |
|---|---|---|---|

Have you ever been denied a license, permit or privilege to operate a motor vehicle     Yes ___ No X
Has any license, permit or privilege ever been suspended or revoked?     Yes ___ No X
(If the answer is yes to either one of the two previous questions, attach statement giving details)

### Driving Experience

| Class of Equipment | Type of Equipment (Van, Tank, Flat, Etc.) | Dates From   To | Approximately Number of Miles (Total) |
|---|---|---|---|
| Straight Truck | | | |
| Tractor & Semi Trailer | | | |
| Other | | | |

### Accident Record for the Past Three Years or More

| Date | Nature of the Accident (Head-on, Rear-end, Upset Etc.) | Fatality | Injury | Non-Injury |
|---|---|---|---|---|
| Last Accident 9-04 | | | | X |
| Next Previous | | | | |
| Next Previous | | | | |

## Applicant Statement

I certify that the information I have provided in this application is true in all respects, and I agree that if the information given is found to be false in any way, it shall be sufficient cause for denial of employment or immediate discharge. I expressly authorize, without reservation, the employer or its representatives to use any information in this application to verify my statements. I expressly authorize, without reservation, past employers, all references, and any other persons to answer all questions asked concerning my ability, character, general reputation, characteristics, mode of living and previous employment. I release all such persons from any liability or damages for having furnished such information.

I understand that nothing contained in this employment application or in the granting of an interview is intended to create an employment contract between The Watco Companies and myself for either employment or for the providing of any benefits. No promises regarding employment have been made to me, and I understand that no such promise or guarantee is binding upon The Watco Companies unless made in writing and signed by the President. If I am hired, I understand that I have the right to terminate my employment at any time, with or without notice and with or without cause, and that The Watco Companies reserve the same rights.

I also understand that, if I am hired, I will be required to provide proof of identification and verification of my eligibility to work in the United States, and that The Watco Companies will require me to complete an I-9 Form for this purpose.

## DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE STATEMENT.

I certify that: I have read, fully understand and agree to the conditions in the above statement.

Signature of Applicant  Joseph Fowler                Date  5-24-04

The Watco Companies Application for Employment

TIBR 139

# Watco Transportation Services
## A Development and Accountability Policy
(Revised June 4, 2009)

### Statement of Principles

Watco Transportation Services recognizes the important contributions Team Members make to our overall success. Our Team Members are truly the most important asset we have and must be treated consistently and with respect. It is our commitment to ensure a safe environment for our Team Members to work. All Team Members are expected to contribute to our common success and realize reward for safe and efficient job performance. All Team Members are encouraged to share a commitment to providing transportation services of the highest quality to our customers and to keep the commitment to safety in mind whenever they perform their duties.

To ensure a safe environment for our Team Members and the communities we serve, the movement of trains, and maintenance of equipment, track and facilities must be conducted on the basis of carefully designed rules and procedures. Failure to follow these rules and procedures may result in death, injury or substantial financial loss. All Team Members, including managers are expected to be safe, conscientious and dependable, comply with rules and policies, and display a positive behavior toward teamwork. Management must provide fair and consistent treatment to all Team Members, using coaching and training prior to achieving desired behavior. Managers are responsible and accountable to ensure safe operations through education, training, in-field efficiency testing and other forms of development and methods to ensure all Team Members operate safely. Positive corrective action with the objective of correcting undesired behavior is the basis of this policy. Consistent with these principles, a breach of a rule, procedure or instruction shall be handled in the manner described in this policy. The information contained in this document applies to all Watco Transportation Services Team Members, both hourly and salary. Company policy compliance is demanded as a condition of employment from all Watco Transportation Services Team Members; hourly and salary alike. All references to "Team Member(s) in this document applies equally to salaried and hourly positions

### General Guidelines

Offenses that are not considered serious violations of rules or policy will be subject to the standard handling procedures described in Part I of this policy. Offenses of a more serious nature, or offenses that warrant dismissal, will be subject to the handling prescribed in Part II and Part III of this policy. Offenses listed as serious or warranting dismissal in Part II and Part III are illustrative only, and not intended to limit management's right to classify offenses as serious and cause for dismissal.

### Part I:  Standard Handling

For most offenses, the main concern is with cumulative behavior. Any Team Member demonstrating a pattern of misconduct is given progressively more discipline with each succeeding offense, depending on the frequency and nature of the offenses. This will ultimately lead to dismissal if performance does not improve.

A Team Member who commits more than one offense will progress through a series of levels based on prior history of rule violations. In determining the level of discipline, the Team Member's rule violation history is considered within a two-year period prior to the current case. Each offense within the last two years for which a discipline sanction was issued, increases the level of discipline for the current offense. Guidelines for determining the specific discipline sanction and associated levels are as follows:

**Level I - first offense within 1 year - formal letter of reprimand**
> The recipient must respond by developing with management a written solution which is accepted by both parties to correct the behavior (Positive Corrective Action) outlined in the letter.

**Level II - second offense within 1 year - 7 day suspension**
> A Team Member will be given from 1 to 7 calendar days' suspension. This suspension may be deferred for a period not to exceed six months at (supervisor) General Managers discretion. If there is another offense during the deferment, progression to **Level III** is automatic.

**Level III - third offense within 2 years - 14 day suspension**
> A Team Member will be given 14 calendar days' suspension. Any suspension time deferred in **Level II** will be added to suspension time issued in **Level III**. The Team Member is given one last chance to correct his/her behavior prior to dismissal for pattern of misconduct.

Fowler

Exhibit No. 2

Gina Medley

TIBR 211

**Dismissal - fourth offense within 2 years - dismissal**
>Team Member is dismissed from service based on an established pattern of misconduct because he/she proved unresponsive to corrective action.

## Part II:  Serious Offenses

This part of the policy describes the corrective action prescribed for a serious offense.  A serious offense may not be sufficient by itself to warrant dismissal, but substantial suspension and retraining will be required. Furthermore, if the Team Member commits two serious offenses within a specified period, not to exceed three years, he/she will be subject to dismissal.  For purposes of illustration, the following rule violations are considered serious (this is not an exhaustive list):

- Operating rule violation for which FRA engineer decertification is also mandated (also considered a serious rule violation for Transportation Team Member on the ground)
- Failure to comply with rules or procedures that protect Team Members or machinery where such protection is defined by dispatcher, prescribed flags, other signal device, or in writing.
- Failure to perform duties causing or contributing to a serious derailment (total damages exceed $7,500), damage to rolling stock, track equipment or shop machinery, or injury to others.
- Failure to report a known on-duty injury before the completion of tour of duty.
- Unauthorized absence.  When not available for work it is the Team Member's responsibility to report their absence to their immediate supervisor, location manager, General Manager or other duly appointed management official of that location or Railroad prior to the absence.
- Any other serious violation of Operating Rules, Maintenance of Way Rules, Mechanical Department Rules, Safety Rules, Conduct Rules, or General Instructions issued to Team Members.
- Any second rules-violation incident resulting in property damage (total property damages exceed $4,000).

>A Team Member who commits a serious offense is assigned a Level S.

### Level S - first serious offense - suspension or retraining as appropriate.

>A Team Member who commits a serious offense will be given a 30 day suspension and assigned a probationary period of one to two years.  Additionally, the Team Member may be offered the opportunity to remove up to half of his/her suspension through a Positive Corrective Action Program, provided the Team Member accepts responsibility for the rule violation or offense (See Part V of this Policy).

>When determining the proper review period for a first serious offense, a manager should consider the Team Member's history of rule violations and attitude.  The Team Member's record determines the length of the probationary period and is a key factor, along with the violation, in determining the use of the PCA program.  To be consistent, managers will review the two years prior to the current case to determine if a reduction of the two year probationary period is warranted.  If such a reduction is warranted, it will be stated in the letter advising the Team Member of the discipline assessed.

**Dismissal - second serious offense within review period**
>In a case where a Team Member has committed a second serious offense within an assigned review period, he/she will be subject to dismissal.

## Part III:  Offenses Warranting Dismissal

The ultimate sanction of dismissal is primarily designed to be a response to a series of offenses, coupled with no sign of significant improvement by the Team Member.  Nonetheless, a single rule violation also may be so serious as to warrant dismissal.

**A Team Member who commits one of the offenses may be dismissed regardless of the nature of his work history and with no leniency for reinstatement permitted.**

### A.  Breaches of personal integrity or standards of personal conduct

TIBR 212

- Theft or other act with intent to defraud Watco Transportation Services of monies or property not due, to include falsification or misrepresentation of an on- duty injury.
- Gross dishonesty in communication with officials of the company about any job-related subject.
- Refusal to submit (at any time) to required testing for drug or alcohol use, adulteration of sample, or failure to comply with instructions of the Medical Director.
- Causing altercation.
- Gross negligence, indifference to duty, intentional destruction of company property, malicious rule violation and insubordination.
- Unauthorized absences or anything that could be determined as job abandonment or excessive absences.
- Insubordination or other disruptive behavior.

### B. Severe violation of safe operating practices

- Rule violation(s) that result in collision and or derailment, injury, fatality or extensive damage to company or public property.
- Knowingly placing the safety of self or others in immediate danger.
- A fourth offense (of any kind) within three (3) years or a second serious offense within the assigned review period.
- Speeding
- Any second rules-violation incident resulting in property damage (total property damages exceed $4,000).

### C. Drug and Alcohol

- Positive test results from random, reasonable cause, probable cause and any other test recommended by a licensed health care professional are cause for dismissal.
- Self referral will be handled through the Team Member Assistance Program.

## Part IV:  Administration of Suspension and Degree of Discipline

An offense that warrants discipline will be permanently recorded in the Team Member's personal record and Inforail.  All suspensions are unpaid and when a suspension is found to be the required course, suspension time will commence upon findings of the investigation.

A suspension will commence on the date discipline is issued unless the Team Member is being withheld from service pending an investigation.

Team Members who complete a deferment period without further disciplinary action are considered to have completed the terms of the suspension.  However, previously deferred suspension will be added to the next level of suspension when a violation occurs during the deferred period.

Subsequent offenses by a Team Member will be taken into consideration for purposes of establishing discipline level when implementing this program.

## Part V:  Positive Corrective Action

Management will have the ability to offer an Team Member in Level I, Level II or Level S an opportunity to substitute Positive Corrective Action (PCA) for up to one half of the assigned suspension.  Team Members involved in Positive Corrective Action must perform the same, working no more than eight hours in any twenty four hour period, accumulating no more than forty (40) hours in any five day period.  In general, one eight-hour day of PCA will equal two days of suspension. PCA cannot be used with a deferred suspension, but may be served concurrently with the balance of an assigned suspension.  PCA may not be used for a Team Member who has committed a willful rule violation or does not accept responsibility for his/her actions.  A Team Member who

participates in PCA will receive 75% of their regular rate of pay. PCA must never be used as the sole purpose of benefiting the Railroad.

The manager should develop and implement PCA based on the specific circumstances surrounding the rule violation. Some suggestions are:

- Have the Team Member conduct job briefings with crews on the incident and how it could have been prevented.
- Give the Team Member cross-functional training with other Team Members related to the offense.
- Give the Team Member formal classroom retraining as part of an "alternative discipline" program.
- Assign the Team Member to observe an experienced Team Member working in the same job.


## Part VI:  Final Resolution of Incident

Upon the assessment of any form of discipline a follow-up meeting(s) must be held.  The purpose of the meeting(s) is to advise the Team Member(s) of their progress on correcting behavior, modification of task or standards, individual performance, or any other corrective action required by the discipline assessed.  Managers must conduct the follow-up meeting(s) with the involved Team Member(s) at a frequency of no greater than thirty (30) day intervals, until desired and/or agreed behavior has been achieved.

Once the Team Member and manager agree that all requirements set forth by the discipline have been met, the follow-up is complete.

## DEVELOPMENT AND ACCOUNTABILITY POLICY SIGNATURE PAGE

I acknowledge I have received a copy of the Watco Transportation Services Development and Accountability Policy.  I understand that the Development and Accountability Policy is the current policy of the Watco Transportation Services and Watco Transportation Services reserves the right to add, delete, or modify this policy as it deems appropriate.  I will familiarize myself with its contents.


Joseph Fowler
**Employee Name (Please Print)**


Joseph Fowler                4-23-2010
**Employee Signature**              **Date**



FOWLER
Exhibit No. 3
Gina Medley

6

February 15th, 2013

To:    Joe Fowler
       Engineer – Job 221

Dear Mr. Fowler

You are hereby notified that you are to attend a formal hearing in the office of the
General Manager, Timber Rock Railroad at 505 W. Avenue F, Silsbee, Texas 77656 at
1:00 p.m. on Thursday February 21, 2013 in accordance with rules and regulations
adopted and published by Timber Rock Railroad.

It is the purpose of this hearing to develop the facts, discover the cause and determine
your responsibility, if any, for the incident on February 14th, 2013. The incident in
question whereas job 221 (in which you were the Engineer) voided your track warrant
while your train was occupying track warrant territory. If the facts of this hearing reveal
that you have responsibility in the above listed incidents, then you will be in violation of
the following General Code of Operating Rules;

General Code of Operating Rules
1.1      Safety
1.1.1    Maintaining a Safe Course
14.7     Reporting Clear of Limits

You are hereby notified that you have the right to be assisted by your Organization
representative and to have witnesses present on your behalf, if you so choose.

Witnesses who are known to the Carrier at this time who have been requested to attend
this hearing who may have facts and/or evidence relevant to this investigation are as
follows:

Tony Williamson

Sincerely,

*Douglas Marshall*
Douglas Marshall
Senior Trainmaster / Charging Officer

cc:  Joshua Kyle Mitchell, union rep
     Hearing officer

*recieved back 3/22/13*
*letter returned to*
*sender resigned*
*2/20*

Fowler
Exhibit No. ___4___
Gina Medley

TIBR 6

I Joseph Fowler  relinguish my
rights as a Timber Rock employee on
Feburcay 20 2013

Joseph Fowler
February 20, 2013

FOWLER
Exhibit No. 5
Gina Medley

TIBR 3

## Timber Rock Railroad
### NOTIFICATION OF CERTIFICATE REVOCATION

Locomotive Engineer   Joseph Fowler

Employee ID No.                                Home Terminal    Silsbee, TX.

Revocation period begins (mm/dd/yy)                            Thursday, February 14, 2013

Revocation period ends (mm/dd/yy)                             Thursday, March 14, 2013

Brief description of incident:    240.117(e)(4) Occupying Main Track without proper authority.

Sign at the end of this paragraph if you accept certificate revocation and waive right to a formal hearing under 49 CFR Part 240.307. By doing so, you indicate that you have knowledge and understanding of all your rights under 49 CFR Part 240 and voluntarily surrender them.

Engineer's Signature

OR

FORMAL HEARING HELD ON :

In accordance with 49 Code of Federal Regulations, Part 240, you are hereby notified of the revocation of your engineer certification. This action was taken as a result of:

240.117 (e) (1)  ☐ Failure to control a locomotive or train in accordance with a signal indication that requires a complete stop before passing it.

240.117 (e) (2)  ☐ Failure to adhere to limitations concerning train speed when the speed at which the train was operated exceeds the maximum authorized limit by at least 10 miles per hour.

240.117 (e) (3)  ☐ Failure to adhere to procedures for the safe use of train or engine brakes when the procedures are required for compliance with transfer, initial or intermediate terminal test provisions of 49 CFR Part 232.

240.117 (e) (4)  ☒ Occupying main track without proper authority.

240.117 (e) (5)  ☐ Failure to comply with prohibitions against tampering with locomotive mounted safety devices.

240.117 (e) (6)  ☐ Incident of noncompliance with FRA drug and alcohol regulations as published in 49 CFR Part 219.101.

Pursuant to 49 CFR Part 240, you will not be allowed to operate a locomotive until revocation period ends.

Receipt acknowledged:

Engineer's Signature          2-20-2013
                              Date

Douglas Marshall              02-20-2013
Supervisor's Signature        Date

Copies to:  Director of Operations
            Regional Safety Manager
            General Manager
            Personal Record File



FOWLER
Exhibit No.  6
Gina Medley

TIBR 7

# TEAM MEMBER WARNING NOTICE

## Team Member Information

Date: _8-9-11_   Department: _Transportation_

Team Member's Name: _Joe Fowler_   Social Security #: _45802-5970_

Hire Date: _6-8-04_   Position: _Engineer_

## Type of Warning

☐ Verbal Warning   ☒ Written Warning   ☐ 2nd Written Warning   ☐ Final Warning

## Type of Violation

| | | |
|---|---|---|
| ☐ Tardiness | ☐ Quality of Work | ☐ Carelessness |
| ☐ Absenteeism | ☐ Quantity of Work | ☒ Safety |
| ☐ Insubordination | ☐ Neatness / Grooming | ☐ Drug Policy Violation |
| ☐ Intoxication or Drinking | ☐ Other | |

Was there a witness to the violation   ☒ Yes  ☐ No   Witness Name: _Josh Triplett_

Violation Date: _8-9-11_  Time Occurred: _0415_   Place of Violation: _Silsbee Yard_

| Company Statement | Warning Statement |
|---|---|
| 1. Describe in detail what the Team Member has done | 1. Explain in detail the steps that must be taken to improve performance. |
| 2. Cite how this interferes with the work environment, Team Member performance, business operations, or the well being of other Team Members. | 2. Cite date by which improvements must be in place |
| 3. Cite the rule, policy, law, standard, or regulation that was violated | 3. Cite consequences if goals or improvements are **NOT** achieved by date specified. |

**Company Statement: (What did the Team Member do)**

_Failed to stop Locomotive short of fixed derail and causing Locomotive to derail. Employee is receiving 15 days deferred._

**Warning Notice: (What must the Team Member do to improve performance)**

_Have better Communication with Conductor. Have better Control of equipment_

When (what date) must the Team Member have the improvements in place: _ASAP_

What are the consequences if improvements are NOT made: _Employee will be handled per D&A Policy_

**Team Member Comments:**


Supervisor's signature: _Douglas Marshall_   Date: _8-9-11_

Team Member's signature: _Joseph Fowler_   Date: _____

Your signature above does not indicate that you agree with what has been written only that you have read the above warning.

FOWLER

Exhibit No. _8_

Gina Medley

TIBR 92

TEAM MEMBER WARNING NOTICE

Company Statement: (What did the Team Member do) continued

Warning Notice: (What must the Team Member do to improve performance) continued

# TIMBER ROCK RAILROAD
## WAIVER OF HEARING

Date:   August 9, 2011.

To:   Joe Fowler

Dear Mr. Fowler

I, _____, hereby waive my right to a formal hearing and accept without protest a fifteen (15) day deferred suspension from service in that while I was working as a Engineer on the Silsbee Switcher (Job # TIBR221) on August 9, 2011 in Silsbee, Texas, I failed to stop short of a fixed derail in track 103.  I further understand that my actions have resulted in the violation of the following parts of the GCOR.

### General Code of Operating Rules
1.1.1   Maintaining a Safe Course
1.1.2   Alert and Attentive
1.6     Conduct
      1. Careless of the safety of themselves and others
      2. Negligent
6.28    Movement on Other than Main Track
7.1     Switching Safely and Efficiently
8.20    Derail Location and Position

Due to the seriousness of this incident I fully acknowledge that I will be subject to a probationary period for one year from the date of this incident (8/9/11).  If at any time during this time period, I am found to be at fault for a serious rules infraction of any kind I will be handled in accordance to the D&A policy. I also acknowledge by my signature below, that I have reviewed all of the rules listed above and understand all of them in their entirety as well as which sections of each rule that I failed to follow.

Employee Signature: _Joseph Fowler_      Date: _8-9-2011_

Company Official: _____      Date: _8-9-11_

FOWLER
Exhibit No. 9
Gina Medley

TIBR 91