APPENDIX OF UNPUBLISHED CASES

CASES                                                                Pages(s)

*Barkley v. Singing River Elec. Power Ass'n,* 433 Fed.Appx. 254 (2011)………………………...1

*Carrera v. Commercial Coating Services Intern., Limited*, 422 Fed.Appx. 334 (2011)…………7

*Fanning v. Metropolitan Transit Authority of Harris County, Tex.*,
     141 Fed.Appx. 311 (2005)………………………………………………………………13

*Mickey v. Texas Co-op Extension*, 265 Fed.Appx. 177 (2008)…………………………………..17

*Mickey v. Texas Co-op. Extension*, 2007 WL 2220978 (S.D. Tex. Aug. 1, 2007)………………18

*Rosales v. City of San Antonio*, 2001 WL 1168797 (W.D. Tex. July. 13, 2001)………………..26

*Smith v. Lattimore Materials*, 77 Fed.Appx. 729 (2003)…………………………………………...47

*Williams, Gonzales*, 2005 WL 3447885 (E.D. Tex. Dec. 14, 2005)…………………………….48

*Williams v. City of Port Arthur*, 2012 WL 1997867 (E.D. Tex. June 1, 2012)…………………60

433 Fed.Appx. 254
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Jon BARKLEY, Plaintiff–Appellant,

v.

SINGING RIVER ELECTRIC POWER
ASSOCIATION, Defendant–Appellee.

No. 10–60599.   |   July 19, 2011.

**Synopsis**
**Background:** African-American employee brought hostile
work environment and retaliation claims against his employer
under Title VII and § 1981. The United States District Court
for the Southern District of Mississippi granted summary
judgment for employer on all claims. Employee appealed as
to § 1981 claims.

**Holdings:** The Court of Appeals, Jerry E. Smith, Circuit
Judge, held that:

[1] employee could not prevail on racially hostile work
environment claim under § 1981, absent showing the
harassment was sufficiently severe or pervasive or that
supervisors knew of the harassment and failed to take
remedial action;

[2] employee failed to establish prima facie case of retaliation;
and

[3] employer's proffered reason for not allowing employee to
withdraw his resignation was legitimate, nonretaliatory, and
nonpretextual.

Affirmed.

West Headnotes (3)

**[1]**   **Civil Rights**
          👉 Hostile environment;  severity,
          pervasiveness, and frequency
          **Civil Rights**
          👉 Knowledge or notice;  preventive or
          remedial measures

African-American employee could not prevail
on racially hostile work environment claim
under § 1981, absent showing the harassment
was sufficiently severe or pervasive or that
supervisors knew of the harassment and failed
to take remedial action; employee's allegations
of racial harassment were ambiguous and
generalized and at best might show that
the harassment occurred frequently, but did
not describe its severity or indicate it was
physically humiliating or threatening, and
employee testified the harassment did not affect
his work performance. 42 U.S.C.A. § 1981.

6 Cases that cite this headnote

**[2]**   **Civil Rights**
          👉 Causal connection;  temporal proximity

African-American employee failed to establish
prima facie case of retaliation under § 1981,
even assuming that he complained about racial
harassment and was prohibited from rescinding
his resignation; employee did not show causal
link between protected activity and adverse
action, or that person he claimed denied his
request knew of his complaint to supervisor four
months earlier. 42 U.S.C.A. § 1981.

14 Cases that cite this headnote

**[3]**   **Civil Rights**
          👉 Particular cases
          **Civil Rights**
          👉 Motive or intent;  pretext

Employer's proffered reason for not allowing
African-American employee to withdraw his
resignation, that it would not allow any employee
to withdraw resignation once it was signed

1

Barkley v. Singing River Elec. Power Ass'n, 433 Fed.Appx. 254 (2011)

and company had moved to fill vacancy, was legitimate and nonretaliatory and was not shown to be pretextual. 42 U.S.C.A. § 1981.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*254**  Robert Nicholas Norris, Louis Hanner Watson, Jr., Esq., Law Offices of Louis H. Watson, Jr., Jackson, MS, for Plaintiff–Appellant.

Kenneth E. Milam, Esq., Amy Camille Felder, Esq., Watkins & Eager, P.L.L.C., Jackson, MS, for Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Mississippi, No. 1:09–CV–716.

**\*255**  Before SMITH, SOUTHWICK, and GRAVES, Circuit Judges.

**Opinion**

JERRY E. SMITH, Circuit Judge: [*]

Jon Barkley appeals a summary judgment on his hostile work environment and retaliation claims against his employer, Singing River Electric Power Association ("SREPA"), under 42 U.S.C. § 1981. We affirm.

## I.

Barkley worked at SREPA for nearly eleven years starting in 1997 as a meter reader. He alleges that during that time, his coworkers called him names such as "n* * * *r" and "black gorilla" on a nearly daily basis and made references to "shackles" and "plantations." It is unclear how many of those comments were made in Barkley's presence or were even about him, because he only vaguely described the alleged harassment [1] and said that he heard most of the racial slurs second-hand from a hidden tape recorder he left around his coworkers.

Barkley reported the racial slurs only to his immediate supervisor and friend, Ken Papania. In 2001, Barkley complained to Papania about one specific instance, a coworker, Danny Dillard, calling him a "n* * * *r" during an argument. Papania notified the General Supervisor, Lee

Hedegaard, about Barkley's complaint, and Hedegaard spoke to Barkley and Dillard. During the meeting, Barkley admitted that he had started the altercation by making disparaging remarks about Dillard's daughter and that Dillard did not actually call him the offensive word during the argument but had used the term months earlier. Regardless of that, Hedegaard told them he would not tolerate such language.

Barkley complained to Papania a second time, seven years later in January 2008, about his coworkers using the term "n* * * *r." [2] Papania told Barkley that he should be used to hearing that word, "because blacks used the term so much," and that his coworkers "were just a 'bunch of rednecks' [so] he should not be offended." [3] Barkley also vaguely asserts that he told Papania about the racial slurs "throughout my whole years of really being there, really," but he does not support **\*256** that broad statement with any other specific examples. Barkley claims he told other people about the discrimination, but he never deposed those individuals, nor did they submit affidavits.

In April 2008, Barkley informed Papania that he intended to resign on July 23 to spend time with his wife, who was pregnant with triplets in a high-risk pregnancy. Although Barkley signed an acknowledgment of resignation on April 4, he claims that ten minutes later, he called Hedegaard to rescind the resignation. Hedegaard denies that he spoke to Barkley, and although Barkley claims that in the ten minutes between signing the resignation and calling Hedegaard, he also told a friend and another employee that he wanted to rescind his resignation, he has not provided their testimony.

On April 25, Barkley called Annette Riley, the Human Resources Manager, to discuss rescinding his resignation. [4] Riley denies that Barkley told her he wanted to rescind his resignation; instead, she claims that Barkley asked to change his resignation date to July 25. Riley provided a copy of Barkley's signed resignation form on which she wrote, "Mr. Barkley called at 5:22 p.m. and changed the date to July 25." Riley signed and dated those comments April 15, and Barkley has not refuted the document's authenticity.

Barkley's last day of work was June 8. He testified that he finished early because of changes in his wife's condition. Before he left SREPA on his last day, he met with Papania and recorded the conversation. [5] He did not discuss wanting to rescind his resignation. Instead, he told Papania he had another job offer. Papania told Barkley numerous times that

2

Barkley v. Singing River Elec. Power Ass'n, 433 Fed.Appx. 254 (2011)

he was sorry to see him go, and they talked at length about Barkley's children and future plans. Barkley told Papania about the tapes he had made and that he had sent them to various national news organizations. Papania said that he did not understand what Barkley was talking about and that he was shocked.

## II.

After leaving SREPA, Barkley sued it for violations of title VII and § 1981 alleging that he was subjected to a hostile work environment and that SREPA fired him in retaliation for complaining about racial discrimination. The district court granted SREPA's motion for summary judgment on the title VII claims, because they were filed with the EEOC more than 180 days after Barkley's employment had ended. [6] The court also granted SREPA summary judgment on Barkley's § 1981 claims. Barkley appeals only the § 1981 claims.

## III.

We review a summary judgment *de novo. Bolton v. City of Dallas,* 472 F.3d 261, 263 (5th Cir.2006). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a); **\*257** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We view the evidence in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but once the moving party has carried its burden, the non-movant must come forward with specific facts showing a genuine factual issue for trial. *Id.* Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment. *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993).

### A.

**[1]**   To prevail on a hostile work environment claim under § 1981, Barkley must show that (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment complained of was based on race, (4) the harassment complained of affected a term, condition, or privilege of his employment, and (5) the employer knew

or should have known of the harassment and failed to take prompt remedial action. *See Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002) (in the title VII context). [7] "A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Stewart v. Miss. Transp. Comm'n,* 586 F.3d 321, 328 (5th Cir.2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Looking at the totality of the circumstances, *id.,* we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with an employee's work performance." *Harvill v. Westward Commc'ns, LLC,* 433 F.3d 428, 434 (5th Cir.2005). The working environment must be both "objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 874 (5th Cir.1999).

SREPA asserts that Barkley has not raised a question of fact as to whether the discrimination was severe or pervasive. It characterizes Barkley's allegations as "vague, confusing, and contradictory" [8] and notes that he described much of the discrimination in broad terms followed by, as he put it, "blah, blah, blah" or "whatever, whatever." *See supra* note 1. Even **\*258** though Barkley claims that the harassment occurred frequently and that he both reported it to other employees and secretly recorded it, SREPA notes that he has not pointed to any evidence in the record to corroborate his testimony.

Barkley does not respond to SREPA's point regarding the lack of corroboration. He seemingly believes that his affidavit and deposition testimony should be sufficient. For some hostile work environment claims, a plaintiff's sworn testimony may be enough to raise a fact issue. Here, however, the allegations are ambiguous and generalized. "[T]o defeat a motion for summary judgment, the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, ... designate *specific facts* showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.,* 639 F.3d 186, 191 (5th Cir.2011) (emphasis added) (internal quotation marks omitted).

In *Ramsey,* 286 F.3d at 269, the plaintiff made similarly vague and generalized allegations of racial harassment. We declined

to find that the plaintiff had raised a fact issue regarding whether she suffered racial discrimination:

> The record is rife with vague assertions of [over thirteen years of] racial animus.... However, other than assertions that her supervisor ... discriminated against her for dating an African American male, there are no specific allegations of racial discrimination against any other employees. [The plaintiff] alleges that she 'suffered ongoing racial harassment from black females,' but points to no concrete examples. [She] explains that the harassment increased when she began dating an African American and subsequently had a child with him but again gives no concrete examples beyond mere conclusory assertions. While claiming that the racial harassment became extreme after beginning work under [a new supervisor], the only example she cites is reference to a remark where [the supervisor] made a derogatory comment about [her]. However, this statement was not heard by [the plaintiff] nor does [she] establish to whom the remark was made. This Court has cautioned that conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment.

*Id.* (internal quotation marks omitted). For the same reasons, Barkley's generalized allegations cannot defeat summary judgment. At best, they might show that the harassment occurred frequently, but Barkley does not describe the severity of the harassment, nor does he allege that the harassment was physically threatening or humiliating. Although he names several of his alleged harassers in his deposition and states which specific epithets he was called, the facts are such a cobbled mess that it is difficult to discern more than one or two specific instances of harassment.

Further, Barkley testified that the harassment had no impact on his work performance. He stated, "[W]hen I heard it, it doesn't really affect me like it effects some people. Some people get in an upror to hear it. With me, you hear it, you just go about your business. I'm not one of those people who get upset when they hear whatever, whatever." Actionable harassment "will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Barkley worked at SREPA for nearly eleven years and never stated that his coworker's racist language detracted from his job **\*259** performance, discouraged him from remaining on the job, or hindered his career advancement. His reason for

leaving SREPA was to be with his pregnant wife, not to get away from racial slurs.

In light of the totality of the circumstances and the vagueness of the allegations, Barkley has failed to raise a genuine dispute as to whether the harassment was severe and pervasive. Thus, we affirm summary judgment on the hostile work environment claim.

But even assuming that the harassment was severe and pervasive, Barkley has not sufficiently shown that there is a question whether his supervisors knew of the harassment and failed to take remedial action. Barkley states that the only supervisor he complained to was Papania. When Barkley told Papania about his altercation with Dillard in 2001, Papania immediately informed his own supervisor, Hedegaard, about the harassment. Hedegaard met with Barkley and Dillard and told them he would not tolerate racial slurs in the workplace. Barkley claims that Hedegaard's response was ineffective and that he told Papania about the continuing racial slurs numerous times after that incident. The test, however, is not whether the harassment stopped but whether the action taken by the employer was "reasonably calculated to end the harassment." *Stewart,* 586 F.3d at 329. Considering Barkley's complaint—that only a single coworker called him a racial epithet—Papania's and Hedegaard's responses were reasonably calculated to end the harassment they knew of.

Barkley makes only vague allegations of further reporting to Papania, describing a single complaint seven years after his first complaint. Barkley claims that he told Papania in January 2008 about "racial harassment," but "Papania refused to take any action, and informed me that I should just be used to the term 'n* * * *r' because blacks used the term so much." But Barkley appears to rest on the apparent offensiveness of Papania's comments and does not address the effectiveness of whatever response Papania took. Barkley's conclusional allegation that Papania did not take any action cannot hold up when he does not even allege that the harassment continued after that meeting. Thus, even if the harassment was severe and pervasive, SREPA has shown that it took reasonable remedial actions to end the harassment it knew of.

### B.

**[2]**   We utilize a burden-shifting framework to analyze claims of retaliation where there is no direct evidence. *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427 (5th

4

Barkley v. Singing River Elec. Power Ass'n, 433 Fed.Appx. 254 (2011)

Cir.2000). The plaintiff must first establish the three elements of a *prima facie* case: (1) He engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *See Gee v. Principi,* 289 F.3d 342, 345 (5th Cir.2002) (in the similar Title VII context). If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to demonstrate a legitimate nondiscriminatory reason for its action. *Id.* If the employer meets its burden, then the defendant cannot withstand summary judgment unless he raises a genuine issue of material fact as to whether the employer's stated reason was merely a pretext for the real, discriminatory purpose. *Id.*

Assuming that Barkley complained about the racial harassment and that he was prohibited from rescinding his resignation, he has failed to show the existence of a causal link and thus cannot establish a *prima facie* case. Barkley claims that Hedegaard did not allow him to withdraw his **\*260** resignation in retaliation for complaining about racial harassment. His only support for that conclusional assertion is the temporal proximity between his January 2008 complaint to Papania and his inability to rescind his resignation in April 2008.

Barkley fails to show, however, that Hedegaard, the person who he claims denied his request, knew of his January complaint to Papania. Hedegaard knew of Barkley's 2001 complaint, but that was seven years earlier. And Papania may have informed Hedegaard of Barkley's complaint in 2008 as he did in 2001, but there is no evidence of that in the record. Without knowledge of Barkley's January 2008 involvement in protected activity, Hedegaard could not have retaliated against Barkley by prohibiting him from withdrawing his resignation. *See Manning v. Chevron Chem. Co.,* 332 F.3d 874, 883 n. 6 (5th Cir.2003). Thus we affirm summary judgment on Barkley's retaliation claim.

Additionally, according to this circuit's caselaw, even if Hedegaard did know of Barkley's January complaint, the four-month gap in time, standing alone, is insufficient to establish *prima facie* evidence of causation. [9] Fifth Circuit precedent on that point, although largely unpublished, fits with the Supreme Court's requirement that the temporal proximity be "very close" to show causation. *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). [10] Barkley cites several cases that he claims state that a four-month period is sufficient, but those cases say no such thing. [11]

**[3]** Finally, even if we assume that Barkley could make a *prima facie* showing of retaliation, SREPA has proffered a legitimate, nondiscriminatory reason for why it would not have allowed Barkley, or any employee, to withdraw his resignation: Once a resignation is signed, the company immediately moves to fill the vacancy, and if an employee wanted to withdraw a resignation after the slot was filled, it could create problems for SREPA. Barkley argues that SREPA's explanation is pretextual merely because Hedegaard testified to it and it is not a written company policy, but he does not cite any cases in which we have said that such a fact should make a difference. Nor has Barkley proffered the names of any employees who were allowed to rescind their resignation to show that the policy was not applied uniformly. Thus, Barkley has failed to raise a genuine dispute of fact regarding his retaliation claim.

AFFIRMED.

**Parallel Citations**

2011 WL 2846542 (C.A.5 (Miss.))

Footnotes
\*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under
      the limited circumstances set forth in 5TH CIR. R. 47.5.4.
1     The following are examples of Barkley's description of the harassment:
        • "[T]hey used a lot of racial slurs, nigger this, blah, blah, blah.... He just was talking, just guys in the group just talking ... [a]bout
          the first black guy they had in the company.... [Black people] coming in and taking their jobs, blah, blah, blah, stuff like that."
        • "Basically people just talking about blacks. This guy Paul got to fighting with Robin Brown in the company. Talk about here
          come—blah, blah, blah. Anyway, Robin was a white guy."
        • "He was there the day that Danny and I crossed, exchanged words about whatever, whatever."
        • "Just hostile, racial, with all the racial slurs.... When you walk in [to the crew room] in the morning, you couldn't see who was
          saying what. You walk into this huge crew room, when you pull open the door, you hear whatever, whatever. And they thought

it was like kind of funny. And so, I would speak to Ken about it, and he would say, 'Jon, you've got to realize'—blah, blah, blah. So, you kind of look at that and think like, okay. But it just kept with the same thing over and over and over."

2   It is uncertain who used the slur, whether his coworkers called Barkley or some other individual that name, and whether they used the term in his presence or if Barkley heard it from his hidden tape recorder.

3   Despite these remarks, Barkley also testified that "Ken and I was really, truly friends."

4   Barkley said that he told Riley that he had heard about another employee, David Ward, who retired from SREPA but was allowed to return, and so he thought there would be no problem with rescinding his resignation. Barkley was mistaken, however. Ward transferred from a meter reader position to a mapping position, and his old position was filled by a new employee. After some time, Ward asked to go back to being a meter reader. SREPA allowed him to do so only because it had another meter reader vacancy.

5   That is the only recorded conversation that appears in the record.

6   *See* 42 U.S.C. § 2000e–5(e)(1).

7   The elements of both claims are identical. *Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1284 n. 7 (5th Cir.1994).

8   Barkley often could not recall the dates of certain events or whether one event occurred before another, even when he was presented with dated and signed records.
   • "Q: Exhibit 2 which you've dated—you said it was in your handwriting, it says April 4th, 2008. Notice acknowledgement [sic] resignation of employment from Singing River.... It's dated April 4th. Are you saying this is incorrect? A: Maybe. Q: Why would it be incorrect? A: I have no idea...."
   • "Q: So, you admit, then, that you had already submitted this document, your resignation, prior to [asking Hedegaard to rescind your resignation]? A: I'm sort of confused about these dates on here. Only thing I know, the day that [Papania] and I talked was in the summer because it was hot."
   • "Q: And when was your last day [of] work? A: I think it was the 17th of July.... Q: I want to show you what's been marked as Exhibit 3, and ask you if you can identify that document? A: Daily time sheet. And I'm looking at the date. It could have been like the 8th. I really—I can't tell you the exact date. Q: Well, if our records indicate that your last day worked was July 8th, 2008, do you have any reason to disagree with that? A: No, I don't."

9   *See Ajao v. Bed Bath & Beyond, Inc.,* 265 Fed.Appx. 258, 265 (5th Cir.2008) (per curiam) (finding temporal proximity of four months "not close enough"); *Myers v. Crestone Int'l, LLC,* 121 Fed.Appx. 25, 28 (5th Cir.2005) (per curiam) (three-month gap did not, by itself, create causal link); *Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 471–72 (5th Cir.2002) (five-month lapse, same).

10  In *Breeden,* the Court held that a gap of twenty months was insufficient but cited cases from the Seventh and Tenth Circuits that held that three- and four-month periods were also insufficient. *Breeden,* 532 U.S. at 273–74, 121 S.Ct. 1508 (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997); *Hughes v. Derwinski,* 967 F.2d 1168, 1174–75 (7th Cir.1992)).

11  *Breeden,* 532 U.S. at 273–74, 121 S.Ct. 1508 (twenty months insufficient); *Richard v. Cingular Wireless, LLC,* 233 Fed.Appx. 334, 338 (5th Cir.2007) (two-and-a-half months sufficient); *Washburn v. Harvey,* 504 F.3d 505, 511 (5th Cir.2007) (two years insufficient); *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir.2001) (five days sufficient).

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Carrera v. Commercial Coating Services Intern., Limited, 422 Fed.Appx. 334 (2011)

422 Fed.Appx. 334
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Daniel CARRERA; Joel Dixon; Ernie
M. Hernandez; Michael R. Hernandez;
Rafael Tello, Plaintiffs—Appellants
v.
COMMERCIAL COATING SERVICES
INTERNATIONAL, LIMITED; CCSI
Management, L.L.C., Defendants—Appellees.

No. 10–20490.   |   April 14, 2011.

**Synopsis**
**Background:** Five former employees sued former employer
under Title VII and § 1981, claiming their supervisors created
hostile work environment by subjecting them to harassment
on basis of their race and that they were fired in retaliation for
complaining about the harassment. The United States District
Court for the Southern District of Texas granted summary
judgment to employer on all claims. Employees appealed.

**Holdings:** The Court of Appeals held that:

[1] four of the former employees failed to adequately allege
racial harassment;

[2] fact issues existed as to fifth employee's claim of
discrimination;

[3] four employees failed to establish prima facie case of
retaliation;

[4] employer's articulated reason for denying those employees
work was legitimate, nonretaliatory and nonpretextual; and

[5] fact issues existed as to fifth employee's retaliation claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes (5)

[1]   **Civil Rights**
      🔑 **Pleading**

      Four of five former employees failed to
      adequately allege racial harassment; their
      allegations were vague and unsubstantiated,
      and there were numerous inconsistencies
      within and between their complaints, their
      deposition testimony, their declarations, their
      Equal Employment Opportunity Commission
      (EEOC) complaints, and their brief. 42 U.S.C.A.
      § 1981; Civil Rights Act of 1964, § 703(a)(1), 42
      U.S.C.A. § 2000e–2(a)(1).

      Cases that cite this headnote

[2]   **Federal Civil Procedure**
      🔑 **Employees and Employment
      Discrimination, Actions Involving**

      Genuine issue of material fact, as to whether
      Hispanic employee was subjected to racial
      harassment, precluded summary judgment on
      his discrimination claims under Title VII and §
      1981; employee claimed that incident wherein
      diesel shop manager slammed hammer down on
      metal table directly behind him, causing damage
      to his ears and injury to his back, was racially
      motivated, that his black supervisor constantly
      called him either a stupid Mexican or f* * *ing
      wetback, and that he was harassed and threatened
      under racial discrimination by forklift driver. 42
      U.S.C.A. § 1981; Civil Rights Act of 1964, §
      703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1).

      5 Cases that cite this headnote

[3]   **Civil Rights**
      🔑 **Causal connection; temporal proximity**

      Four employees failed to establish prima facie
      case of retaliation under Title VII or § 1981;
      assuming arguendo that they were subjects of

7

adverse employment actions, they failed to establish requisite causal link between their protected activity and any reduction in field assignments. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a).

2 Cases that cite this headnote

**[4]**   **Civil Rights**
👈 Particular cases

**Civil Rights**
👈 Motive or intent;  pretext

Employer's articulated reason for denying four employees field work, because they performed poorly on the job or were otherwise unable to comply with its job requirements, was legitimate and nonretaliatory and was not shown to be pretext to retaliate against them for protected discrimination complaints. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a).

2 Cases that cite this headnote

**[5]**   **Federal Civil Procedure**
👈 Employees and Employment Discrimination, Actions Involving

Genuine issue of material fact, as to whether Hispanic employee was terminated in retaliation for complaining about hammer incident, precluded summary judgment for employer on retaliation claims under § 1981 and Title VII; employee was observed forcibly entering locked office on same day he met with management to discuss that complaint, but employer's claim that break-in was grounds for termination was weakened by its concession that employee was authorized to enter office and only had to ask for key if he wished to gain access, not to mention disputed fact whether forcible entry was routinely allowed. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*335** David Charles Holmes, Houston, TX, for Plaintiffs–Appellants.

Lori Ann Hood, Johnson, Trent, West & Taylor, L.L.P., Houston, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:08–CV–3021.

Before REAVLEY, JOLLY, and STEWART, Circuit Judges.

**Opinion**

**\*336** PER CURIAM: [*]

Appellants are five former employees of Commercial Coating Services International ("CCSI") who claim that CCSI supervisors created a hostile work environment by subjecting Appellants to harassment on the basis of their race, and that they were fired in retaliation for complaining about this harassment. The district court granted summary judgment to CCSI on both the hostile work environment and retaliation claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. Appellants argue on appeal that there are genuine issues of material fact as to both sets of claims. We conclude that there are no genuine issues of material fact except with respect to Appellant Ernie Hernandez's claims of discrimination and retaliation. We therefore REVERSE the judgment of the district court with respect to these claims, and AFFIRM as to all claims raised by the remaining Appellants.

**I.**

CCSI is a Conroe, Texas-based company that provides corrosive coatings for pipelines and valves. The company assigns "field technicians"—whose job is to coat and fit pipe as it is laid into the ground—to projects on an as-needed basis. Field technician positions are per contract jobs, although those who are not working on field projects often work in CCSI's shop at headquarters until the next project opens.

The Appellants in this case are five individuals who, between 2007 and 2008, worked on a contract basis as field technicians for CCSI: Daniel Carrera ("Carrera"), Joel Dixon ("Dixon"), Ernie Hernandez ("Ernie"), Michael Hernandez ("Michael"), and Rafael Tello ("Tello"). All Appellants claim (1) that they

were subjected to a hostile work environment at the hands of their field project supervisors on account of their race, (2) that they complained about racial harassment to managers at CCSI, (3) that CCSI did nothing to put an end to the harassment, and (4) that after Appellants complained, CCSI retaliated against them by denying them field work or firing them.

CCSI responds that Appellants' allegations are vague, generalized, and conclusory. CCSI asserts (1) that Appellants were not discriminated against, (2) that contrary to Appellants' allegations, they never complained to CCSI managers, (3) that the Appellants generally had job-performance problems justifying any reduction in field technician assignments, and (4) that only one of the five Appellants—Ernie Hernandez—was actually terminated from his employment, which was due to unauthorized behavior.

Carrera, Ernie, Michael, and Tello—all of whom are Hispanic—claim that they were harassed by their supervisors Johnny Hicks ("Hicks"), who is black, and Sean Dougherty ("Dougherty"), who is white. Dixon, who is white, claims that he was harassed by Hicks.

The district court rejected Appellants' claims of discrimination and retaliation. As to the former, the court reasoned that Appellants offered only vague recollections and did not provide evidence of harassment to the court. With respect to the retaliation claims, the court noted that all Appellants had been reprimanded for poor performance —a legitimate, nonretaliatory reason for the company to limit their field assignments—and that they failed to produce evidence "from which to infer that **\*337** their complaints caused the cessation of work." Appellants timely appealed to this Court, invoking our jurisdiction under 28 U.S.C. § 1291.

## II.

The central question on appeal is whether a genuine issue of material fact exists with respect to the racial discrimination and retaliation claims asserted by Appellants. We review the district court's grant of summary judgment *de novo,* applying the same legal standard as the district court. *Freeman v. Quicken Loans, Inc.,* 626 F.3d 799, 801 (5th Cir.2010). "When reviewing a summary judgment, although we construe all facts and draw all justifiable inferences in the light most favorable to the nonmoving party, the nonmoving party must

set forth specific facts to establish that there is a genuine issue for trial." *First Colony Life Ins. Co. v. Sanford,* 555 F.3d 177, 180 (5th Cir.2009).

> An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.... A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.... Finally, a summary assertion made in an affidavit is simply not enough proof to raise a genuine issue of material fact.

*Id.* at 181 (internal quotation marks and citations omitted).

## A.

"A plaintiff may establish a Title VII violation based on race discrimination creating a hostile work environment." *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002). "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To do so, Appellants must establish a prima facie case that (1) they belong to a protected group; (2) they were subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment; and (5) CCSI knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey,* 286 F.3d at 268.

To affect a term or condition of employment, harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). This determination requires that we apply a "totality-of-the-circumstances test that focuses on the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 347 (5th Cir.2007) (internal quotation marks and citations omitted).

9

**1.**

[1]   We agree with the district court that the allegations of racial harassment made by Carrera, Dixon, Tello, and Michael Hernandez are properly dismissed on summary judgment because they are vague and unsubstantiated. Furthermore, there are numerous inconsistencies within and between their complaints, their deposition testimony, their declarations, their EEOC complaints, and their brief. "This Court has cautioned that 'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment." **\*338** *Ramsey,* 286 F.3d at 269 (quoting *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (en banc)). In *Ramsey,* we found a plaintiff's allegations of racial harassment insufficient to overcome summary judgment where the plaintiff had "allege[d] that she 'suffered ongoing racial harassment from black females,' but point[ed] to no concrete examples." *Id.* Most of Appellants' claims are similarly generalized and even opaque, such as Dixon's assertion that all non-black employees were "harassed and degraded and humiliated on a constant basis" and Michael Hernandez's claim that Hicks was "consistently harassing and badgering with racial slurs and vulgarity." These vague assertions are inadequate to satisfy Appellants' burden in a motion for summary judgment.

To be sure, the four men do allege a few concrete instances of harassment. We have held, however, that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Hockman v. Westward Communications, LLC,* 407 F.3d 317, 328 (5th Cir.2004) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)) (internal quotation marks omitted). Dixon and Tello each worked on only one field project for CCSI and each allege no more than two specific incidents of harassment. Carrera and Michael Hernandez, who worked at CCSI for approximately three to five months each, similarly fail to allege sufficiently severe or pervasive harassment over their brief employment. The incidents of harassment that they identify—such as Michael's allegation that Dougherty once tried to run him over with his car while working on a field job—are unsubstantiated beyond their own bare assertions. Furthermore, Appellants have presented no evidence to support their conclusory allegation that similarly situated black employees were treated with greater respect or given more favorable work than Hispanic

or white employees. Viewing the record in the light most favorable to these Appellants, they have failed to meet their burden of showing that a genuine issue of material fact exists with respect to legally cognizable discrimination by CCSI.

**2.**

[2]   We next turn to Ernie Hernandez's discrimination claims. In contrast to his co-plaintiffs, Ernie alleges a number of specific incidents of racially discriminatory harassment involving slurs and physically threatening conduct. We conclude that the district court improperly granted summary judgment to CCSI on Ernie's discrimination claim.

Ernie Hernandez was employed by CCSI in a full-time capacity by virtue of a retention program for field technicians. He worked as a field technician beginning in April 2007 and was terminated in June 2008. He testified about various incidents of racial hostility, including one instance when he was on his cell phone while in his car at a job site and Hicks pounded on his car, "threatening [him] physically with his fists" and calling him a "f* * *ing Mexican" as he yelled at him to get out of the car. Ernie alleges that in another incident a diesel shop manager named Charlie Simpson ("Simpson") slammed a hammer down on a metal table directly behind Ernie, causing damage to his ears and an injury to his back. Ernie testified that he felt he was attacked because of his race, although CCSI's internal investigation concluded that this was an incident of horseplay, and the company issued a warning to Simpson for violation of company policy.

Ernie claims that "Hicks constantly called me either stupid Mexican or **\*339** f* * *ing wetback, either in the shop ... or out in the field as a field technician," and that Hicks called him a "f* * *ing Mexican" when he arrived late for work. He testified further that he was "harassed and threatened under racial discrimination" by a forklift driver at CCSI's headquarters location. Ernie states that he reported the forklift incident to several supervisors, and that one of them told him they had all conferred with the forklift operator and mutually agreed they "were going to deny it." He also claims to have reported Hicks's harassment to at least three supervisors, to no avail. Ernie filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in January 2008, and at that point CCSI assigned him to work in the shop full-time while it investigated his grievance.

According to CCSI, its internal investigation revealed nothing to corroborate Ernie Hernandez's discrimination claim. Certain incidents Ernie has described, however, are uncontroverted. For example, although CCSI disputes that Simpson's conduct in the hammer incident was racially motivated, there is no question that the incident took place. Furthermore, Ernie's allegations of racial harassment are substantially more specific than those of the other Appellants, and the conduct he cites is more severe and pervasive in nature. [1] In the light of these considerations, we conclude that the allegations set forth by Ernie Hernandez are sufficient to establish triable issues of fact on the question of racial harassment.

## B.

We next address Appellants' claim that CCSI retaliated against them in violation of Title VII and § 1981. "To present a prima facie case of retaliation under either Title VII or § 1981, a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 319 (5th Cir.2004). Complaining to supervisors about racial harassment is a protected activity. [2] *See Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427–28 (5th Cir.2000) ( "Under Title VII, an employee has engaged in protected activity if he or she has (1) 'opposed any practice made an unlawful employment practice by this subchapter,' or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' ") (quoting 42 U.S.C. § 2000e–3(a)).

### 1.

[3]   Carrera, Dixon, Tello, and Michael Hernandez contend that they were subjects of adverse employment actions in the sense that they stopped receiving field work. The record indicates, however, that all four were per contract employees and that the availability of field assignments was generally inconsistent. Assuming arguendo that they were subjects of adverse employment actions, these Appellants have   **\*340** failed to establish the requisite causal link between their protected activity and any reduction in field assignments.

[4]   "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir.2007). Appellants submit that they have made a prima facie showing of a causal link through the temporal proximity between their complaints and the alleged denial of field work. CCSI does not dispute that temporal proximity can be a basis for demonstrating the requisite causal link. We thus turn to whether CCSI has articulated a legitimate reason for denying Appellants work.

"The employer's burden is only one of production, not persuasion, and involves no credibility assessment. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose." *McCoy,* 492 F.3d at 557 (internal citations omitted). CCSI has elicited declarations and deposition testimony to show that Appellants performed poorly on the job or were otherwise unable to comply with CCSI's job requirements, and that this justifies any adverse employment action they may have experienced. Indeed, all four Appellants acknowledge that they had been reprimanded for poor performance.

The burden thus shifts to Appellants to show pretext. "To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003). Appellants have failed to produce any evidence other than their own conclusory assertions as to the pretextual nature of CCSI's proffered nonretaliatory justification. We therefore conclude that the district court properly granted summary judgment to CCSI on these claims.

### 2.

[5]   Turning to Ernie Hernandez's retaliation claim, we conclude that there are genuine issues of fact warranting reversal of summary judgment. Ernie's claim differs materially from those of the other Appellants. Ernie was a full-time employee of CCSI, and the company acknowledges terminating his employment in June 2008. Although CCSI generally asserts that all of the Appellants had "performance issues," it argues with respect to Ernie specifically that he was terminated because video surveillance caught him

breaking into a locked office at CCSI headquarters without authorization on June 4, 2008. Ernie does not dispute entering the office, but he asserts that it was a designated room that field technicians were allowed to use at any time, and that two supervisors had personally shown him how to use a screwdriver to "jimmy" the door whenever he wished to access it. Dixon corroborated this account, testifying that he too would jimmy the door to access the room using a credit card, and that he was told by supervisor Paul Shaw ("Shaw")—from whom there is no record testimony—that jimmying the door was acceptable. According to Dixon, Shaw told him that field technicians were allowed to enter the room in whatever way they could because keys to the office were not available.

Ernie was observed forcibly entering the locked office on the very same day that he met with CCSI management to discuss his complaint regarding the hammer incident, in which he claims to have been  **\*341**  victimized by Simpson on account of his race. A letter reflecting CCSI's internal resolution of the hammer incident indicates that the break-in discovery came about as a result of CCSI's investigation that day into Ernie's grievance. CCSI's position that the break-in was grounds for termination is weakened, however, by its concession that Ernie was authorized to enter the office and needed only to ask for a key if he wished to gain access, not to mention the disputed fact whether forcible entry was routinely allowed. Under these circumstances, we conclude that there are genuine issues of material fact with respect to Ernie's claim that his termination was retaliatory.

**III.**

To summarize, with the exception of Ernie Hernandez, Appellants have failed to substantiate their generalized and conclusory assertions of racial harassment by CCSI employees, nor have they shown the discrimination they allege to be sufficiently severe or pervasive to state a cognizable claim under Title VII. They have similarly failed to support their claims that CCSI retaliated against them for complaining about the harassment. Assuming they were subject to adverse employment actions, Appellants have failed to rebut the nonretaliatory justifications proffered by CCSI for any reduction in field assignments that they experienced. Ernie Hernandez, by contrast, has substantiated his specific allegations of discrimination and retaliation, establishing the existence of genuine issues for trial.

We have thus concluded that the district court properly awarded summary judgment to CCSI on the discrimination and retaliation claims raised by Carrera, Dixon, Tello, and Michael Hernandez, and that summary judgment for CCSI on the claims raised by Ernie Hernandez was improper. We therefore REVERSE the judgment of the district court as to Ernie Hernandez and AFFIRM the judgment in all other respects. The case is remanded for further proceedings not inconsistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

**Parallel Citations**

2011 WL 1439918 (C.A.5 (Tex.))

Footnotes
\*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.
1    We note in this regard Ernie's recollection of specific events that, if true, evidence a pervasive atmosphere of racial discrimination created by Hicks. For example, according to Ernie, one day when an elderly man had passed out while on the job, Hicks turned his back to the man, saying "F* * * that white boy."
2    Although some of Appellants' assertions as to their complaints to CCSI managers are vague and unsubstantiated, we can assume that CCSI was put on notice about these grievances, either through Appellants' alleged complaints to their supervisors or through the filing of their EEOC complaints in January and March of 2008.

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Fanning v. Metropolitan Transit Authority of Harris County, Tex., 141 Fed.Appx. 311 (2005)

141 Fed.Appx. 311
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Edward FANNING, Plaintiff–Appellant,

v.

METROPOLITAN TRANSIT AUTHORITY OF
HARRIS COUNTY, TEXAS, Defendant–Appellee.

No. 04–20572.   |   Decided July 28, 2005.

**Synopsis**
**Background:** Former employee sued metropolitan transit
authority for alleged age discrimination and retaliation
pursuant to Age Discrimination in Employment Act (ADEA).
The United States District Court for the Southern District of
Texas granted summary judgment for authority and denied
former employee's motion to reconsider. Former employee
appealed.

**Holdings:** The Court of Appeals held that:

[1] early retirement offer was not evidence that termination
resulted from age discrimination;

[2] former employee could not establish prima facie claim of
retaliation; and

[3] denial of motion for reconsideration was not abuse of
discretion.

Affirmed.

West Headnotes (4)

[1]     **Civil Rights**

👈 **Public employment**

Offer in which metropolitan transit authority
employee's supervisor and department head
indicated that they would allow employee
to resign when he reached early retirement
age, instead of being fired earlier, was not
evidence that employee was terminated due to
his age in violation of Age Discrimination in
Employment Act (ADEA). Age Discrimination
in Employment Act of 1967, § 2 et seq., 29
U.S.C.A. § 621 et seq.

Cases that cite this headnote

[2]     **Civil Rights**
👈 **Causal connection; temporal proximity**
        **Municipal Corporations**
👈 **Grounds**

Metropolitan transit authority employee could
not establish causal connection between his
termination, which had been planned for
several months, and his protected activities
of complaining to employer's human resources
department and filing of age discrimination
claim with Equal Employment Opportunity
Commission (EEOC), and thus could not
establish prima facie claim of retaliation
under Age Discrimination in Employment Act
(ADEA). Age Discrimination in Employment
Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

7 Cases that cite this headnote

[3]     **Federal Civil Procedure**
👈 **Time for instituting proceedings**

Motion for reconsideration was timely where
it was filed within 10 days after entry
of summary judgment order, not counting
intervening Saturdays and Sundays. Fed.Rules
Civ.Proc.Rules 6(a), 59(e), 28 U.S.C.A.

Cases that cite this headnote

[4]     **Federal Civil Procedure**
👈 **Time for consideration of motion**
        **Federal Civil Procedure**
👈 **Grounds and Factors**

13

Denial of motion for reconsideration of order granting summary judgment for former employer on former employee's claims under Age Discrimination in Employment Act (ADEA) was not abuse of discretion when outstanding discovery would not have produced facts needed to withstand summary judgment motion and former employee did not seek continuance for further discovery in opposing motion. Fed.Rules Civ.Proc.Rules 56(f), 59(e), 28 U.S.C.A.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*311** Michael A. Starzyk, Starzyk & Associates, The Woodlands, TX, for Plaintiff–Appellant.

**\*312** Jeffrey C. Londa, Michael D. Mitchell, Stephen Eric Hart, Ogletree, Deakins, Nash, Smoak & Stewart, Houston, TX, for Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Texas (4:02–CV–4544).

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.

**Opinion**

PER CURIAM: *

Edward Fanning challenges the summary judgment awarded Metropolitan Transit Authority (Metro) against his age discrimination and retaliation claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (ADEA). **AFFIRMED.**

**I.**

Metro employed Fanning as a manager of architecture in its planning, engineering, and construction department. Fanning's direct supervisor was Gary Lemley (age 51); John Mickelson (age 50) was the department head. On 9 November 2001, they met with Fanning to discuss their dissatisfaction with his work, including his recent inability to meet deadlines and his insubordinate communications

with Metro executives. They told Fanning they wanted to terminate his employment immediately, but offered him three options: resign; be fired; or take advantage of Metro's early retirement policy upon his upcoming 55th birthday in March 2002. Fanning responded that they had violated federal law by suggesting he take early retirement.

Several days later, Fanning complained to Metro's human resources department (HR) about the 9 November meeting. HR later placed Fanning on a 60–day corrective action program (CAP).

In February 2002, after he had been placed on the CAP, Fanning filed an age discrimination complaint with the EEOC, claiming the 9 November option and Lemley and Mickelson's subsequent inquiries about his retirement, constituted age discrimination. The EEOC determined there was no basis for Fanning's claim and issued a right-to-sue letter in August 2002. Fanning's employment was terminated after he received that letter.

Fanning brought this ADEA action against Metro, claiming age discrimination and retaliation. After limited discovery, Metro moved for summary judgment, contending Fanning could not present a *prima facie* case for either claim. Pursuant to the standard for such judgment, the district court held: Fanning could not establish a *prima facie* case for either claim; and, even if he could, he could not show that Metro's legitimate reasons for firing him were pretext for an underlying discriminatory motive.

Pursuant to Federal Rule of Civil Procedure 59(e), Fanning moved for reconsideration. He contended the court erred when it: (1) granted summary judgment prior to the deadline for production of compelled discovery; and (2) granted such judgment.

The district court denied the motion, holding: it was untimely; and, in the alternative, the timing of the summary judgment was not prejudicial to Fanning because the evidence he sought did not support his *prima facie* case.

**\*313 II.**

Fanning appeals from the summary judgment and denial of his motion to reconsider. We address each in turn.

## A.

A summary judgment is reviewed *de novo. E.g., GDF Realty Inv., Ltd. v. Norton,* 326 F.3d 622, 627 (5th Cir.2003), *cert. denied,* 545 U.S. 1114, 125 S.Ct. 2898, 162 L.Ed.2d 294 (2005). Such judgment is proper when "there is no genuine issue as to any material fact and ... the [movant] is entitled to a judgment as a matter of law". FED.R.CIV.P. 56(c); *e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All inferences must be drawn in favor of the nonmovant, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); but, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted", *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

To establish a *prima facie* case of ADEA age discrimination, a plaintiff must show: "1) he was discharged; 2) he was qualified for his position; 3) he was within the protected class [over age 40]; and 4) he was replaced by someone outside the protected class, someone younger, or was otherwise discharged because of his age". *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 (5th Cir.2003) (quotation marks omitted). To establish a *prima facie* case of ADEA retaliation, a plaintiff must show: he was qualified for his position; and "(1) ... he engaged in a protected activity, (2) ... there was an adverse employment action, and (3) ... a causal link existed between the protected activity and the adverse employment action". *Holtzclaw v. DSC Communications Corp.,* 255 F.3d 254, 259 (5th Cir.2001) (citation omitted).

The burden-shifting analysis presented in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to ADEA discrimination and retaliation claims when, as here, they are based on circumstantial evidence. *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir.2004) (ADEA retaliation); *West,* 330 F.3d at 384 (ADEA age discrimination). If the employee makes a *prima facie* showing, the employer "must produce evidence of a legitimate, nondiscriminatory reason for its decision to terminate [plaintiff's] employment". *West,* 330 F.3d at 384. If the employer meets this requirement, the court must "decide whether [plaintiff] has proved intentional discrimination. To meet his burden of proof, [plaintiff] can rely on evidence that

[the employer's] reason for terminating him was pretextual". *Id.* at 385 (internal citation omitted).

The district court held Fanning could not show a *prima facie* case for either claim because he did not present any direct or circumstantial evidence that he was fired for anything but personal or professional reasons. The court further determined that, even if Fanning could do so, he presented no evidence of discriminatory motive or retaliatory animus by Metro.

Fanning contends the district court erred in concluding: (1) he could not establish a *prima facie* case for either claim; (2) in response to Fanning's claims, Metro presented legitimate, non-discriminatory reasons for firing him; and (3) Fanning failed to present evidence that Metro's reasons for firing him were pretext. Fanning also maintains the district court refused **\*314** incorrectly to apply the mixed-motive standard to his claims. Metro responds that Fanning did not meet his summary judgment burden of presenting a *prima facie* case for either claim because he could not show any evidence of discriminatory animus on Metro's part. In the alternative, Metro maintains the claims still fail as a matter of law because Fanning could not produce any evidence that Metro's proffered motives for firing him were anything but professional.

**[1]**   Essentially for the reasons stated by the district court, Fanning's *prima facie* case for age discrimination fails because, *inter alia,* Lemley and Mickelson's offer at the 9 November 2001 meeting to allow him to resign when he reached early retirement age, instead of being fired earlier, is not evidence that Fanning was terminated because of his age. *See Fagan v. New York State Elec. & Gas Corp.,* 186 F.3d 127, 133 (2d Cir.1999).

**[2]**   Fanning's *prima facie* case for retaliation fails because he cannot establish a causal connection between his termination, planned since November 2001, and the ADEA-protected activities of complaining to HR or filing a claim with the EEOC. "Employers need not suspend previously planned [employment actions] upon discovering that a [claim with the EEOC] has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality". *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Fanning v. Metropolitan Transit Authority of Harris County, Tex., 141 Fed.Appx. 311 (2005)

Because summary judgment was proper based on Fanning's failure to establish a *prima facie* case for age discrimination or retaliation, we need not reach Fanning's contention that the district court applied the incorrect standard in examining whether he could prove pretext.

**B.**

The denial of a Rule 59(e) motion is reviewed for abuse of discretion. *E.g., Fletcher v. Apfel,* 210 F.3d 510, 512 (5th Cir.2000). In claiming abuse of discretion, Fanning asserts: (1) his motion was timely; and (2) summary judgment should not have been awarded before the deadline for a recently-granted motion to compel evidence, and, had the court waited until after that deadline, he could have presented evidence of pretext. Metro replies: Fanning waived any discovery issue when he did not move for a continuance under Rule 56(f) (party opposing summary judgment may seek continuance for further discovery if, for reasons stated, it cannot present facts adequate to justify opposition); and any error was harmless because, as Fanning acknowledged, the requested evidence concerned pretext and did not support his *prima facie* case for either claim.

[3]   Fanning's motion was timely. Pursuant to Rules 59(e) and 6(a), he filed it within the requisite ten days after the entry of the summary judgment order—not counting intervening Saturdays and Sundays.

[4]   In any event, the district court did not abuse its discretion in ruling, in the alternative, against the motion. "This court has long recognized that a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when the record shows that the requested discovery is not likely to produce the facts needed by the plaintiff to withstand a motion for summary judgment." *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir.1990) (citation omitted). Further, our court has foreclosed a party's contention on appeal that it had inadequate time to marshal evidence to defend against summary judgment when the party did not seek **\*315** Rule 56(f) relief before the summary judgment ruling. *Potter v. Delta Air Lines,* 98 F.3d 881, 887 (5th Cir.1996). A Rule 56(f) motion, not one for reconsideration, is the proper remedy for a party claiming summary judgment is inappropriate because of inadequate discovery. *E.g., Access Telecom, Inc. v. MCI Telecommunications Corp.,* 197 F.3d 694, 719–20 (5th Cir.1999), *cert. denied,* 531 U.S. 917, 121 S.Ct. 275, 148 L.Ed.2d 200 (2000); *Washington,* 901 F.2d at 1285.

**III.**

For the foregoing reasons, the judgment is

***AFFIRMED.***

**Parallel Citations**

2005 WL 1792690 (C.A.5 (Tex.))

Footnotes

\*      Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

265 Fed.Appx. 177
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Bouche MICKEY; Shirley
Brown, Plaintiffs-Appellants
v.
TEXAS COOPERATIVE EXTENSION, The Texas
A&M University System, Defendant-Appellee.

No. 07-20647   |   Summary
Calendar.   |   Feb. 6, 2008.

**Attorneys and Law Firms**

Rhonda Hunter Wills, Houston, TX, for Plaintiffs-Appellants.

Richard Dalton Naylor, Office of the Attorney General, General Litigation Division, Austin, TX, for Defendant-Appellee.

Appeal from the United States District Court for the Southern District of Texas, Houston, No. 4:05-CV-3931.

Before KING, DAVIS, and CLEMENT, Circuit Judges.

**Opinion**

PER CURIAM: [*]

Plaintiffs-appellants Bouche Mickey and Shirley Brown (collectively, "Plaintiffs") appeal the district court's summary judgment in favor of defendant-appellee Texas Cooperative Extension ("TCE"), a member of the Texas A&M University System, on their race discrimination claims, brought under Title VII of the Civil Rights Act of 1964, alleging wrongful demotion and discriminatory failure to promote (Mickey's claims), wrongful termination (Brown's claim), and hostile work environment (both). Plaintiffs contend that they made a prima facie case of each of their claims, that the nondiscriminatory reasons proffered by TCE for each of the challenged employment decisions were factually inaccurate, and that they have raised a sufficient fact question on the issue of pretext to survive summary judgment. Plaintiffs argue that the district court applied the incorrect legal standard in concluding that they failed to raise a fact question regarding pretext, relying on *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003). However, we conclude that the district court applied the proper legal standard, as *Laxton* defines an employer's "explanation [a]s false or unworthy of credence *if it is not the real reason for the adverse employment action,*" not merely if the employer may have been mistaken in its good faith belief in its proffered explanation. *Id.* (emphasis added).

The district court's thorough and detailed memorandum and order stating its reasons for granting TCE's motion for summary judgment comprehensively addressed each and every one of Plaintiffs' arguments. The memorandum explained that Plaintiffs failed to make a prima facie case of some of their claims, including their hostile work environment claim (which was raised in Plaintiffs' complaint, abandoned in their summary judgment responses, but resurrected in their briefs on **\*178** appeal), and failed to raise a fact issue regarding pretext on *any* of their claims.

Because we could not improve upon the reasoning of the district court, we AFFIRM the judgment for the reasons stated by the district court.

**Parallel Citations**

2008 WL 341587 (C.A.5 (Tex.))

**Footnotes**

[*]   Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext® © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2220978
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Bouche MICKEY and Shirley Brown, Plaintiffs,
v.
TEXAS COOPERATIVE EXTENSION, the
Texas A & M University System, Defendant.

Civil Action No. H-05-3931.   |   Aug. 1, 2007.

**Attorneys and Law Firms**

Rhonda Hunter Wills, Wills Law Firm, Katrina S. Patrick,
Attorney at Law, Houston, TX, for Plaintiffs.

Richard D. Naylor, Office of the Atty Gen., Gen Litigation
Div., Austin, TX, for Defendant.

**Opinion**

***MEMORANDUM AND ORDER***

EWING WERLEIN, JR., United States District Judge.

 **\*1** Pending is Defendant the Texas Cooperative Extension,
The Texas A & M University System's Motion for Summary
Judgment (Document No. 23). After carefully reviewing the
motion, responses, reply, and the applicable law, the Court
concludes that the motion should be granted.

## I. *Background*

This is a race discrimination suit brought under Title VII of
the Civil Rights Act of 1964 ("Title VII") against Defendant
Texas Cooperative Extension ("TCE"), a member of the
Texas A & M University System. Plaintiffs Bouche Mickey
("Mickey") and Shirley Brown ("Brown"), who state they
are African-American, allege that they were unjustifiably
targeted by a workplace investigation at the conclusion of
which Brown was terminated and Mickey lost a promotion
and was offered a demotion, which prompted him to retire.
Plaintiffs also allege that they were subjected to a racially
hostile environment.

Mickey began working for TCE in 1974 and had "risen
through the ranks of the agency," ultimately being named
the County Extension Director in Fort Bend County effective
January, 2002. [1] As Director of the Fort Bend County
Extension ("FBCE") Office, Mickey was in charge of the
office and had supervisory authority over its 23 employees.
Document No. 23 ex. A at 3. Mickey was responsible
for "budgetary matters, supervision, employee coordination,
capital improvements, [and] political support." Document
No. 25 ex. A-1 ¶ 4. Brown began working with the Extension
Service in 1976, and she worked in the FBCE Office from
1981 until her termination in 2004. She served as County
Extension Agent specializing in Family and Consumer
Services. Brown's immediate supervisor was Mickey, whom
she had known and worked with for many years.

In 2003, Texas Ranger Jeff Cook ("Cook") advised the TCE
administration of a criminal investigation that potentially
implicated Mickey and Brown. Document No. 23 ex. A at 3-4.
The newly-elected Fort Bend County Treasurer was alleged
to have written more than $16,000 in unauthorized checks
on the account of the Parent Leader's Association ("PLA"),
an organization that had a working relationship with the
FBCE Office. *Id.;* Document No. 25 ex. A-2 ¶ 3. Kyle Smith
("Smith"), TCE's Associate Director of County Programs,
avers that Cook asked TCE to delay its internal investigation
of the matter until he completed his review.

On May 7, 2004, while the outside criminal investigation was
ongoing, TCE announced that Mickey had been promoted to
County Extension Director in Harris County. Soon thereafter,
TCE administration learned that an employee in the FBCE
Office had recently filed an EEOC charge of discrimination
and criminal assault charges against Mickey. Document No.
28 ex. A at 2. Dr. Chester P. Fehlis ("Fehlis"), Associate
Vice Chancellor for Agriculture of the Texas A & M
University System ("TAMUS") and TCE Director, appointed
an internal ad hoc committee (the "Committee") to interview
FBCE employees and "make recommendations concerning
any actions that [TCE] might find necessary." Document
No. 23 ex. A at 3. On May 10, 2004, the Committee
began interviewing FBCE employees, including Mickey and
Brown. Three days later, Mickey was notified by letter that
he would be placed on administrative leave with pay status
"to allow time for investigation and administrative review
of allegations that may be grounds for dismissal," and the
promotion to the Harris County position was temporarily
placed on hold. *Id.* ex. A-1.

**\*2**  In June, 2004, Fehlis met with Chief Auditor Catherine Smock ("Smock"), who oversees the Texas A & M University System Internal Audit Department ("Audit Department"), to discuss allegations involving the possible misappropriation of federal tobacco grant funds by TCE employees. Document No. 23 ex. B at 1-2. [2] The Audit Department conducted an investigation and internal audit of the FBCE Office's handling of the grant funds, and found that Mickey and Brown had engaged in misconduct in the handling of the funds. In its Final Report dated July 19, 2004, the Audit Department found that Mickey had violated TAMUS Policies and Regulations when (1) he made an oral agreement between the FBCE Office and Horizons that led to receipt of $85,000 in federal grant funds; (2) he authorized over a two-year period without knowledge or approval of the TCE Fiscal Office or Administration the deposit of approximately $85,000 in federal grant funds to a private bank account over which TCE had no signatory authority; and (3) he failed to comply with TAMUS regulations governing the disbursement of the grant funds, which disbursements were required to be made on vouchers certified as valid claims and approved for payment by authorized personnel. *Id.* at 2-3; *id.* ex. A-2 at 1-3. The Audit Department found that Brown (the Extension Agent in charge of the Tobacco Education Program) had violated the Texas Penal Code and various TAMUS Policies by (1) submitting two falsified invoices totaling more than $7,000 for payment to a vendor for services Brown knew had not been performed, which sums the vendor, after depositing the checks, then paid to Brown personally; (2) directing a subordinate to falsify the services provided on a request to Horizons for reimbursement from a federal grant; and (3) directing a vendor to submit another invoice to falsify the services rendered for which payment was sought. *Id.* ex. A-2 at 2-4. [3] Smith avers in his affidavit that "the information set forth in the audit report was consistent with the information provided to our committee during the course of our interviews of the Fort Bend office personnel." Document No. 23 ex. A at 4. By letters dated July 27, 2004, Brown was notified that her employment with TCE would be terminated effective August 10, 2004, *id.* ex. A-3, and Mickey was given the option of accepting a transfer/demotion to Bexar County to serve as County Extension Agent, or to proceed with retirement. *Id.* ex. A-4. Mickey's promotion to the Harris County position was also terminated. Mickey chose to retire.

In their complaint, Plaintiffs allege that they were unjustifiably targeted by the workplace investigation and "treated differently from their non-black counterparts with regard to discipline and terminations." Plaintiffs also allege that they were subjected to a work environment "replete with racial animosity." Plaintiffs seek damages, injunctive relief, interest, attorney's fees, and costs. TCE moves for summary judgment on all of Plaintiffs' claims.

## II. *Standard of Review*

**\*3**  Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact exists will not suffice. *Id.* "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Id.*

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. Price-Macemon, Inc.,* 992 F.2d 1408, 1413 (5th Cir.1993) (citing *Matsushita,* 106 S.Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson,* 106 S.Ct. at 2513.

### III. *Discussion*

#### A. *Title VII Standard of Review*

Title VII proscribes an employer from terminating or otherwise discriminating against any individual because of that individual's race. 42 U.S.C. § 2000e-2(a)(1). The Title VII inquiry is "whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 651 (5th Cir.2004). Intentional discrimination can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 219 (5th Cir.2001), *cert. denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002). Because Plaintiffs present no direct evidence of discrimination, their claims are analyzed using the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case of discrimination. *Id.*

**\*4** The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.' " *Id* . (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993)). If the employer sustains its burden, the plaintiff's prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive alternative). *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004). Here, Plaintiffs do not argue, and the pleadings do not support, a mixed motive theory of discrimination. As such, Plaintiffs' claims will be considered under the more traditional pretext analysis. *See Johnson v. Saks Fifth Ave., TX, LP,* 2007 WL 781946, at \*21 (S.D.Tex. Mar.9, 2007) (Rosenthal, J.); *Ward v. Midwestern State Univ.,* 217 Fed. Appx. 325, 329 & n .20 (5th Cir.2003). At all times, the ultimate burden of persuasion that the employer intentionally discriminated remains with the plaintiff. *Reeves,* 120 S.Ct. at 2106; *Hicks,* 113 S.Ct. at 2749.

#### B. *Plaintiff Mickey*

##### 1. *Mickey's Prima Facie Case*

TCE concedes that Mickey has met the first three prongs of a prima facie case with respect to his wrongful demotion claim, namely, that: (1) he is a member of a protected class; (2) he was qualified for the position he held; and (3) he suffered an adverse employment action. The summary judgment evidence also establishes the fourth element of his prima facie case, namely, that he was replaced by a person outside his protected class. *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 512-13 (5th Cir.2001); *Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358, 360-61 (5th Cir.2004). Mickey has therefore established a prima facie case of race discrimination with respect to his wrongful demotion claim.

Mickey has not, however, established a prima facie case for his separate claim for discriminatory failure to promote him to the position of Harris County Extension Director. To establish a prima facie case, among other things, Mickey must show either that the employer awarded the position to someone outside his protected class or that after the employer rejected the plaintiff, the employer continued to seek applicants with plaintiff's qualifications. *See Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 680-81 (5th Cir.2001); *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 (5th Cir.1996). There is no proof of either. The uncontroverted summary judgment evidence is that TCE awarded the position of Harris County Extension Director to Hurley Miller, an African-American, after Mickey's promotion was terminated. Document No. 28 ex. A at 4. Mickey has failed to establish a prima facie case on his failure to promote claim.

##### 2. *TCE's Legitimate, Non-discriminatory Reasons and Mickey's Evidence of Pretext*

**\*5** TCE contends that even with a prima facie case of race discrimination, Mickey cannot rebut TCE's proferred legitimate, non-discriminatory reasons for its decision to offer him a demotion or retirement-namely, that Mickey (1) failed to exercise proper oversight and management of the FBCE Office; (2) failed adequately to supervise his staff; and (3) violated various TAMUS policies in relation to the investment, disbursement, and administration of the federal grant funds. TCE presents evidence that its employment decision was based upon (1) the findings and recommendation of the Committee that investigated the irregularities and interviewed employees in the FBCE Office,

20

including Mickey and Brown; and (2) the Audit Department's findings in its detailed Final Report dated July 19, 2004, that Mickey had violated TAMUS Policies with regard to the handling of the federal grant funds. The violations found were that (1) Mickey over a two-year period that permitted $85,000 of TCE's federal grant funds to be deposited into a private bank account over which TCE had no signatory authority and regarding which the TCE Fiscal Office and Administration had no knowledge; (2) he made an oral contract with Horizons rather than a written agreement as required; and (3) he failed to comply with System regulations in making disbursements of grant funds. *See* Document No. 23 ex. A-2 at 2-3. The Audit findings were consistent with the Committee's findings. *Id.* ex. A at 4. Hence, TCE's executive management determined to give Mickey an option of reassignment to the Bexar County Agent position or retirement. *Id* . at 5. TCE's reasons, if believed, are legitimate, non-discriminatory reasons for Mickey's reassignment. *See, e.g., Mendez v. Dollar Tree Stores, Inc.,* 114 Fed. Appx. 149, 150 (5th Cir. Nov.22, 2004)* (unpublished); *Friend v. Interior Sys., Inc.,* 69 Fed. Appx. 659, 2003 WL 21356075, at *2 (5th Cir. May 30, 2003)* (unpublished) (mismanagement is legitimate, non-discriminatory reason); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1228 (11th Cir.1993).

Mickey contends that the reassignment reasons proffered by the TCE Administration-the same Administration that shortly before had designated him for a promotion-were mere pretexts to discriminate against him based on his race. "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.' " *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir.2003); *see also Reeves,* 120 S.Ct. at 2106. "An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action." *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 412 (5th Cir.2007). Mickey attempts to show pretext largely by challenging one of TCE's proffered reasons: its contention that Mickey violated TAMUS Policies in the handling of the federal grant funds. Mickey does not dispute that he engaged in the conduct that led to his reassignment, but rather, he asserts that TAMUS Policies did not govern TCE and that TCE had no policies or guidelines for handling donations, grants, accounts, and contracts. Document No. 25 at 14-15. Mickey offers his own *ipse dixit* affidavit and affidavits from two former TCE employees who had worked for Mickey, plus another employee who saw him about four times a year, who all aver in identical language that TCE was "never

governed by Texas A & M System Policy." *See* Document No. 25 ex. A ¶¶ 19; ex. C ¶ 13; ex. D ¶ 9; ex. E ¶ 15. The uncontroverted written TAMUS Policies, however, by their own terms expressly apply to the Texas A & M University System and its components, administrators, employees, and agents. *See* Document No. 28 at 8-9; ex. A-8 at 1 ("The official actions of the ... Texas A & M University System and its components, administrators, employees, and agents are governed by the" System Policies and Regulations); *id.* ¶ 3.1 ("The Board requires its members, administrators, employees, agents, and students to comply with all System Policies at all times."). [4] That TCE is an agency or component of the Texas A & M University System is uncontroverted in the summary judgment evidence and, indeed, from the day they filed this suit Plaintiffs have identified Defendant as "Texas Cooperative Extension, The Texas A & M University System." In his supplemental affidavit Smith provides various examples of how "TCE's ties to TAMUS are present in every facet of TCE's existence," such as routine forms and form letters used in the Extension Office which make reference to System Policies (including a letter signed by Brown herself). *Id.* ex. A at 3-4; ex. A-9. Mickey provides no evidence that the System Policies exempt from their coverage any component of the System or, in particular, TCE. The competent summary judgment evidence establishes as a matter of law that TAMUS Policies apply to *all* educational institutions and agencies that are components of the System, including TCE and its employees.

**\*6** Even if TCE were mistaken in its determination that Mickey's conduct was in violation of TAMUS Policies, however, such error alone is insufficient to establish that TCE's proffered reason is pretext absent any evidence of discriminatory motive. *See Dismuke v. City of Indianola,* 32 Fed. Appx. 126, 2002 WL 334618, at *3 (5th Cir. Feb.11, 2002)* ("[E]ven where an employer objectively errs in concluding that an employee violated a work rule or policy, absent evidence of discriminatory motive for the employer's discipline of the employee, such error alone is insufficient to establish that the employer's proffered justification is pretext."); *Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir.1991); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995); *Laxton,* 333 F.3d at 579 ("[The inquiry] is not whether [the employer]'s proffered reason was an *incorrect* reason for [the] discharge."). The proper inquiry is "whether [TCE]'s *perception* of [Mickey]'s performance, accurate or not, was the real reason for [his demotion]." *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 408-09

Mickey v. Texas Co-op. Extension, Not Reported in F.Supp.2d (2007)

(5th Cir.1999); *see also Thompson v. Sanderson Farms, Inc.,* 2006 WL 2711497, at \*6-7 (S.D.Miss. Sept.21, 2006).

Here, Mickey presents no evidence that Fehlis, TCE executive management, or any other decision maker involved in the reassignment decision did *not* perceive Mickey's handling and oversight of the federal grant funds to be deficient and in violation of TAMUS Policies. The uncontroverted summary judgment evidence is that TCE executive management made the decisions to withdraw Mickey's promotion and to offer him a reassignment or retirement only after receiving information from the Committee and the detailed report from the Audit Department of Mickey's violations of TAMUS Policies with respect to the oversight and handling of $85,000 in federal grant funds. Mickey has presented no evidence that TCE's determination that he violated TAMUS Policies in his handling of $85,000 of federal grant funds was pretextual or not made in good faith. *See, e.g., Mayberry v. Mundy Contract Maint. Inc.,* 197 Fed. Appx. 314, 316 (5th Cir.2006).[5]

Mickey also attempts to show pretext by arguing that unnamed other Directors were treated more favorably. Document No. 25 at 19. To prove disparate treatment, Mickey must show that the misconduct for which he was disciplined was "nearly identical to that engaged in by an employee not within [his] protected class whom [the employer] retained." *Wallace,* 271 F.3d at 221 (internal alterations and quotation omitted). Mickey presents no summary judgment evidence that other similarly-situated, non-black Directors engaged in similar misconduct but were treated more favorably. Mickey neither argues nor presents evidence that other TCE directors were found through internal audits to have dealt with federal grants or other funds in disregard of TAMUS policies, but were treated more favorably upon the discovery of their supervisory failures. Although Mickey asserts in his unverified brief that other "similarly-situated non African-American directors" were not demoted after engaging in similar practices, these "general, conclusory, and unsubstantiated statements do not constitute competent summary judgment evidence." *Ramirez v. Gonzales,* 2007 WL 329207, at \*4 (5th Cir. Jan.30, 2007) (unpublished); *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir.2002) ( "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment.") (quotation omitted). Mickey has presented no evidence to raise a fact issue that he was similarly situated to but received less favorable treatment

than other non-black TCE employees under nearly identical circumstances.

**\*7** In sum, after viewing the evidence in the light most favorable to Mickey, Mickey has failed to raise a genuine issue of material fact that TCE's legitimate, non-discriminatory reasons for offering him a demotion or retirement were mere pretexts for intentional race discrimination. TCE is entitled to summary judgment on Mickey's disparate treatment race discrimination claim.

**C. *Plaintiff Brown***

**1. *Brown's Prima Facie Case***
Brown contends that she was terminated as an act of race discrimination. TCE acknowledges that Brown has satisfied the first three elements of her prima facie case but claims she has failed to establish the fourth element. Indeed, the summary judgment record reveals no allegations or summary judgment evidence regarding who replaced Brown as County Extension Agent after her termination. Further, TCE argues that there is no summary judgment evidence that someone outside of Brown's protected class was treated more favorably than Brown *in nearly identical circumstances. See Wallace,* 271 F.3d at 221; *Aguinaga v. Tex. Alcohol & Beverage Comm'n,* 98 Fed. Appx. 328, 331 (5th Cir.2004).

Brown argues that other TCE employees were paid from funds in the volunteer organization account, and it was "common practice" for TCE agents and specialists to be reimbursed for expenses and services in conducting educational programs. Brown names several TCE employees who allegedly received direct payments for rendering services to various groups working with TCE, but who were not discharged: (1) Glenn Averitt (white), who was paid by the Horse Committee for "training and speaking"; (2) Ron Castillo (white/Hispanic), who contracted with TSU/ Horizons to provide food for an event; and (3) "[n]umerous other white TCE agents and specialists [who] have been compensated through EPC accounts for services rendered in speaking at events of various groups working with TCE...." Document No. 26 ex. 1 ¶ 25; ex. 2 ¶ 15. None of these circumstances raises a genuine issue of material fact as to whether Brown was treated less favorably than those outside the protected class. While the record reflects that other TCE employees may have been paid for personally providing services to various groups working with TCE, there is no summary judgment evidence that any employee except Brown submitted false invoices and approved falsified

invoices for payment to an outside vendor, who in turn cashed the checks and gave back the money to the authorizing employee.[6] Brown does not allege that any other TCE employee committed fraudulent or potentially illegal acts with respect to being paid for providing such services, but was not terminated. There is no evidence that Brown's comparators wer similarly situated to Brown but not terminated under *nearly identical* circumstances. *See Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304-05 (5th Cir.2000); *Shackelford,* 190 F.3d at 405-06.

Brown also claims that she was treated less favorably than Ron Wooley ("Wooley") (white), a TCE employee who allegedly assaulted his secretary in the TCE office and was not terminated, but instead was later promoted to Regional Extension Director or District Extension Director. *See* Document No. 26 at 11; ex. 2 ¶ 16. The summary judgment record reveals no facts regarding the incident characterized by Plaintiffs as an "assault," the position that Wooley held at the time, the identity of his supervisor, whether Wooley's supervisor or the TCE administration knew of the incident, or the actions, if any, taken by TCE to address the matter. There is, in short, no evidence by which to compare Wooley's conduct in that vaguely described incident with the proven misconduct of Brown in misappropriating over $7,000 in federal grant funds and submitting falsified invoices to one's employer. *See, e.g, Okoye,* 245 F.3d at 514; *Smith v. Wal-Mart Stores,* 891 F.2d 1177, 1180 (5th Cir.1990); *Black v. Sysco Foods of Houston,* No. 06-2236, 2007 WL 1481081, at *5 (S.D.Tex. May 21, 2007) ("In essence, to raise a presumption of discrimination in this case, plaintiff must demonstrate that non-African American workers, who engaged in the *same misconduct under similar circumstances,* were not terminated.") (emphasis added). In sum, Brown has failed to present any evidence that she suffered disparate treatment under nearly identical circumstances with regard to her termination.

**\*8** Nonetheless, Brown argues, "the circumstances give rise to an inference of discrimination." Document No. 26 at 8. Brown does not identify the "circumstances" to which she refers, but in her affidavit she avers that "[f]rom the beginning, it seemed that [Texas Ranger Cook] had an agenda on a witch hunt directed at me and Mr. Mickey" and she speculates that the outside criminal investigation was "directed by false and misleading information provided by Melody Krejci, Margaret Kunz, and Jacque Gerke, three white employees who had previously used racial epithets and made statements about not wanting to work

for black supervisors." *See id.* ex. 1 ¶ 26. Brown provides only conclusory statements and subjective beliefs, but no competent summary judgment evidence to suggest that the investigations were racially biased or mere pretexts. *See Young v. Equifax Credit Info. Servs., Inc.,* 294 F.3d 631, 639 (5th Cir.2002) ("Conclusory affidavits are not sufficient to defeat a motion for summary judgment."); *Friend,* 2003 WL 21356055, at *2 n. 5 ("Plaintiffs' conclusional assertions of discrimination in the conduct of the investigation are not sufficient, in the absence of supporting evidence, to defeat summary judgment."). Moreover, Plaintiff's conclusory statements about a biased outside criminal investigation permit no reasonable inference that *Fehlis or TCE* harbored a bias against African Americans or acted with racial animus, or that TCE's decision to terminate Brown was at all influenced by Brown's race. Brown also argues that only one of seven African Americans who held "key positions" in Fort Bend County now remains. Document No. 26 at 5. Again, there is no evidence as to the identities of these employees, the circumstances or dates of their departures (*e.g.,* whether or when they resigned, retired, were terminated, transferred, or promoted), or any other evidence from which a bias against African Americans could reasonably be inferred. There is no evidence, considered separately or cumulatively, that gives rise to an inference that Brown's termination was an act of intentional race discrimination. In sum, because Brown has presented no summary judgment evidence that she was replaced by someone outside of her protected class, and because she cannot raise so much as a fact issue that similarly-situated non-black employees were not terminated under nearly identical circumstances, or that her termination was otherwise discriminatory on account of her race, Plaintiff has failed to establish a prima facie case.

### 2. *TCE's Legitimate, Non-discriminatory Reasons and Brown's Evidence of Pretext*

Even if Brown could establish a prima facie case of race discrimination, she has presented no proof to rebut TCE's proffered legitimate, non-discriminatory reasons for its decision to terminate her. TCE explained its reasons for her termination in a two-page letter dated July 27, 2004: "[I]n recent weeks [TCE] has reviewed certain aspects of its operation in the Extension Office in Fort Bend County with primary emphasis on the manner in which local and external funds are received and accounted for." It advised that "[a] number of serious items of concern ... surfaced during the review," including: (1) Brown's creation of falsified invoices for over $7,000 in printing services that she knew Champion

Services had not performed, her authorization of payment for these invoices, and that Champion Services "deposited the payments and returned all or most of the money to [Brown]"; (2) Brown's intentional falsification of a $215 invoice for a catered lunch after she discovered that the grant did not allow for the purchase of food, and (3) Brown's instructions to a vendor to change a $2,200 invoice for "meals" to "youth services"-actions that constituted falsification of government documents, violations of System and agency guidelines, and acts of dishonesty. Document No. 23 ex. A-3. The letter stated that these incidents (which were the "most serious, but are not the only violations") "constitute [Brown's] repeated failure to abide by rules and regulations, a lack of personal and professional credibility that undermines your ability to function effectively in your job, a lack of trustworthiness, and/ or acts of dishonesty. Each incident individually is grounds for dismissal." *Id.* These reasons, if believed, constitute legitimate, non-discriminatory reasons for Brown's discharge. *See, e.g., Moore v. Eli Lilly & Co.,* 802 F.Supp. 1468, 1472 (N.D.Tex.1992).

 **\*9** Brown asserts pretext by challenging TCE's characterization of her job performance and providing some excuses for her described misconduct. However, Brown "cannot survive summary judgment simply by denying or explaining her alleged deficiencies." *Ramirez,* 2007 WL 329207, at \*3. The proper inquiry is "whether [TCE]'s *perception* of [Brown's] performance, accurate or not, was the real reason for her termination." *Shackelford,* 190 F.3d at 408-09; *see also Laxton,* 333 F.3d at 579; *Mayberry,* 55 F.3d at 1091. Brown provides no evidence that Fehlis and TCE did not perceive her job performance deficient in every way described. In fact, in response to the termination letter, Brown herself, through her attorney, admitted that "all of the concerns detailed in the termination letter ... are fault worthy and [Brown] is regretful." Document No. 23 ex. C at 2. Brown admitted that she performed the printing services initially contracted to Champion Services and that she received the money, and "[s]he realizes that her conduct lacked good judgment." *Id.*

Brown also attempts to show pretext by arguing that she was "unfairly singled out and terminated" for being reimbursed for performing printing services, as it was a "common practice" for TCE agents to be reimbursed for expenses and services incurred in conducting educational programs. However, as discussed above, the summary judgment record does not support Brown's contention that she was treated differently under nearly identical circumstances because there

is no summary judgment evidence that any named employee besides Brown submitted falsified invoices and approved falsified invoices for payment to an outside vendor, who in turn cashed the check and turned the money over to the complicit employee. Nor is there summary judgment evidence that any TCE employee besides Brown committed fraudulent or possibly illegal acts to obtain such payments without being terminated. *See Wallace,* 271 F.3d at 221; *Wyvill,* 212 F.3d at 305. In sum, Brown has failed to raise an issue of material fact that her employment was terminated by TCE based on race discrimination, and TCE is entitled to summary judgment on her disparate treatment race discrimination claim.

**D. *Hostile Work Environment Claim***
Plaintiffs' other discrimination claim, based on a racially hostile work environment, requires Plaintiffs to prove that: (1) they were members of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on their race; (4) the harassment affected a term, condition, or privilege of employment; and (5) TCE knew or should have known of the harassment, yet failed to take prompt remedial action. *See Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 353 (5th Cir.2001); *see also Felton v. Polles,* 315 F.3d 470, 484 (5th Cir.2002). To be actionable, the challenged conduct must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993). Whether the harassment is sufficiently severe or pervasive is based on a totality-of-the-circumstances test that focuses on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating ... and whether it unreasonably interferes with an employee's work performance." *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 347 (5th Cir.2007) (quoting *Walker v. Thompson,* 214 F.3d 615, 625 (5th Cir.2000)); *see also Harris,* 114 S.Ct. at 371. "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (internal citation omitted). The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (applying the standard to sexual harassment case, but noting that the standards for racial and sexual harassment overlap); *see also Harris,* 114 S.Ct. at 370.

**\*10**  Plaintiffs do not defend the hostile work environment claim in their briefs. Mickey in his affidavit, however, claims that it "came to [his] attention" that three lower-level white employees had made inappropriate remarks, and he attempted to correct the situation as their manager. *See* Document No. 26 ex. 2 ¶ 14. Mickey presents no evidence, however, that he himself was subjected to unwelcome harassment based on race, or that any alleged harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of his employment. Although Brown in her affidavit contends that she "personally witnessed" "a small number of white female employees" balk at taking orders from some unnamed "black superiors," she does not identify who, when, where, or any other facts regarding this incident or how it was resolved. Moreover, she presents no summary judgment evidence that she herself was subjected to racial harassment or a hostile work environment, or that any harassment altered a term or condition or her employment, or that she complained to any member of management about the alleged conduct.

Because Plaintiffs have failed to raise a genuine issue of material fact that they were subjected to a racially hostile work environment, TCE is entitled to summary judgment on this claim.

### IV. *Order*

Based on the foregoing, it is

ORDERED that Defendant the Texas Cooperative Extension's Motion for Summary Judgment (Document No. 23) is GRANTED, and Plaintiffs Bouche Mickey's and Shirley Brown's claims against Defendant are DISMISSED on the merits.

The Clerk will enter this Order and provide a correct copy to all counsel of record.

Footnotes

1   The Texas Cooperative Extension (formerly known as the Texas Agricultural Extension Service (TAES)), a member of the Texas A & M University System, is an educational organization that serves nearly every county in Texas, with approximately 250 offices and 1,400 personnel. The uncontroverted summary judgment evidence is that there are 7 County Extension Director positions in Texas, currently held by "four whites, one Hispanic, one African-American, and one Asian/Pacific Islander." Document No. 28 ex. A at 4.
2   The allegations involving the federal grant funds appear unrelated to the separate outside criminal investigation by Ranger Cook. Smock avers that the grant funds were "provided to the Texas Department of Health as the result of a federal settlement involving several major tobacco companies." Document No. 23 ex. B at 2. The Texas Department of Health awarded funding to Texas Southern University (TSU) to provide Tobacco Prevention Programs to the public, and TSU, in turn, contracted with 5 non-profit health organizations to oversee the educational programming. "One of these organizations, Horizons Intergenerational Wellness Coalition (Horizons) sub-contracted with the [FBCE Office] to provide educational programs to Fort Bend County residents." *Id.*
3   It is uncontroverted that in June, 2005, a grand jury in Fort Bend County returned criminal indictments against Shirley Brown and Arnold Brown, the owner of Champion Services, for misappropriation of property from the Texas Department of Health in relation to Brown's handling of the grant funds.
4   Section 88.001 of the Texas Education Code lists the five agencies and services which are components of the TAMU System, including the TCE (formerly known as "TAES"). TEX. EDUC.CODE § 88.001. Section 85.21 provides that "the board [of regents] shall make bylaws, rules, and regulations it deems necessary and proper for the government of the university system and its institutions, agencies, and services." *Id.* § 85.21(a).
5   TCE also concluded that Mickey's conduct with respect to the grant funds constituted mismanagement and a failure to exercise proper oversight and supervision of his staff. Mickey offers no evidence that these reasons are false or a pretext for intentional discrimination.
6   Plaintiffs' attorney, Katrina Patrick ("Patrick"), submits an affidavit in which she avers that she has become aware that other TCE employees performed outside services for groups working with TCE, and were compensated for such work. Document No. 26 ex. 9 ¶ 2. She avers that "[m]any said it was a common practice ... and were surprised that Ms. Brown was being terminated...." *Id.* TCE has correctly objected to this statement as inadmissible hearsay, and it is not considered. *See* FED.R.EVID. 801(c); *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995).

   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 1168797
Only the Westlaw citation is currently available.
United States District Court, W.D.
Texas, San Antonio Division.

George ROSALES et al, Plaintiffs
v.
CITY OF SAN ANTONIO, Texas, Defendant.

No. SA-00-CA-0144, 143
LC 34310.   |   July 13, 2001.

**Attorneys and Law Firms**

Stephen Goldsmith (Law Office of Stephen Goldsmith), San Antonio, for Plaintiffs.

Donald Storm Bayne (City Attorney's Office), Ray R. Ortiz (Jones Kurth & Treat PC) and Barbara Lee Quirk (Jones Kurth & Andrews PC), San Antonio, for Defendant.

**Opinion**

**[Statement of Case]**

NOWAK, Magistrate J.

**\*1** This is an employment discrimination case brought by plaintiffs George Rosales and Ralph Fuentes against the defendant, the City of San Antonio ("the City"). According to their 42-page Third Amended Complaint, plaintiffs allege that while employed at the Streets and Drainage Operations Division of the Public Works Department, they were subjected to sexual harassment, in the form of a hostile work environment, by their crew leader, Jose De La Cruz.

The sexual harassment for which plaintiffs complained apparently began in February of 1999 when De La Cruz would not only expose his genitals to them but would also attempt to grope and fondle them on at least six different occasions. According to the plaintiffs, De La Cruz' actions were offensive and unwelcome. In fact, plaintiffs allege that after telling De La Cruz to stop and rebuffing his advances, the harassment worsened. On May 14, 1999, the plaintiffs complained to management, and shortly thereafter, filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 17, 1999. The City deemed inconclusive its investigation into plaintiffs' allegations because it found no corroboration to plaintiffs'

story of sexual harassment. Likewise, the EEOC issued its dismissal letter and notice of right to sue on November 5, 1999, finding that based upon its investigation, it was unable to conclude that discrimination had taken place. Plaintiffs timely filed this action on February 3, 2000. [1]

In sum, plaintiffs allege that the City failed to adequately investigate their complaints of discrimination and that the sexual harassment policy, which had been in effect since 1982, was defective and dysfunctional in various respects. On that basis, plaintiffs argue that the City should be held vicariously liable for the illegal actions of De La Cruz, who plaintiffs argue, was their immediate supervisor at the time the discrimination took place. In addition to their sexual harassment hostile work environment claim, plaintiffs have asserted numerous causes of action, some of which have only been listed by plaintiffs with no discussion and/or application to the facts of the case. The causes of action pleaded by plaintiffs with some level of specificity are: retaliatory discrimination under Title VII (Count II of the complaint), intentional infliction of emotional distress (Count III of the complaint), negligent retention (Count IV of the complaint), negligent supervision (Count V of the complaint), denial of due process (Count VI of the complaint), breach of the implied covenant of good faith and fair dealing (Count VII of the complaint), constructive fraud (Count VIII of the complaint), Family and Medical Leave Act ("FMLA") violations, 29 U.S.C. § 2601 (Count IX of the complaint), and wrongful termination (Count X of the complaint).

The City filed a second amended answer and moved for dismissal under various provisions of FED. R. CIV. P. 12. [2] Its requests for dismissal are primarily targeted to those causes of action listed by plaintiffs in the Jurisdiction and Venue portion of their amended complaint. [3] Plaintiffs responded that each of their causes of action as stated in their latest amended complaint are properly pleaded and are not subject to dismissal. [4] The City has also moved for summary judgment as to all of plaintiffs' specifically pleaded causes of action. [5]

**\*2** In seeking summary judgment on plaintiffs' hostile environment sexual harassment claim, the City does not dispute plaintiffs' prima facie case, but rather contends there is no genuine issue of material fact as to each of the elements of its affirmative defenses that: (1) any purported acts of sexual harassment discrimination occurring in 1995 are barred by limitations; (2) the City, as a matter of law, cannot be held

26

vicariously liable because De La Cruz was not a supervisor for purposes of Title VII, and the City exercised reasonable care in preventing and promptly correcting plaintiffs' complaints of sexual harassment; and (3) even assuming De La Cruz was a supervisor for purposes of Title VII, plaintiffs' hostile work environment claim fails because they exercised reasonable care to prevent or promptly correct any harassing behavior, and the plaintiffs failed to use reasonable care to avoid harm. [6]

Concerning plaintiffs' retaliation claim, the City contends it is entitled to summary judgment because plaintiffs have failed to establish their prima facie case that they suffered an adverse employment action as a result of having engaged in protected activity. [7] Similarly, the City has moved for summary judgment with respect to plaintiffs' other pleaded causes of action on the grounds that they cannot establish their prima facie case under the applicable legal standards. [8] In addition, the City argues it is entitled to summary judgment on plaintiffs' request for punitive damages and further states that plaintiffs' Title VII damages are statutorily limited to a cap of $ 300,000. [9] Plaintiffs, as expected, have filed their response opposing each one of the City's summary judgment grounds. [10] I have jurisdiction to enter this Order as the parties consented to have the case assigned to me for all purposes, including entry of final judgment, in accordance with 28 U.S.C. § 636 (c).

Because plaintiffs' Title VII actions are the crux of their lawsuit, I will first proceed to address the City's motion for summary judgment, beginning with plaintiffs' sexual harassment and retaliation, and will then address the City's arguments for summary judgment and/or dismissal of plaintiffs' other causes of action.

## II. Jurisdiction

This court has original jurisdiction pursuant to 42 U.S.C. § 2000e-5 (f) and 28 U.S.C. § 1331, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## III. Applicable Standards

The City has moved for summary judgment and for dismissal. The standards that I will apply in considering the City's motions are discussed below.

### A. Summary Judgment

The applicable standard in deciding a motion for summary judgment is set forth in FED. R. CIV. P. 56, which provides in pertinent part as follows:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [11]

 **\*3** Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact. [12] In an employment discrimination case such as this one, the court focuses on whether a genuine issue of material fact exists as to whether the defendant intentionally discriminated against the plaintiff. [13] A fact is material if it might affect the outcome of the lawsuit under the governing law. [14] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. [15] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted. [16]

The movant on a summary judgment motion bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact. [17] To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense, or if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. [18] Regardless of whether the movant accompanies its summary judgment motion with affidavits or other evidentiary materials, the motion must be granted if the evidence before the court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied. [19] Once the movant has carried that burden, the burden then shifts to the party opposing the motion to present

27

affirmative evidence in order to defeat a properly supported motion for summary judgment. [20]

The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings. [21] Rather, the nonmovant must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing the existence of a genuine issue for trial. [22] The court will look at the record in the light most favorable to the nonmovant drawing all inferences most favorable to that party. [23] Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." [24] Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. [25]

Accordingly, summary judgment motions permit the court to resolve lawsuits without the necessity of trials if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law. [26]

### B. Dismissal

 **\*4** FED.R.CIV.P.12(b)(1) authorizes the dismissal of a case for lack of subject-matter jurisdiction when the district court lacks the statutory and constitutional power to adjudicate the case. [27] In deciding a motion to dismiss, the court will construe the facts alleged in the complaint in the light most favorable to the plaintiff. [28] A district court may dismiss a case for lack of subject-matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. [29]

Rule 12(c), in turn, enables a party to move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay the trial." [30] The movant, must establish, that on the basis of the pleadings, there is no issue of material fact to be resolved and that the movant is entitled to judgment as a matter of law. [31] Motions brought under Rule 12(c) should be read in conjunction with the standards outlined for motions brought under Rule 12(b), such as 12(b) (1) & 12(b)(6).

Pursuant to Rule 12(b)(6), a plaintiff's claim should be dismissed for failure to state a claim upon which relief may be granted when, viewing the allegations in the plaintiff's complaint in the light most favorable to him and drawing all reasonable inferences in his favor, it appears certain that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. [32] Rule 12(b)(6) allows a court to eliminate actions that are fatally flawed in their legal premises and destined to fail, thus sparing the litigants the burdens of unnecessary pretrial and trial activity. [33] Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss pursuant to Rule 12(b)(6). [34] In ruling on a motion to dismiss, a court should consider only those facts stated on the face of the complaint or incorporated into the complaint by reference, and matters of which judicial notice may be taken. [35] If a complaint omits facts concerning pivotal elements of a plaintiff's claim, a court is justified in assuming the non-existence of those facts. [36]

### IV. Analysis

The City's motion for summary judgment presents the following issues:

. Whether the alleged harasser, De La Cruz, is a "supervisor" for purposes of Title VII analysis?

. Whether the plaintiffs are precluded from relying on the 1995 "indecent exposure" incident involving De La Cruz as part of their prima facie proof for hostile environment sexual harassment?

. Whether plaintiffs can establish their prima facie case for retaliation/constructive discharge under Title VII?

. Whether plaintiffs can establish their prima facie case for intentional infliction of emotional distress under Texas law?

. Whether plaintiffs can establish their prima facie case for negligent retention and/or negligent supervision?

 **\*5** . Whether the City is entitled to summary judgment with respect to plaintiffs' claims alleging denial of due process, breach of the implied covenant of good faith and fair dealing, and constructive fraud?

. Whether plaintiffs have pleaded a viable cause of action for subjecting the City to strict liability under the FMLA?

. Whether the City is entitled to judgment as a matter of law with respect to plaintiffs' claim for punitive damages?

. Whether plaintiffs' request for damages under Title VII is limited to $ 300,000?

## A. Hostile Environment Sexual Harassment

Plaintiffs' specific instances of hostile environment sexual harassment are stated in paragraphs 9-14 of their third amended complaint. [37] Title VII provides a cause of action for individuals subjected to a sexually hostile or abusive work environment. [38] Ordinarily, a plaintiff must establish five elements to set forth an actionable hostile environment claim: (1) that he belongs to a protected class; (2) that he was the subject of unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the "harassment affected a "term, condition, or privilege" of employment; and (5) that the employer, knew or should have known of the harassment and failed to take prompt remedial action. [39] For harassment to affect a "term, condition or privilege" of employment, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [40] In determining whether a working environment is hostile or abusive, all circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [41]

The City has moved for summary judgment only on the grounds that there is no basis for holding it liable in this case. [42] Thus, for purposes of summary judgment only, I will assume that plaintiffs have met the first four elements of their prima facie case. The sole issue which I must address on summary judgment is whether the City can be held liable for the hostile environment sexual harassment as alleged by the plaintiffs.

### i. Basis for employer liability

An employer's liability for hostile environment sexual harassment depends upon whether the alleged harasser is the victim's supervisor or merely a co-employee. [43] Harassment "by co-workers differs from harassment by supervisors...." [44] Where the harasser is a supervisor and the victim suffered no tangible employment action, an employer is strictly liable, although there is the possibility of an affirmative defense. [45] "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." [46] Because employers do not entrust mere co-employees with any significant authority with which they might harass a victim, employers are liable for a co-employee's harassment only "when they have been negligent either in discovering or remedying the harassment." [47] An employer's legal duty in co-employee harassment cases will be discharged if it takes "reasonable steps to discover and rectify acts of sexual harassment of its employees." [48]

**\*6** In the present case, plaintiffs allege that De La Cruz was their supervisor and that the City is vicariously liable for his actions. [49] The record demonstrates that De La Cruz was transferred to the position of "crew leader" and/or "foreman" of the barrier/flex-beam section sometime in February of 1999. Rosales was already employed as an equipment operator in that section and Fuentes was employed as a section assistant. [50] Plaintiffs allege that almost immediately after his arrival, De La Cruz exerted his "supervisory authority" to sexually harass them by, for example, brushing his genitals against plaintiffs while they were either sitting down, bent over working, or kneeling. [51] According to plaintiffs, De La Cruz would also intentionally rub his genitals over plaintiffs' shoulders, back and arms while they were not looking or were otherwise occupied in their work. [52] Specifically, plaintiffs claim that as their crew leader, De La Cruz had control of their daily work activities and had the authority to discipline them for not doing as instructed. [53] According to Rosales, De La Cruz' supervisory authority became evident when Rosales was suspended for two days for not following one of De La Cruz' orders. [54] In addition, plaintiffs maintain that other supervisory/managerial employees of their division such as Tony Trevino, Norbert Schneider and Armando Aranda regarded De La Cruz as having supervisory authority over the plaintiffs. [55]

The City, on the other hand, contends that De La Cruz was not plaintiffs' supervisor for purposes of sexual harassment analysis as a matter of law. [56] According to the City, De La

29

Cruz was an hourly employee and was "on the same level" as plaintiffs. Further, the City maintains that although De La Cruz held the title of "crew leader" or "foreman," plaintiffs' actual and immediate supervisors during the course of their employment in the barrier/flex-beam section were carpentry supervisors Tony Trevino and Eddie Gray. [57] Contrary to plaintiffs' assertions, the City maintains that these individuals, and not De La Cruz, had the controlling authority to hire, fire, reward, promote, or discipline the plaintiffs. [58] The City, thus, argues, that as De La Cruz' job title implies, his job was to "lead" other workers at the site, but not to supervise. In light of the parties' divergent views, I must determine the essential attributes of a supervisor for purposes of determining employer liability under Title VII, and assess whether the City endowed De La Cruz with these characteristics.

At the outset, it must be noted that Title VII provides no definition of the term "supervisor." Because of this, my understanding of the term must be guided by the common law of agency and the purposes of Title VII. [59] The United States Supreme Court has made clear that heightened liability exists in this context only because a supervisor's conduct is made possible by the "abuse of his supervisory authority," his apparent authority, or because his supervisory position aided him in accomplishing the harassment. [60] In short, because liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor. [61]

 **7** The various courts that have addressed the issue consistently distinguish employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers. [62] Before the United States Supreme Court established the rule of employer liability in Burlington Industries, Inc., v. Ellerth [63] and Faragher v. City of Boca Raton, [64] the Fifth Circuit, as well as other circuit courts, made an effort to maintain a line between low-level supervisors who were the equivalent of co-workers and supervisors whose authority and power was sufficient to make consequential employment decisions affecting the subordinate, such that the supervisor was effectively acting on the employer's behalf. [65] In light of the courts' distinction between low-level supervisors (who are equivalent to co-employees for purposes of Title VII) and true supervisors, the question, then, is how much or what kind of authority must an individual possess to be a true supervisor.

Cases subsequent to Faragher and Ellerth indicate that whether an individual is "a supervisor with immediate (or successively higher) authority" is dependent upon whether his authority was of a substantial magnitude. [66] Hence, it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes of imputing liability to the employer. [67]

Applying this standard to the present case, it is evident that De La Cruz was not a supervisor for purposes of imposing strict liability on the City under Title VII. According to the undisputed summary judgment evidence presented by the City, De La Cruz as "crew leader" or "foreman" did not have the authority to hire, fire, reward, promote, or significantly discipline the plaintiffs. There is no evidence disputing the City's position that De La Cruz was an "hourly employee" and was "on the same level" as plaintiffs. [68] In fact, Rosales testified that he had even served as "crew leader" in the past whenever the assigned person (i.e., Manuel De La Torre) was absent. [69] There is no question that the most persuasive piece of evidence establishing De La Cruz's status as a low-level supervisor equivalent to that of a co-worker is Rosales' own deposition testimony. [70] According to his testimony, Rosales recognized that his true supervisors were the individuals who held the position of carpentry supervisors. [71] The evidence in this case reflects that during the relevant time period in question (from February through May of 1999), those individuals were Tony Trevino and Eddie Gray. [72] Significantly, although Rosales referred to crew leaders such as De La Cruz as his immediate supervisors, he understood that his actual supervisors were Trevino and Gray. According to the organization structure as of May 14, 1999, submitted by the plaintiffs as an attachment to the deposition of the Streets and Drainage Operations Manager, Armando Aranda, both plaintiffs as well as De La Cruz, ultimately reported to the carpentry supervisor (who at the time was Eddie Gray). [73] Based on the summary judgment evidence before me, and particularly, Rosales' deposition testimony, I conclude that plaintiffs knew that their actual supervisors, those who had the ability to significantly affect the terms and conditions of their employment, were Trevino and Gray, and not De La Cruz.

30

**\*8**  Further, there is no evidence that De La Cruz accounted for his time or was paid any differently than the plaintiffs. There is also no evidence that De La Cruz ever substituted for carpentry supervisors Trevino or Gray. In addition, there is no evidence that De La Cruz as crew leader and/or foreman had any say as to what work was to be done at a particular site or how many employees would be assigned to his crew. Additionally, any authority that De La Cruz may have had over the plaintiffs at the time of the alleged sexual harassment incidents was tenuous at best because he had just transferred to the barrier/flex-beam crew, and as Rosales testified, he "did not know his job very well." [74]

With respect to the incident of insubordination, the summary judgment evidence demonstrates that Rosales had already loaded his truck pursuant to previous orders he received from Gray. When De La Cruz asked Rosales to load up his truck, apparently not knowing that he had done so already, Rosales, in a disrespectful fashion, told De La Cruz, that he was not his boss and that he had already loaded up the truck. Trevino, who was present when the exchange between Rosales and De La Cruz took place, told Rosales that he needed to obey De La Cruz because he was his section crew leader. In light of Rosales' inappropriate behavior (i.e., using foul language towards another employee), as witnessed by Trevino, he was written up for insubordination and suspended for two days. There is no evidence on record that De La Cruz had anything to do with the disciplinary action imposed on Rosales for this incident.

Further, it should be noted that both plaintiffs claim that De La Cruz bragged on more than one occasion about his authority over them, stating that he was in charge of them and insinuating that they did not need to work as hard as long as they submitted to his sexual advances. Even if De La Cruz' boasts were accurate, they do not elevate him to supervisory status. [75] Because there is no evidence that De La Cruz enjoyed more than minimal authority, and exercised almost no control over equipment operators and their assistants, he clearly was not a supervisor with immediate or successively higher authority. Moreover, no reasonable person could have believed that De La Cruz was endowed with this supervisory authority. Accordingly, the City's liability for the purported harassment must be determined according to the standard for co-employees.

*ii. Notice or knowledge of harassment*

As mentioned earlier in this Order, employers are liable for a co-employees' harassment only when they have been negligent either in discovering or remedying the harassment. [76]  An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees. [77]  Of course, it "would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee." [78]  Thus, notice of knowledge of the harassment is a prerequisite for liability. [79]

**\*9**  In determining whether an employer had notice of harassment, I must first determine whether the employer had designated a channel for complaints of harassment. [80]  Where an employer sets up a "point person" to accept complaints, "this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." [81]  Where a point person was not identified or easily accessible, an employer can receive notice of harassment from a "department head" or someone that "the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment. [82]  With respect to the extent of the notice given to an employer, a plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." [83]

Plaintiffs argue that the City failed to take prompt remedial action because it had an ineffective sexual harassment policy in place at the time they filed their internal complaints. [84]  For instance, plaintiffs contend that the policy failed to properly provide the identity of those individuals in charge of receiving a complaint of sexual harassment, and most importantly, it failed to provide the procedures that the City would follow in investigating such complaints. As summary judgment evidence, plaintiff has attached an expert witness report (Dr. Margaret Langford) discussing the deficiencies of the City's procedures (or lack thereof) that were in place at the time of plaintiffs' complaints, as well as the ineffectiveness of the internal investigation conducted by Armando Aranda, the Streets and Drainage Operations Manager, and Abel Araiza, Executive Assistant of Public Works Department. [85]  Further, plaintiffs rely on the deposition testimony of Mr. Aranda, who admitted having conducted the interview as "he saw fit." [86]  Plaintiffs argue that by having Mr. Aranda conduct the

31

investigation, the City acted in a biased fashion in remedying the reported harassment. Mr. Aranda, plaintiffs maintained, was a supervisory employee working in the same department as plaintiffs who did not have any specialized knowledge as to how to properly conduct these types of investigation. Based on the evidence, plaintiffs argue the City did not a have a viable mechanism in place for adequately investigating their allegations and for taking appropriate corrective action. [87]

In turn, the City maintains that as soon as plaintiffs reported their complaint of sexual harassment, on May 14, 1999, it took prompt and corrective action in addressing the complaints. [88] The City further argues that it had no notice of any harassment taking place against the plaintiffs prior to May 14th since they admittedly failed to report it sooner. Further, the City states that on the same day it received plaintiffs' complaints, it began investigating them. According to the summary of the interviews conducted, De La Cruz was placed on administrative leave with pay pending the outcome of the investigation. [89] The City closed the investigation as inconclusive, as it was unable to corroborate plaintiffs' sexual harassment allegations through the witnesses interviewed. Further, the City states that at the time plaintiffs lodged their internal complaints, it had in place a published sexual harassment policy which contained grievance and investigation procedures. [90] The City further maintains that the policy and procedures were properly disseminated among its workforce and that it provided training to its employees on those policies and procedures. The City argues that it could not have responded more swiftly and adequately in this case as it did, and as such it cannot be held liable. I disagree.

**\*10** After having reviewed the summary judgment record on the issue, I conclude that triable issues remain as to whether a two-page sexual harassment policy, Administrative Directive No. 4.67, which was enacted seventeen years earlier on February 1, 1982, provided a proper mechanism for investigating plaintiffs' 1999 allegations of sexual harassment. [91] Not surprisingly, the policy was substantially revised on October 1, 1999. [92] Plaintiffs, however, were not able to avail themselves of the revised policy and procedures because by that time, the City had already conducted its investigation and issued its findings on plaintiffs' internal complaints of harassment. Accordingly, the original sexual harassment policy, in effect since 1982, is the document that would determine whether the City's responded appropriately in this case. Based on plaintiff's discussion on the deficiencies of the City's policy and investigation procedures, as well

as my own study of the 1982 and 1999 sexual harassment policies, I note the following:

First and foremost, the policy was in effect before same-sex harassment was even recognized as a viable cause of action. [93] Second, the policy is devoid of any clear grievance procedure to be followed by employees in submitting complaints of discrimination. In that regard, it should be noted that in 1999, the City's EEO Division was part of the Office of Internal Review. The Office of Internal Review is not even mentioned in the 1982 policy. Further, the simple fact that Rosales had filed an EEOC charge alleging national origin discrimination prior to his sexual harassment claims does not establish that he was aware of the City's sexual harassment policy and procedures. [94] Third, the policy is completely silent as to what type of investigation the City will undertake once it receives a sexual harassment complaint, and who will be in charge of conducting such investigations. This may have prompted plaintiffs to file an EEOC charge of discrimination immediately after having complained to the City and before the City began its own investigation of the complaints. Finally, the 1982 policy does not indicate how the City disseminated it to its workforce. In contrast, the 1999 revised policy requires City employees to sign an attached acknowledgment form indicating having received the policy. [95]

Further, according to the excerpts of Aranda's deposition testimony, he was unable to explain how he applied the policy to his investigation, or what definition of sexual harassment he used in conducting his investigation. The City cannot reasonably argue that Aranda's investigation of the complaints as "he saw fit" absolves them from liability in this case, even if that liability is to be analyzed under a negligence standard. [96] In that regard, I also note that there is no evidence that Aranda or the other supervisory/managerial employees involved in plaintiffs' investigation received any particularized training on how to conduct effective sexual harassment investigations. In addition, although the City has submitted summary judgment evidence that De La Cruz and plaintiffs received and were trained on the policy when, they were first hired by the City, there is no evidence that the issue was revisited at a later time in light of the changes in the law, or that they received any kind of subsequent training on the subject. [97]

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

**\*11** The lack of an effective (and updated) written sexual harassment policy certainly weighs in the plaintiffs' favor in determining whether there is a genuine issue of material fact with regard to whether the City exercised reasonable care to prevent any sexually harassing behavior. [98] Accordingly, viewing the evidence in the light most favorable to the plaintiffs (as non-movants), I find that plaintiffs have created a genuine issue of material fact with respect to element five of their prima facie case, that is, whether the City knew or should have known of the harassment and failed to take prompt remedial action. Thus, the City's summary judgment motion on this ground is DENIED, and plaintiffs's hostile environment sexual harassment will proceed to trial. [99]

### iii. The 1995 "indecent exposure" incident

Plaintiffs rely on the continuing violation theory and "relation back" doctrine to argue that an incident that occurred in May of 1995, four years before they internally complained to the City and filed their charges of discrimination with the EEOC, should be considered prima facie proof of their claim for hostile work sexual harassment. The City, in turn, argues that this incident is barred by the applicable statute of limitations. I agree with the City but for different reasons.

Plaintiffs described the 1995 incident at issue in their amended complaint:

> During the summer of 1995, while at a worksite at Coliseum Oaks Subdivision, Mr. Rosales along with other workers and a senior supervisor witnessed Mr. De La Cruz pull down his pants and expose his genitals to many of the workers. Mr. Rosales was standing to the left of Mr. De La Cruz and found the incident disturbing, outrageous, and sick. Mr. De La Cruz was facing Mr. James Storey, a high-level supervisor, and they were communicating some sort of invitations to each other. Mr. Rosales walked away in disgust. Other witnesses were present and heard and saw more of this public lewdness [...]. Mr. Rosales did not know Mr. De La Cruz before this time but the incident definitely caused a conditioning [sic] impression on him and others at the site. [100] It is well-established in the Fifth Circuit that in order to support a finding of a continuous violation, a plaintiff must do more than show a series of unrelated and isolated instances of discrimination. The core idea of the theory is that "equitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights

action are or should be apparent to a reasonably prudent person similarly situated ." [101] The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his/her rights. At the same time "the mere perpetuation of the effects of the time barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period," (which in this case is within 300 days from May 17, 1999). [102] The continuing violation theory only preserves claims based on acts outside the prescriptive period if the plaintiff timely files a claim based on a *present* violation. [103]

**\*12** In Berry v. Board of Supervisors, [104] the Fifth Circuit identified three factors that are relevant to determining whether a continuing violation has occurred: (1) subject matter-do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-are the alleged acts recurring or more in the nature of an isolated work assignment or employment decision; and (3) degree of permanence (embodying the "core-idea" discussed above)-does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert her rights. [105] Thus, to establish that a continuing violation occurred, plaintiff must establish: (1) that some "independent actionable conduct" occurred during the statutory period and (2) that she did not know and could not reasonably be expected to have realized that the time-barred events were in themselves actionable until within 300 days of the date she filed her EEOC charge. [106]

In this case, the continuing violation theory does not apply. It is undisputed that the incident in question was not directed at Rosales. By Rosales' own accounts, he did not even know De La Cruz at the time the incident took place. He merely witnessed De La Cruz' exposure and he was not even the intended audience. Plaintiffs have failed to establish how this isolated incident is related to their allegations of sexual harassment which occurred in 1999. Because the 1995 incident was not directed at Rosales, it is not proper proof of plaintiffs' prima facie case. [107]

This time-barred incident, however, may be used by the plaintiffs as circumstantial evidence. [108] For instance, this evidence may be relevant the claim that the City failed to promulgate an effective sexual harassment policy among its workforce which would have prompted Rosales, as well as

33

the other co-workers (including supervisors) who witnessed the incident, to timely report De La Cruz' actions as sexual harassment. Also, it can be argued that this circumstantial evidence may prove that had the City enacted an effective sexual harassment policy identifying those acts that could be considered as sexual harassment, that De La Cruz would have not acted the way he did. Other than that, the evidence is of little relevance to the case. For these reasons, the City's motion for summary judgment is GRANTED to the extent plaintiffs seek to use the 1995 incident as part of their prima facie proof.

### iv. Quid Pro Quo Sexual Harassment

It should be noted that although the City has moved for summary judgment under the theory of quid pro quo sexual harassment, a reading of plaintiffs' amended complaint evidences that they have solely alleged sexual harassment under a hostile work environment theory. [109] It appears that plaintiffs have attempted to plead tangible employment actions in support of their retaliation claim. Nevertheless, to the extent that plaintiffs allege quid pro quo sexual harassment, that claim is not supported by the record because there is no evidence that De La Cruz, a low-level supervisor at the most, with authority equivalent to that of a co-employee, took any tangible employment action against the plaintiffs. [110] Accordingly, the City's summary judgment motion with respect to plaintiffs' purported claim for quid pro quo sexual harassment is GRANTED.

### B. Title VII Retaliation

 **\*13**  The City seeks summary judgment on plaintiffs' retaliation claims on the basis that plaintiffs failed to exhaust their administrative remedies because they failed to allege retaliation in their EEOC charges. Alternatively, the City argues that even if the claim is properly before this court, plaintiffs fail to establish that they suffered an adverse employment action as a result of engaging in protected activity.

The City's exhaustion argument is not supported by the record. For instance, plaintiff Fuentes specifically checked the box for retaliation as one bases for his complaint in his EEOC charge. [111] Also, Rosales' EEOC documentation subsequent to his charge indicates that he also complained of retaliatory discrimination. [112] Accordingly, I will focus on the City's summary judgment argument regarding plaintiffs' ability to meet their prima facie case of retaliation.

To demonstrate a claim for retaliation, the plaintiffs must prove: (1) that they engaged in an activity that was protected; (2) an adverse employment action occurred; and (3) a causal connection existed between the participation in the activity and the adverse employment action. [113] Here, I am concerned solely with ultimate employment decisions. It is well-settled that the analytical framework applicable to Title VII disparate treatment cases, as set forth in McDonnell Douglas Corp. v. Green, [114] is also applicable to Title VII unlawful retaliation cases. [115] After plaintiffs prove all of their prima facie case elements, the burden shifts to the City to articulate a non-discriminatory reason for the employment decision. Once the City proffers a non-discriminatory reason, the burden returns to plaintiffs to show that the City's explanation is a mere pretext for unlawful retaliation. [116]

The plaintiffs correctly assert that they engaged in a protected activity when they filed their internal complaints of discrimination with the City, as well as their EEOC charges of discrimination. [117] Thus, the first prong is satisfied. Regarding the second-prong, Rosales' alleged adverse employment actions include: (1) the City's failure to provide him with an Employee Performance Rating for the period ending in September/October of 1999; (2) his involuntary reassignment to another center in November of 1999; (3) the City's retroactive application of his FMLA leave which resulted in his termination from employment on July 28, 2000; (4) his involuntary transfer as of May 19, 2000; (5) the City's failure to reverse his insubordination charge; (6) the City's failure to rectify a series of wrongs in his favor (i.e., to clear him from a work related auto accident based on new evidence); and (7) the City's suspension or limited internal grievance procedure for the filing of his sexual harassment complaint, which included the City's decision at the conclusion of its investigation to return him back to work along with De La Cruz.

Fuentes, on the other hand, claims that he was retaliated against when on August 19, 1999, he was reprimanded for having his wife, and not him personally, call the City to inform he was going to be absent on that day. Fuentes further claims that due to the City's retaliatory acts against him and its lack of response in properly addressing his sexual harassment complaint, he was forced to involuntarily resign from employment on March 1, 2000.

**\*14** Contrary to plaintiffs' legal arguments, the Fifth Circuit defines the term "adverse employment action" as including ultimate employment decisions "such as hiring, granting leave, discharging, promoting, and compensating." [118] In Dollis v. Rubin, for instance, the employee alleged, among other things, that she was refused consideration for promotion, refused attendance at a training conference, and her work was criticized to a government vendor. [119] The Fifth Circuit held that these were at most "tangential" to future decisions that might be ultimate employment decisions. Likewise, in Mattern v. Eastman Kodak Company, [120] the Fifth Circuit found the following events did not constitute adverse employment actions because of their lack of consequence: verbal threat of being fired, reprimand for not being at assigned station, missed pay increase, and being placed on "final warning."

Under this framework, I find that most of plaintiff Rosales alleged retaliatory actions, with the exception of the supposed November 1999 unwanted reassignment, the May 2000 unwanted transfer and the retroactive application of FMLA leave, which ended his leave period sooner than he anticipated, do not constitute ultimate employment decisions within the realm of Title VII as a matter of law. The factual background leading to the three remaining employment actions must be examined in greater detail to determine whether they constitute ultimate employment actions under Title VII.

With respect to Rosales unwanted reassignment in November of 1999, according to the record before me, it is not clear whether his reassignment was ever effectuated since he went on leave that same month. Further, besides Rosales having a longer commute at the new reassigned location, Rosales presents no evidence that this action resulted in a demotion in pay and/or job duties. Without more, this action cannot constitute an adverse employment action.

Regarding his FMLA leave, it appears that Rosales began receiving medical treatment on November 13, 1999, for severe depression and panic disorder. [121] Rosales has attributed his mental health problems to the sexual harassment he endured by De La Cruz. He was first absent without leave due to medical reasons on November 29, 1999. [122] As of December 1, 1999, Rosales exhausted all of his paid leave balances and the City placed him on leave without pay. [123] He applied for workers' compensation benefits but was denied due to the City's position that no sexual harassment

had occurred against him. He then applied for medical disability benefits but was also denied. Due to Rosales' continued absence from work, David Magana, one of Rosales' supervisors, wrote him a letter on April 5, 2000 informing him of the FMLA leave benefits available to him. On April 17, 2000, Rosales and his Union representative met with Magana and EEO specialist Zulema Gonzalez to discuss his FMLA leave related benefits. [124] Rosales' medical provider signed the Physician's Certification Form required by the City to apply for FMLA leave on April 20, 2000, and on that day, both, Rosales and his supervisor signed a "Notice to Employees Regarding FMLA Leave." [125] By a memorandum dated May 8, 2000, the City notified Rosales that his absence since April 5, 2000, was designated as due to a serious medical health condition and was being counted against this twelve work week entitlement under the Act. [126] Importantly, the City also notified Rosales that his FMLA would expire on June 29, 2000, and that his failure to return to work after that date would be treated as an unauthorized absence, which could warrant termination from employment. Rosales remained absent well past the expiration of his FMLA leave. Based on Rosales' unauthorized absence, the City issued him a notice of final termination on July 28, 2000. [127] Even though, Rosales at tributes his inability to return to work to the alleged sexual harassment he suffered, there is no evidence that the City retaliated against him by denying him FMLA leave benefits he was entitled to receive.

**\*15** Finally, the summary judgment record demonstrates that his May 20, 2000 involuntary transfer was due to allegations of sexual harassment lodged against him by another employee. [128] Rosales maintained that he did not harass anyone and that the charges against him are unfounded. This transfer, if it occurred as Rosales alleges, took place a year after he complained of discrimination and while he was still on FMLA leave.

Even assuming that Rosales satisfies element two of his prima facie case, as I must do in a summary judgment proceeding, he has failed to present any evidence establishing a causal connection between his protected activity and any of these adverse employment actions. Nevertheless, even if I were to find that Rosales has met all elements of his prima facie case of retaliation, the City has articulated a non-discriminatory reason for its decision to terminate Rosales' employment. Rosales did not return to work after his FMLA leave expired. He had been absent from work for a total period of eight months (since November of 1999). Rosales has not stated

35

how the City's reason to terminate his employment after the expiration of his FMLA leave is a pretext for unlawful retaliation. In other words, Rosales has not shown that his termination was motivated by his complaints rather than by his continuous unauthorized absence from work after his FMLA leave expired. As such, the City's motion for summary judgment as to Rosales' retaliation claim is GRANTED.

Likewise, Fuentes' retaliation claim also fails. Because reprimands do not rise to the level of an adverse employment action under Title VII as a matter of law, the only issue I have to determine is whether Fuentes can establish his constructive discharge claim. According to the amended complaint and response to summary judgment, Fuentes attempts to argue that he has met his burden of establishing that the City took an adverse employment action against him by asserting he was constructively discharged from employment in March of 2000. [129] To prove that he was constructively discharged, Fuentes must show that a "reasonable person in [his] shoes would have felt compelled to resign." [130] Significantly, a constructive discharge claim further requires a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." [131] Accordingly, just because I have concluded that plaintiffs' hostile environment sexual harassment claim can proceed to trial, it does not follow that Fuentes' constructive discharge should also be tried as well.

Besides his subjective beliefs and conclusory arguments, Fuentes presents no other evidence in support of his claim that he was constructively discharged. Evidence of a plaintiff's subjective beliefs, with no supporting summary judgment evidence, however, is typically considered to carry little weight in the discrimination inquiry under the applicable legal standards. [132] In order to establish the third prong of his prima facie case, that is, that a causal link existed between the protected activity and the illegal employment action, the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity. [133] Fuentes has failed to present competent summary judgment evidence establishing a causal connection between any protected activity and any adverse employment action. Further, it should be noted that the record is devoid of any evidence that De La Cruz continued to sexually harass Fuentes after he reported his actions to the City and the EEOC or that Fuentes complained of any other discriminatory action from August of 1999 through his resignation in March of 2000.

**\*16** After having reviewed the competent summary judgment evidence on record, assuming *arguendo,* that Fuentes has met his first two prima facie elements of retaliation, I conclude that he has not brought forth sufficient evidence to support a finding that "but for" his protected activity, he would have not have resigned from employment. [134] Because Fuentes has failed to establish his prima facie case of retaliation and/or constructive discharge, the burden-shifting analysis under McDonnell Douglas is not invoked. Based on these reasons, the City's motion for summary judgment as to Fuentes' retaliation/constructive discharge claim is GRANTED.

### C. Intentional Infliction of Emotional Distress

Plaintiffs' intentional infliction of emotional distress claim is premised on De La Cruz' harassing actions against them also made the basis of their hostile environment sexual harassment claim under Title VII. The City has moved for summary judgment on this claim arguing that plaintiffs cannot establish that it is liable (under the doctrine of respondeat superior) for the alleged unlawful actions of De La Cruz. Significantly, the City has acknowledged that the determination of whether an employee has acted within the scope and course of his employment is a question of fact, and that it only becomes a question of law when the facts are undisputed and no conflicting inferences are possible. [135] Since the relevant facts are heavily disputed in this case, and based on my ruling concerning plaintiffs' sexual harassment claim, I must DENY the City's motion for summary judgment on this cause of action and allow the plaintiffs to present their claim to a jury. [136]

To prevail on a claim of intentional infliction of emotional distress, Texas law requires a finding of four elements: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. [137] Conduct is considered to be "outrageous" if it surpasses "all bounds of decency" such that it is "utterly intolerable in a civilized community." [138] Liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions. [139] There is no litmus test as to what constitutes outrageous conduct. Therefore, whether the conduct was outrageous and extreme must be analyzed on a case by case basis. [140]

36

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

Under Texas law, an employer may be vicariously liable for the intentional tort of its employee under the doctrine of respondeat superior or directly liable under the theory of ratification. In reading plaintiffs' amended complaint, it appears that they are pleading both theories of liability. [141] Regarding liability through ratification, the employer may be found to have ratified its employee's conduct through its own acts, conduct, or affirmative acquiescence. [142] The employer's mere retention of the employee in service will not establish ratification. [143] Nor will its mere denial of liability. [144] The employer's failure to repudiate its employee's tortuous act may sometimes establish ratification. [145] In cases of employer silence as ratification, the employer must possess all material facts. [146] Therefore, in the case of intentional infliction of emotional distress, the employer must know enough to realize that the employee's conduct was extreme and outrageous. [147] The plaintiff bears the burden of proving ratification. [148]

 **\*17**  After having reviewed the summary judgment record and the arguments raised by both parties in this case, I find that plaintiffs have alleged genuine issues of material fact precluding summary judgment to the City on this claim. Accordingly, the City's summary judgment motion with respect to this claim is DENIED.

### D. Negligent Retention/Negligent Supervision

Plaintiffs allege that the City acted negligently in retaining and supervising De La Cruz on the grounds that: (1) the City should not have hired him in the first place due to his criminal record: and (2) despite De La Cruz' propensity to sexually harass other employees, the City failed to monitor his actions and take remedial action in rectifying his behavior. [149] The City has moved for summary judgment with respect to these claims on the basis that plaintiffs have failed to establish their prima facie case under both of these legal theories. [150] I hereby GRANT the City's motion for summary judgment but for different reasons than those articulated by the City.

According to case authority from the Fifth Circuit, these negligent causes of action are preempted by the Texas Workers' Compensation Act. [151] The Act provides the exclusive remedy for injures sustained by an employee in the course of his employment as a result of his employer's negligence. [152] Because there is no question that plaintiffs

base their claims on the City's alleged negligence with respect to retaining and supervising De La Cruz at the workplace, recovery is foreclosed by the Texas Workers' Compensation Act. The City's motion for summary judgment is thus GRANTED with respect to Counts IV and V of plaintiffs' amended complaint.

### E. Denial of Due Process Rights, Breach of the Implied Covenant of Good Faith and Fair Dealing and Constructive Fraud

A reading of the amended complaint and plaintiffs' summary judgment response indicates that, in addition to their sexual harassment allegations, they (and in particular Rosales) have had numerous work-related grievances against the City throughout the course of their employment. By pleading due process violations and breach of the implied covenant of good faith and fair dealing, it appears that plaintiffs are trying to litigate all their employment related disputes with the City in this action. For instance, the record reveals that Rosales complained about the City's actions concerning: his employee performance appraisals; the City's failure to rectify his personnel record as it related to a car accident occurring at work; the City's failure to produce material facts during his disciplinary hearings, which according to Rosales, amount to obstruction of justice; and the City's failure to bargain with his Union, among others. In very general terms, plaintiffs argue that the City did not follow its own "manuals, laws and other protocols" in its dealings with them. Plaintiffs further maintain that, under Texas law, employee manuals are considered contracts, and as such, they also argue that the City breached its contracts of employment with them. Because plaintiffs' claims have no merit in law or fact, they must be dismissed.

 **\*18**  To show a due process violation in the public employment context, the plaintiffs must first show that they had a legally recognized property interest at stake. [153] Such a showing, as the Fifth Circuit noted in Schaper v. City of Huntsville, [154] must be made by reference to state law. "The Constitution does not create property interests; 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." ' [155]

In reviewing Texas law in the context of plaintiffs' claims, it is clear that their cause of action for breach of the covenant of good faith and fair dealing is not a viable one. Texas law does not recognize this cause of action in the employment

relationship. [156] Accordingly, the City's motion for summary judgment is GRANTED with respect to this claim.

Next, I address plaintiffs' breach of contract allegations based on their position that the City's employee manual, which prescribes procedures for disciplinary action and employment termination, constitutes a legally binding written employment contract. Under Texas law, personnel manuals and employee handbooks do not create contractual rights, unless the parties expressly agree that the procedures contained in these manuals are binding. [157]

The Fifth Circuit in Aiello v. United Air Lines, Inc., [158] recognized an exception to the general rule in Texas that personnel manuals and employee handbooks do not create contractual rights. The Court noted that only under circumstances of "great significance," could such materials constitute express written contracts. [159] The Aiello court identified three factors that would establish circumstances of "great significance:" (1) the employee manual contained detailed procedures for discipline and discharge; (2) the employer followed these procedures and notified the employee that he was entitled to them; and (3) the supervisor or managerial employee who discharged the employee treated the provisions of the employee manual as a contractual obligation. [160]

In this case, plaintiffs have failed to demonstrate circumstances of "great significance" sufficient to establish an Aiello exception. Even assuming that plaintiffs have adequately demonstrated that the City's employee manual contained detailed discharge procedures, they failed to show that the City treated these procedures as anything more than advisory guidelines, or that John L. German, the person who discharged Rosales, treated the employee manual as a contractual obligation. Nothing in the record suggests that the City employee manual constituted a written contract. Accordingly, because plaintiffs have failed to carry their burden, summary judgment to the City is GRANTED on their breach of contract claim.

Based on the summary judgment record, it is evident that Rosales was given the opportunity to challenge the disciplinary actions taken against him during the course of his employment with the City. Documents of record show that he exercised his administrative appeal rights on many occasions, that the City allowed his Union to represent him during these proceedings, and that he was given an opportunity to explain

his side of the story. Concerning his termination, Rosales received a proposed notice of termination and was given an opportunity to respond to it before it became final. Rosales did and his response was considered prior to the City issuing its final notice terminating his employment. There is simply no evidence establishing that the City violated plaintiffs' due process rights. Just because plaintiffs disagreed with the outcome of its employment grievances, does not necessarily mean that the City did not afford them due process rights.

**\*19** Finally, plaintiffs' claim for constructive fraud or fraud in the inducement falls as well. Rosales, in essence, argues that the City committed fraud when it induced him into applying for FMLA leave by promising he would be paid while on leave. To withstand summary judgment, the plaintiff in a fraud action must adduce some evidence that the purported misrepresentation was deliberately or recklessly false at the time it was made. [161] "A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. [162]

Assuming that the employee who allegedly made the promise to Rosales is an agent of the City, Rosales has failed to introduce any summary judgment evidence that the City possessed the requisite fraudulent intent at the time of the alleged misrepresentation. Further, based on the City's subsequent actions, no fraudulent intent can be inferred. Rosales has provided a transcribed copy of the meeting he had with his supervisor David Magana and EEO specialist Zulema Gonzales on April 17, 2000 regarding his FMLA benefits. [163] Rosales, who had a Union representative present at the meeting, was able to ask all the questions he had about FMLA leave benefits. In fact, when he specifically asked whether he would receive any compensation or back wages while on FMLA leave, the City informed him that besides retaining his health insurance benefits, the Act did not provide him with any other monetary benefit. These two individuals also were not able to corroborate that a City employee made a promise to Rosales that he would be paid while on leave. Rosales was informed of this prior to submitting the required medical certification to begin FMLA leave. Accordingly, Rosales cannot argue that he relied on any alleged fraudulent statement when he made the decision to apply for FMLA leave.

According to the evidence, Rosales was denied workers' compensation and medical disability benefits for his alleged mental condition. Once he was denied benefits under those

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

two programs, the only alternative was to apply for FMLA leave. The City informed Rosales of this as it would have informed any other of its employees. In light of these facts and of Rosales' failure to introduce any specific evidence of the City's fraudulent intent, I conclude that he has failed to raise a fact issue sufficient to avoid summary judgment. [164] The City's summary judgment motion is therefore GRANTED on this claim.

### F. FMLA

As already discussed in this Order, there is no evidence that Rosales was retaliated against for having exercised its FMLA rights. [165] There is also no evidence that the City somehow interfered with Rosales' FMLA leave benefits, in violation of *29 U .S.C. § 2615* (a)(1). [166] To the contrary, the evidence establishes that the City honored Rosales' FMLA leave. Rosales failed to report back to work after having exhausted his FMLA leave. As a result, the City terminated his employment on July 28, 2000, thirty days after his FMLA leave expired. Finding that no material genuine issues of fact remain with respect to Rosales' inability to state an FMLA claim, I hereby GRANT the City's summary judgment motion on this claim.

### G. Punitive Damages

**\*20** The City has moved for summary judgment by arguing that plaintiffs are not entitled to an award of punitive damages because they cannot show the City acted with malice or with reckless indifference in its handling of their sexual harassment complaints. [167] Based on my findings concerning plaintiffs' sexual harassment and intentional infliction of emotional distress claims and the present posture of the case, the City's motion for summary judgment on the issue of punitive damages is DENIED.

### H. Statutory Cap on Title VII Damages

Plaintiffs who allege employment discrimination on the basis of sex traditionally have been entitled to such remedies as injunctions, reinstatement, back pay, lost benefits, and attorneys' fees under § 706(g) of the Civil Rights Act of 1964. [168] In the Civil Rights Act of 1991, Congress expanded the remedies available to these plaintiffs by permitting, for the first time, the recovery of compensatory and punitive damages. [169] The 1991 Act provides that "the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, *in addition to any*

*relief authorized by section 706(g) of the Civil Rights Act of 1964.* "[170] The amount of compensatory damages awarded under § 1981a for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," and the amount of punitive damages awarded under § 1981a, however, may not exceed the statutory cap set forth in § 1981a(b)(3). The statutory cap is based on the number of people employed by the defendant. In this case, as the City has pointed out, the cap is $ 300,000 (per plaintiff), because the City has more than 500 employees.

I also take notice of the recent decision by the United States Supreme Court, Pollard v. E.I. du Pont de Nemours & Co. [171] In that case, the Court held that front pay (usually awarded in lieu of reinstatement) is not an element of compensatory damages within the meaning of the Civil Rights Act of 1991, and therefore, is not subject to the Act's statutory cap. [172] The City has moved for summary judgment by stating that "compensatory and punitive damages under the 1991 amendment to Title VII are limited to a cap of $ 300,000 for front pay, emotional distress, and punitive damages combined." This is not a correct statement of the law as discussed above.

Accordingly, the City's motion for summary judgment on plaintiff's Title VII damages is DENIED IN PART for its failure to accurately state the law as discussed in this Order, but GRANTED IN PART, because as both parties agree, plaintiffs' Title VII compensatory and punitive damages are subject to a statutory cap pursuant to *42 U.S.C. § 1981a* (b)(3).

### I. Plaintiffs' Other Causes of Action

In the Jurisdiction and Venue portion of their third amended complaint, plaintiffs list in a summary fashion, numerous causes of action under state and local laws, as well as City ordinances. [173] With respect to these causes of action, plaintiffs' complaint does not satisfy even the liberal pleading requirements of FED. R. CIV.P. 8(a). As discussed in this Order, plaintiffs will be able to proceed to *a* jury trial on their theories of sexual harassment under Title VII and intentional infliction of emotional distress under Texas law, which, in my view, are the only causes of action supported by the relevant facts of the case. It is my opinion that giving plaintiffs a fourth chance to amend their complaint would be futile, and at this stage in the case, prejudicial to the City. Accordingly, because plaintiffs have failed to state a claim upon which relief can be granted under the causes of action listed in the Jurisdiction

39

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

and Venue of their amended complaint, I hereby GRANT the City's request for dismissal pursuant to FED.R.CIV.P. 12(b)(6).

**VI. Conclusion**

**\*21** It is therefore ORDERED that the City's motion for summary judgment (Docket Entry No. 122) is GRANTED IN PART, AND DENIED IN PART, so that the only causes of action that will proceed to trial are plaintiffs' hostile environment sexual harassment and intentional infliction of emotional distress. Plaintiffs' causes of action for quid pro quo sexual harassment and retaliatory discrimination under Title VII, negligent retention, negligent supervision, denial of due process violations, breach of the implied covenant of good faith and fair dealing, constructive fraud, and for retaliation under the FMLA, are DISMISSED WITH PREJUDICE, as plaintiffs have failed to allege facts sufficient to entitle them to relief such that there is no genuine issue of material fact under the applicable legal standards.

Likewise, the City's requests for dismissal (Docket Entry Nos. 122 & 127) of those causes of action summarily listed in the Jurisdiction and Venue portion of plaintiffs' third amended complaint, are hereby GRANTED in their entirety. Moreover, the City's objections to plaintiffs' factual summary judgment evidence made part of its reply brief are hereby DENIED for the reasons articulated by the plaintiffs in their sur-reply. [174]

**Footnotes**

| | |
|---|---|
| 1 | Plaintiffs originally sued as individual defendants De La Cruz and John L. German, Executive Director of the Public Works Department. Subsequently plaintiffs dismissed their claims against these defendants, leaving the City as the only defendant in the case. |
| 2 | Docket Entry No. 127. |
| 3 | Id. at 1-4; and Docket Entry No. 116, at 1-4 (pages unnumbered). |
| 4 | Docket Entry No. 130. The City filed a reply to plaintiffs' response. Docket Entry No. 133. |
| 5 | Docket Entry No. 122 |
| 6 | Id. at 1-7. |
| 7 | Id. at 8-9. |
| 8 | Id. at 9-12. |
| 9 | Id. at 13-14. |
| 10 | Docket Entry No. 128. |
| 11 | FED.R.CIV.P. 56(C); *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).* |
| 12 | *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).* |
| 13 | See *LaPierre v. Benson Nissan, Inc., [68 EPD ¶ 44,155] 86 F.3d 444, 447 (5th Cir.1996)* (citing *Armstrong v. City of Dallas, 997 F.2d 62, 65-66 (5th Cir.1993)).* |
| 14 | *Anderson, 477 U.S. at 248; Thomas v. LTV Corp., 39 F.3d 611, 616 (5th Cir.1994).* |
| 15 | Id.; *Wise v. E.I. DuPont De Nemours & Co., 58 F.3d 193, 195 (5th Cir.1995).* |
| 16 | *Anderson, 477 U.S. at 249.* |
| 17 | *Celotex Corp., 477 U.S. at 323.* |
| 18 | *Edwards v. Aguillard, 482 U.S. 578, 595 n. 16, 96 L.Ed.2d 510, 107 S.Ct. 2573 (1987);* and *Celotex Corp., 477 U.S. at 325.* |
| 19 | Id. |
| 20 | *Anderson, 477 U.S. at 257.* |
| 21 | FED R.CIV.P. 56(e); *Anderson, 477 U.S. at 250; State of Texas v. Thompson, 70 F.3d 390, 393 (5th Cir.1995).* |
| 22 | *Celotex Corp., 477 U.S. at 324; Fields v. City of South Houston, Texas, 922 F.2d 1183, 1187 (5th Cir.1991); Neff v. American Dairy Queen Corp., 58 F.3d 1063, 1065 (5th Cir.1995),* cert. denied, *516 U.S. 1045, 133 L.Ed.2d 660, 116 S.Ct. 704 (1996).* |
| 23 | *Hibernia Nat'l Bank v. Carner, 997 F.2d 94, 97 (5th Cir.1993).* See also *Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)* (holding that a nonmovant cannot discharge her burden with doubt as to the material facts, by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence). |
| 24 | See *Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir.1996)* (citing *Forsyth v. Barr, 19 F.3d 1527, 1533* (5th Cir.), cert. denied, *513 U.S. 871 (1994)).* |
| 25 | *Celotex Corp., 477 U.S. at 322* ("In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of the proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). *Id. at 323.* |

40

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

26    See *Fields, 922 F.2d at 1187.*

27    See *Home Builders Association of Mississippi, Inc., v. City of Madison, 143 F.3d 1006, 1010 (5th Cir.1998).*

28    See *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L.Ed.2d 90, 94 S.Ct. 1683 (1974).*

29    See *Clark v. Tarrant County, [41 EPD ¶ 36,436] 798 F.2d 736, 741 (5th Cir.1986)* (citations omitted). See also *Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017 (5th Cir.1996)* (In ruling on a motion to dismiss, a court should consider only those facts stated on the face of the complaint or incorporated into the complaint by reference, and matters of which judicial notice may be taken); and *McNamara v. Bre-X Minerals Ltd., 57 F.Supp.2d 396, 417 n. 12 (E.D.Tex.1999).*

30    FED. R. CIV. P. 12(c).

31    Id. See also 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1369, 2d ed.1987); and *Frey v. Bank One, 91 F.3d 45, 46 (7th Cir.1996)* ("We review a motion pursuant to [Rule] 12(c) under the same standard as a motion to dismiss under [Rule] 12(b). The motion should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.").

32    See *Kaiser v. Aluminum & Chem Sales, Inc. v. Avendale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir.1982),* cert. denied, *459 U.S. 1105, 74 L.Ed.2d 953, 103 S.Ct. 729 (1983);* and *Adolph v. Federal Emergency Management Agency, 854 F.2d 732, 735 (5th Cir.1988).*

33    See *Spivey, Jr., v. Robertson, 197 F.3d 772, 774 (5th Cir.1999).*

34    See *Fernandez-Montes v. Allied Pilots Assoc., 987 F.2d 278 (5th Cir.1993).*

35    See *Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017 (5th Cir.1996)* and *McNamara v. Bre-X Minerals Ltd., 57 F.Supp.2d 396, 417 n. 12 (E.D.Tex.1999).*

36    See *Ledesma v. Dillard Dept. Stores, Inc., 818 F.Supp. 983 (N.D.Tex.1993).*

37    Docket Entry No. 116.

38    See *Meritor Savings Bank, FSB v. Vinson, [40 EPD ¶ 36,159] 477 U.S. 57, 66-67, 91 L.Ed.2d 49, 106 S.Ct. 2399 (1986).*

39    See *Jones v. Flagship Int'l, [40 EPD ¶ 36,392] 793 F.2d 714, 719-20 (5th Cir.1986)* and *Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir.1999).*

40    *Harris v. Forklift Systems, Inc., [62 EPD ¶ 42,623] 510 U.S. 17, 21, 126 L.Ed.2d 295, 114 S.Ct. 367 (1993)* (internal citations omitted) and *Oncale v. Sundowner Offshore Services, Inc., [72 EPD ¶ 45,175] 523 U.S. 75, 78, 140 L.Ed.2d 201, 118 S.Ct. 998 (1998)* (where the Court held that sex discrimination consisting of same-sex sexual harassment, such as the one alleged here, is actionable under Title VII).

41    *Harris, 510 U.S. at 21-23;* and *Walker v. Thompson, 214 F .3d 615, 625 (5th Cir.2000).*

42    Docket Entry No. 122, at 1-6.

43    *Faragher v. City of Boca Raton, [73 EPD ¶ 45,321] 524 U.S. 775, 805-07, 141 L.Ed.2d 662, 118 S.Ct. 2275 (1998).*

44    See *Hunter v. Allis-Chalmers Corp., [41 EPD ¶ 417] 797 F.2d 1417, 1422 (7th Cir.1986).*

45    *Faragher, 524 U.S. at 802-03.* The Fifth Circuit has also provided guidance in the application of the Ellerth/Faragher test to supervisor sexual harassment. See *Casiano v. AT & T Corp., 213 F.3d 278* & Appendix entitled "Supervisor Sexual Harassment Roadmap" (5th Cir.2000).

46    *Burlington Industries, Inc., v. Ellerth, [73 EPD ¶ 45,340] 524 U.S. 742, 747, 141 L.Ed.2d 633, 118 S.Ct. 2257 (1998).*

47    See *Williamson v. City of Houston, 148 F.3d 462, 465-66 (5th Cir.1998).*

48    Id.

49    Docket Entries Nos. 116 & 128.

50    The summary judgment record indicates that Rosales became a City employee on April 4, 1995. Fuentes' starting date of employment with the City was October 27, 1997. De La Cruz became a City employee on November 3, 1986. Docket Entry No. 122, at Exhibit P.

51    Docket Entry No. 116 at P 14.

52    Id.

53    Docket Entry No. 128 at 5-7.

54    Id. at 6-7. Interestingly, Rosales was charged with insubordination the day before he complained that De La Cruz was sexually harassing him.

55    Id. at 3 and Exhibits E-H.

56    Docket Entry No. 122, at 3.

57    Id.

58    Id.

59    *Faragher, 524 U.S. at 791* (quoting and adopting Restatement (Second) of Agency § 219(1) (1958)); and *Meritor, 477 U . S. at 72.*

41

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

60   *Faragher, 524 U.S. at 793* (quoting and adopting Restatement (Second) of Agency § 219(1) (1958)) ("in implementing Title VII it makes sense to hold an employer vicariously liable for some tortuous conduct of a supervisor made possible by use of his supervisory authority...."). See also *Karibian v. Columbia Univ., [64 EPD ¶ 43,060] 14 F.3d 773, 777 (2d Cir.1994)* (strict liability is imposed on employers for quid pro quo harassment because the harasser wields the employer's authority to alter the terms and conditions of employment).

61   See *Wright-Simmons v. City of Oklahoma City, 155 F.3d 1264, 1271 (10th Cir.1998)* ("the operative question in determining supervisory status is whether the employee in question 'had sufficient control over the plaintiff to be considered her supervisor...' ').

62   See *Saxton v. American Tel. & Tel. Co., [63 EPD ¶ 42,713] 10 F.3d 526, 536 n. 19 (7th Cir.1993)* ("if someone in the employer's decision-making hierarchy engages in harassment, the employer may be held liable...,"but not when the supervisor is at such a low level that he would not be the company's agent); *Haynes v. Williams, [68 EPD ¶ 44,175] 88 F.3d 898, 899 (10th Cir.1996)* ("supervisor is an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment."); *Sauers v. Salt Lake County, [62 EPD ¶ 42,612] 1 F.3d 1122, 1125 (10th Cir.1993)* (an employer is liable for harassment by a "supervisor with significant control over plaintiff's hiring, firing, or conditions of employment."); *Swentek v. USAIR, Inc., 830 F.2d 552, 558 (4th Cir.1987)* (although pilots exercised some authority, it did not include the authority to "hire, fire, promote, or demote flight attendants."); and *Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir.1987)* (the employer is liable for hostile environment sexual harassment carried out by "someone with the authority to hire, fire, promote and discipline the plaintiffs.").

63   *524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).*

64   *524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)*

65   Prior to the Ellerth and Faragher decisions, the Fifth Circuit and the other circuits defined the essential attributes of a supervisor for purposes of a claim of hostile environment sexual harassment under Title VII. In Pfau v. Reed, for instance, the plaintiff claimed that her audit team supervisor had sexually harassed her. *125 F.3d 927, 930-37 (5th Cir.1997),* cert. granted and vacated on other grounds, *525 U.S. 801 (1998).* The Court held that the audit team supervisor did not qualify as a supervisor for purposes of Title VII. Id. at 937. While it emphasized that the audit team supervisor could not hire or fire other employees, the Court also noted that he simply did not exercise any significant control over the terms of plaintiff's employment. Id. For example, the audit team supervisor's powers were limited to recommending subordinate awards or discipline and handling the procedural aspects of Pfau's termination. The Court held that these powers alone were not substantial enough to hold the employer liable for the audit team supervisor's harassment. Id. This decision was remanded to the district court level in order to determine, in part, whether an audit team supervisor qualifies as a supervisor under the Faragher and Ellerth definition. *167 F.3d 228 (5th Cir.1999).* The district court's decision on remand has not been published.

66   See *Deffenbaugh-Williams v. Wal-Mart Stores, Inc., [74 EPD ¶ 45,510] 156 F.3d 581, 592 (5th Cir.1998)* (employee was victim's supervisor under Faragher and Ellerth where he had the authority to discharge her); *Phillips v. Taco Bell Corp., 156 F.3d 884, 888 (8th Cir.1998)* (harasser, who was the store manager, was a supervisor based on the authority he had over the plaintiff); and *Lissau v. Southern Food Services, [74 EPD ¶ 45,597] 159 F.3d 177, 179 (4th Cir.1998)* (the Ellerth and Faragher standard of liability applied where the harasser "could hire and fire sales representatives," such as the plaintiff).

67   See STEPHANIE ANN HENNING BLACKMAN, *The Faragher and Ellerth Problem: Lower Courts' Confusion Regarding the Definition of "Supervisor," 54 VAND. L. REV. 123 (Jan.2001),* where the author advocates that since the Ellerth and Faragher decisions did not intend to overrule the traditional "hiring, firing, or conditions of employment" definition of supervisor, most courts, including the Fifth Circuit, have continued to correctly apply the traditional definition.

68   Docket Entry No. 122, at 3 (and cited portions of its Statement of Facts).

69   Id. at Exhibit B, at 147:5-7.

70   *Id. at 142-45 & 147.*

71   *Id. at 147:22-25.*

72   Id.

73   Docket Entry No. 128, Exhibit AA.

74   Docket Entry No. 122, Exhibit B, at 118:22-25 & 119:1-3. See also the first three pages of the attached deposition testimony of Ralph Fuentes, Exhibit C.

75   See *Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1034 (7th Cir.1998)* ("Although [plaintiff] claims that [harasser] once bragged about his ability to have employees fired, even if his boast were accurate, this does not elevate him to supervisory status.") (citing *Pfau, 125 F.3d at 937).* Significantly, the Seventh Circuit in Parkins, stated that a traditional "foreman" simply did not possess enough authority to be considered a supervisor for Title VII purposes. *163 F.3d at 1034.*

76   *Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997).*

77   *Williamson, 148 F.3d at 464-65.*

42

Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)

78   *Carr v. Allison Gas Turbine Div., Gen. Motors Corp., 32 F.3d 1007, 1009 (7th Cir.1994).*

79   *Perry, 126 F.3d at 1014.*

80   *Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir.1997).*

81   Id. at 674.

82   Id.

83   *Zimmerman v. Cook County Sheriff's Dept., 96 F.3d 1017, 1019 (7th Cir.1996).*

84   Docket Entry No. 116, at 12-15 & Docket Entry No. 128, at 8-9.

85   Docket Entry No. 128, at 8-9 & Exhibit B.

86   Id. at Exhibit O, 12:22-25.

87   Docket Entry No. 116, at 13-16 & 26-28; and Docket Entry No. 128, at 8-9.

88   Docket Entry No. 122, at 4-6.

89   Docket Entry No. 128, at Exhibit C.

90   Docket Entry No. 122, at 4-6.

91   Docket Entry No. 122, at Exhibit P.

92   Id.

93   *Oncale, 523 U.S. at 79-80* and Docket Entry No. 122, Exhibit P, where the City in acknowledging this change in the law, revised its definition of sexual harassment as follows: "3.2 Sexual harassment can be committed by a member of either sex and can involve members of the same sex as well as members of the opposite sex." Id.

94   Docket Entry No. 122, at Exhibit s G & H.

95   Id. at Exhibit P, 1999 revised policy, at P 5.25.

96   Id. at Exhibit O.

97   Docket Entry No. 122, at Exhibit P. Affidavit of David M. Griffith. Interestingly, the City's own summary judgment evidence demonstrates that it began providing periodic sexual harassment training to its employees in June of 1999, a month after plaintiffs filed their complaints.

98   *Walker, 214 F.3d at 627.* The EEOC in its Enforcement Guidance on vicarious liability for unlawful harassment by supervisors noted that although the affirmative defense does not apply in cases of harassment by coworkers, an employer cannot claim lack of knowledge as a defense to such harassment if it did not make clear to employees that they can bring such misconduct to the attention of management and that such complaints will be addressed. See EEOC Enforcement Guidance on vicarious liability, at 27 & n. 58 (dated June 18, 1999), available at www.eeoc.gov/docs/harassment.html. See also *Perry v. Ethan Allen, 115 F.3d 143, 149 (2d Cir.1997)* ("When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.' ') (cited in *Faragher, 524 U.S. at 799).* Furthermore, an employer is liable for harassment by a co-worker if management knew or should have known of the misconduct, unless the employer can show that it took immediate and appropriate corrective action. *29 C.F.R. § 1604.11(d).*

99   I am aware of Defendant's evidentiary objections to the plaintiff's expert witness report as stated in its reply brief. Docket Entry No. 129, at 2. My summary judgment ruling is based on the language of the 1982 sexual harassment policy and its 1999 revisions, as well as the deposition testimony of Mr. Aranda. I did not rely on any of plaintiffs' expert opinion in deciding the issues raised by the City's motion for summary judgment. Accordingly, the City's objections to this summary judgment evidence are denied as moot. I do note the relevancy that report may have at trial and will address properly presented Daubert objections, if any, at that time.

100   Docket Entry No. 116, at P 8.

101   See *Glass v. Petro-Tex Chemical Corp., 757 F.2d 1554, 1560 (5th Cir.1985)* (citation omitted).

102   See *Trevino v. Celanese Corporation, 701 F.2d 397, 403 n. 7 (5th Cir.1983);* and *Messer v. Meno, 130 F.3d 130, 135 (5th Cir.1997),* cert. denied, *119 S.Ct. 794 (1999).*

103   *Hendrix v. City of Yazoo City, Mississippi, 911 F.2d 1102, 1103 (5th Cir.1990)* (Emphasis added).

104   *715 F.2d 971, 981 (5th Cir.La.1983).*

105   Id.

106   See *Glass, 757 F.2d at 1561* ("This inquiry turns on the facts and context of each particular case").

107   For the same reason, the "relation back" doctrine is inapplicable to the case as Rosales cannot establish how the 1995 incident was proof of De La Cruz' harassing behavior towards him. Further, the "relation back" doctrine applies to conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge. Since the 1995 incident occurred well before plaintiffs' EEOC charges, the "relation back" doctrine by definition, cannot apply in this case. *Perry, 115 F.3d at 153.*

43

108   See *Ray v. Tandem Computers, Inc., 63 F.3d 429, 434 & fn.12 (5th Cir.1995)* (citations omitted).

109   Docket Entry No. 116, at 27 (Count I); and Docket Entry No. 128, at 11.

110   The United States Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a significant change in benefits." *Ellerth, 524 U.S. at 761-62;* and *Casiano, 213 F.3d at 283.*

111   Docket Entry No. 122, at Exhibit E.

112   Docket Entry No. 128, at Exhibit T, Rosales' Memorandum to James Lyons, EEOC Investigator, dated August 12, 1999.

113   *Walker, 214 F.3d at 628-29.*

114   *411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).*

115   See *Byers v. The Dallas Morning News, 209 F.3d 419, 427 (5th Cir.2000).*

116   See *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07, 125 L.Ed.2d 407, 113 S.Ct. 2742 (1993).*

117   See *Dollis v. Rubin, 77 F.3d 777, 781 (5th Cir.1995)* (explaining that "there can be no question that the [employee's] retaliation claims satisfy the first element of the analysis ... filing an administrative complaint is clearly protected activity.").

118   *Dollis, 77 F.3d at 782.*

119   *Id.* at 779-80.

120   *104 F.3d 702, 708* (5th Cir.), cert. denied, *522 U.S. 932 (1997).*

121   Docket Entry No. 122, at Exhibit Q.

122   Id. at Exhibit R.

123   Id.

124   Docket Entry No. 128, at Exhibit FF.

125   Docket Entry No. 122, at Exhibit Q.

126   Id.

127   Id. at Exhibit R.

128   The terms of the transfer are not clear from the record.

129   Docket Entry No. 116, at

130   *Benningfield v. The City of Houston, 157 F.3d 369, 378 (5th Cir.1998)* (where the court noted that constructive discharge can constitute a tangible or adverse employment action in the proper factual scenario) (quoting *Landgraf v. USI Film Products, 968 F.2d 427, 429-30 (5th Cir.1992));* and *Boze v. Branstetter, 912 F.2d 801, 804-05 (5th Cir.1990)* (the burden is on the employee to prove constructive discharge).

131   Id.

132   See *Hornsby v. Conoco, Inc., 777 F.2d 243, 246 (5th Cir.1985)* (court held that "employee's subjective belief that she was terminated because of her age and sex could not be the basis for judicial relief where adequate nondiscriminatory reason for discharge was presented."); and *Elliott v. Group Med. & Surgical Serv., 714 F.2d 556, 567 (5th Cir.1983),* cert. denied. *467 U.S. 1215, 81 L.Ed.2d 364, 104 S.Ct. 2658 (1984).*

133   See *Sherrod v. American Airlines, Inc., 132 F.3d 1112, 1122 (5th Cir.1998).*

134   See *McMillan v. Rust College, Inc., 710 F.2d 1112, 1116 (5th Cir.1983); Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir.1984)* (noting that prima facie retaliation requires "but for" causation); and *Long v. Eastfield College, 88 F.3d 300, 304-05 & n. 4 (5th Cir.1996)* ("even if plaintiff's protected conduct is a substantial element in a defendant's [adverse employment] decision ..., no liability for unlawful retaliation arises if the [same decision would have been made] even in the absence of the protected conduct.").

135   Docket Entry No. 122, at 10.

136   See *Skidmore v. Precision Printing and Packaging Inc., 188 F.3d 606 (5th Cir.1999),* where the plaintiff's causes of action for hostile work sexual harassment and intentional infliction of emotional distress were presented to a jury.

137   See *Ugalde v. McKenzie Asphalt Co., 990 F.2d 239, 242 (5th Cir.1993)* (citing *Dean v. Ford Motor Credit Co., 885 F.2d 300, 306 (5th Cir.1989)).*

138   Id. (quoting Restatement (Second) of Torts § 46 emt.d).

139   See *Wilson v. Monarch Paper Co., 939 F.2d 1138, 1143 (5th Cir.1991).*

140   *Id. at 1143* ("some employment settings 'contemplate a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous.'").

141   Docket Entry No. 116, at 31-33.

142   See *Skidmore, 188 F.3d at 608* (citation omitted).

44

| 143 | Id. (citing *Durand v. Moore, 879 S.W.2d 196, 203* (Tex.App.-Houston [14th Dist] 1994, no writ)); and *Prunty v. Arkansas Freightways, Inc., 16 F.3d 649, 653-54 (5th Cir.1994).* |
|---|---|
| 144 | Id. (citing *Southwestern Bell Telephone Co. v. Wilson, 768 S.W.2d 755, 764* (Tex.App.-Corpus Christi 1988, writ denied)). |
| 145 | Id. (citing *Prunty, 16 F.3d at 653).* |
| 146 | Id. (citing *Southwestern Bell Telephone, 768 S.W.2d at 764)* . |
| 147 | Id. |
| 148 | Id. |
| 149 | Docket Entry No. 128, at 20-21; and docket entry no. 116, at 33-35. |
| 150 | Docket Entry No. 122, at 10-11. |
| 151 | TEX. LAB. CODE ANN. § 408.001 (Vernon 1996 & Supp.2001). |
| 152 | See *Ward v. Bechtel Corp., 102 F.3d 199, 203-04 (5th Cir.Tex.1997)* (where in affirming the trial court's grant of summary judgment, the Court held that plaintiff's claims for premises liability and negligent hiring, supervision and retention claims based on her employer's alleged negligence with respect to its workplace supervision of subordinate, were preempted by the exclusive remedy afforded by the Texas Workers' Compensation Act) (citing *Dickson v. Silva, 880 S.W.2d 785* (Tex.App.-Houston [1st Dist] 1993, writ denied), and *Ajaz v. Continental Airlines, 156 F.R.D. 145, 148-49 (S.D.Tex.1994))* |
| 153 | See *Lollar v. Baker, 196 F.3d 603, 606-07 (5th Cir.1999); State of Texas v. Walker, 142 F.3d 813, 818 (5th Cir.1998);* and *Spuler v. Pickar, 958 F.2d 103, 107 (5th Cir.1992)* (stating that a prerequisite to a substantive due process claim is the establishment of a constitutionally protected property right). |
| 154 | *813 F.2d 709 (5th Cir.1987).* |
| 155 | *Id. at 713* (quoting *Board of Regents v. Roth, 408 U.S. 564, 577, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972)).* See also *Bishop v. Wood, 426 U.S. 341, 344, 48 L.Ed.2d 684, 96 S.Ct. 2074 (1976)* (stating "a property interest in employment can, of course, be created by ordinance or by an implied contract ... in either case, however, the sufficiency of the claim must be decided by reference to state law."). |
| 156 | See *Pruitt v. Levi Strauss & Co., 932 F.2d 458, 461 (5th Cir.1991)* (affirming summary judgment in favor of employer on the grounds that former executive had no cause of action for alleged breach of covenant of good faith and fair dealing in employment relationship) (citing *English v. Fischer, 660 S.W.2d 521 (Tex.1983)).* |
| 157 | *Pruitt, 932 F.2d at 463* (citing *Vallone v. Agip Petroleum Co., 705 S.W.2d 757, 759* (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) ("Employee handbooks, unaccompanied by an express agreement dealing with procedure for discharge of employees, do not create contractual rights regarding those procedures."); *Reynolds v. Manufacturing Co., v. Mendoza, 644 S.W.2d 536, 539* (Tex.App.-Corpus Christi 1982, no writ) (absent express reciprocal agreement dealing with procedures for discharge, employee handbooks "constitute no more than general guidelines")). |
| 158 | *818 F.2d 1196 (5th Cir.1987).* |
| 159 | *Id. at 1201* (citing *United Transportation Union v. Brown, 694 S.W.2d 630* (Tex.App.-Texarkana 1985, writ ref'd n.r.e .)). |
| 160 | Id. |
| 161 | *Pruitt, 932 F.2d at 462.* |
| 162 | Id. (citing *Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex.1986)).* |
| 163 | Docket Entry No. 128, at Exhibit FF. |
| 164 | See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U .S. 574, 586, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)* (The opponent of a summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts."). |
| 165 | See discussion on Rosales' retaliation claim, at 31-33, supra. |
| 166 | Docket Entry No. 122, at 12-13 (and relevant summary judgment evidence). |
| 167 | See *Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 281-84 (5th Cir.1999);* and *Kolstad v. American Dental Association, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)* . |
| 168 | *42 U.S.C. § 2000e-5* (g)(1). |
| 169 | *42 U.S.C. § 1981a* (a)(1). As a side note, the parties have not briefed whether punitive damages under Title VII can be assessed against political subdivisions such as the City. This may become a relevant issue at trial. |
| 170 | Id. (Emphasis added). |
| 171 | *121 S.Ct. 1946, 1949-52, 150 L.Ed.2d 62 (2001)* |
| 172 | *Id. at 1952.* |
| 173 | Docket Entry No. 116, at 1-4. For instance, plaintiffs assert several causes of action under the Texas Penal Code, Texas Open Records Act and the Texas Local Government Code, among others. Id. |
| 174 | Docket Entry No. 131. |

45

**Rosales v. City of San Antonio, Texas, Not Reported in F.Supp.2d (2001)**

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Smith v. Lattimore Materials, 77 Fed.Appx. 729 (2003)

77 Fed.Appx. 729
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Kenneth J. SMITH, Plaintiff-Appellant,

v.

LATTIMORE MATERIALS, Defendant-Appellee.

No. 03-40626.   |   Summary
Calendar   |   Oct. 8, 2003.

Appeals from the United States District Court for the Eastern
District of Texas. m 4:02-CV-27.

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

**Opinion**

PER CURIAM. [*]

 **\*1** Kenneth Smith, *pro se,* sued Lattimore Materials for
violation of the ADA. The magistrate judge to whom the
matter was referred by consent granted summary judgment
for Lattimore. Smith appeals *pro se.*

There is no basis for recovery under the ADA. The magistrate
judge explained why in a comprehensive and persuasive order
dated March 24, 2003, and entered on March 25, 2003.

The judgment is AFFIRMED, essentially for the reasons
given by the magistrate judge.

**Parallel Citations**

2003 WL 22303062 (C.A.5 (Tex.))

Footnotes

[*]     Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under
        the limited circumstances set forth in 5TH CIR. R. 47.5.4.

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3447885
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Beaumont Division.

Leon WILLIAMS, Plaintiff,
v.
Alberto R. GONZALES, Attorney
General of the United States, Defendant.

No. Civ.A. 104CV342.   |   Dec. 14, 2005.

**Attorneys and Law Firms**

Gideon T. Carter, III, Law Office of Ossie Brown, Baton Rouge, LA, for Plaintiff.

Andrea Hedrick Parker, U.S. Attorney, Beaumont, TX, for Defendant.

**Opinion**

### MEMORANDUM AND ORDER

CRONE, J.

**\*1**  Pending before the court is Defendant Alberto R. Gonzales's ("Gonzales") Motion to Dismiss, or Alternatively, for Summary Judgment (# 22). Gonzales seeks dismissal or summary judgment on Plaintiff Leon Williams's ("Williams") action alleging racial discrimination in employment arising under the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e-2000h-6. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

### I. *Background*

Williams, an African American, is employed as the Supervisor of Education in the Education and Recreation Department of the United States Penitentiary, Federal Correctional Center in Beaumont, Texas ("FCC-Beaumont"), part of the United States Bureau of Prisons ("BOP"). Williams's job responsibilities include providing educational opportunities and leisure activities to inmates. He supervises approximately seventeen BOP employees, who, in turn,

supervise eighty to ninety inmate workers. During an investigation of alleged improprieties involving an employee under his supervision, Williams was asked to provide an affidavit concerning the events in question. In his affidavit, dated May 19, 2000, Williams described giving an inmate four cases of soda as an informal resolution of the inmate's claim that he was not being accurately credited for hours worked. Based on his statement, Williams was subject to an investigation for violating the BOP's Standards of Employee Conduct by inappropriately using government property. On October 10, 2003, Associate Warden Alfonso Haynes, who is African American, proposed a three-day suspension as punishment. Williams responded to the disciplinary charge in a letter dated October 19, 2000, in which he acknowledged the underlying facts of the infraction, but denied that such facts constituted wrongdoing. In light of Williams's previously exemplary service, Warden Ernest Chandler ("Chandler"), who is Caucasian, assessed a reduced suspension of one day.

Williams served the one-day suspension on December 18, 2000. On March 5, 2001, he filed an Equal Employment Opportunity ("EEO") class action complaint against Chandler and the BOP, alleging racial discrimination, retaliation, and the existence of a hostile work environment on behalf of seven named class members. In addition to the one-day suspension, Williams complained of other acts of purported harassment by Chandler, specifically his less favorable treatment of African Americans at meal times, his refusal to give an African American an award personally, verbally threatening Williams with discipline, twice initiating disciplinary investigations into Williams's conduct, deliberately understaffing Williams's department, and making negative comments about the sanitation of Williams's department during an independent performance review.

**\*2**  The administrative judge ("AJ") refused to certify the case as a class action and ultimately rejected Williams's claims. While finding that the complaint set forth a *prima facie* case of race discrimination, the AJ held that Williams had failed to overcome the BOP's articulated legitimate, nondiscriminatory reason for its action, namely, that Williams was punished for his violation of the BOP's Standards of Employee Conduct. Additionally, the AJ determined that Williams had not established a *prima facie* case of retaliation, as no evidence suggested that Williams had engaged in protected EEO activity prior to the alleged retaliation. The AJ did not identify hostile work environment, a claim raised in this action, as an issue. The AJ's rulings were

48

formally entered on September 17, 2003, and Williams's subsequent appeal was denied by the Equal Employment Opportunity Commission ("EEOC") on February 26, 2004. After receiving a right-to-sue letter from the EEOC, Williams filed this civil action in federal district court on June 6, 2004, naming John Ashcroft ("Ashcroft"), Attorney General of the United States, the head of the BOP, as the defendant. *See* 42 U.S.C. § 2000e-16. On February 28, 2005, Gonzales, following his confirmation as Attorney General of the United States, was substituted for Ashcroft.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis of his motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which he believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir.2005); *Martinez v. Schlumberger, Ltd.,* 338 F.3d 407, 411 (5th Cir.2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.,* 310 F.3d 870, 877 (5th Cir.2002). Where a defendant moves for summary judgment on the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "[he] must adduce evidence to support each element of [his] defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." *Rushing v. Kansas City S. Ry. Co.,* 185 F.3d 496, 505 (5th Cir.1999), *cert. denied,* 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000) (citing *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1074 (5th Cir.), *cert. denied,* 522 U.S. 915, 118 S.Ct. 299, 139 L.Ed.2d 231 (1997)); *see Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986). To warrant judgment in his favor, the movant " " 'must establish beyond peradventure *all* of the essential elements of the defense.' " ' *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir.2003) (emphasis in original) (quoting *Chaplin v. NationsCredit Corp.,* 307

F.3d 368, 372 (5th Cir.2002) (quoting *Fontenot,* 780 F.2d at 1194)).

**\*3** "A fact is *'material'* if it *'might affect* the outcome of the suit under governing law." " *Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson,* 477 U.S. at 248); *see Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 F.3d 466, 471 (5th Cir.2001); *Merritt-Campbell, Inc. v. RxP Prods., Inc.,* 164 F.3d 957, 961 (5th Cir.1999); *Burgos v. Southwestern Bell Tel. Co.,* 20 F.3d 633, 635 (5th Cir.1994). "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan,* 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *accord Harken Exploration Co.,* 261 F.3d at 471; *Merritt-Campbell, Inc.,* 164 F.3d at 961. The moving party, however, need not negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir.2005); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322-23; *Anderson,* 477 U.S. at 257; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Smith ex rel. Estate of Smith v. United States,* 391 F.3d 621, 625 (5th Cir.2004); *Malacara v. Garber,* 353 F.3d 393, 404 (5th Cir.2003); *Rushing,* 185 F.3d at 505. "[T]he court must review the record 'taken as a whole.' " ' *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 587). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *see Reeves,* 530 U.S. at 150; *Malacara,* 353 F.3d at 398; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003); *Harken Exploration Co.,* 261 F.3d at 471; *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir.), *cert. denied,* 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d

49

349 (1990) (citing *Anderson,* 477 U.S. at 255); *Lincoln Gen. Ins. Co.,* 401 F.3d at 349; *Martin,* 353 F.3d at 412; *Martinez,* 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 507 (5th Cir.), *cert. denied,* 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Chaplin,* 307 F.3d at 372. The evidence is construed "in favor of the nonmoving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999); *accord Little,* 37 F.3d at 1075 (citing *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

**\*4** Nevertheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party." ' *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468-69. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Anderson,* 477 U.S. at 247-48; *Boudreaux,* 402 F.3d at 540; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston,* 337 F.3d at 541; *see Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir.2003); *Hugh Symons Group, plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002).

Summary judgment is mandated if the nonmovant fail to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322; *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of

the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322-23.

**B.** *Admissibility of Expert Witness Affidavit*
Gonzales points out that Williams failed to designate his expert witness, Professor Robert J. Newman ("Newman"), in a timely manner. In an affidavit attached to Williams's response to Gonzales's summary judgment motion, Newman analyzes the probability of a disproportionate percentage of disciplinary cases directed at African Americans being a matter of random chance in a race-neutral disciplinary process. Newman concludes that the probability of the ratio of discipline applied to African Americans compared to non-class members in a race-neutral environment is only 1.9% for supervisory staff and 14.2% for other staff. Williams argues that a fact-finder could infer from Newman's statistical analysis that Chandler's actions towards Williams were dictated by illegitimate racial animus. Williams, however, failed to disclose his intention to designate Newman as an expert in a timely fashion.

**\*5** Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure requires the disclosure of expert testimony prior to trial. Specifically, the rule provides that:

> In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

FED. R. CIV. P. 26(a)(2)(A). Additionally, to eliminate unfair surprise, the rules also require the parties to disclose the substance of any expert opinion testimony and the basis of such opinion. *See Soll v. Provident Life & Acc. Ins.,* No. Civ. A. 00-3670, 2002 WL 1461891, at \*3 (E.D.La. July 5, 2002) (citing FED. R. CIV. P. 26(a)(2)(B)). This rule states:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by

50

the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the date or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding ten years.

FED. R. CIV. P. 26(a)(2)(B).

In conjunction with this requirement, Rule 26(a)(2)(C) mandates that such expert disclosures "be made at the times and in the sequence directed by the court." FED. R. CIV. P. 26(a)(2)(C). Here, in an agreed scheduling order entered February 16, 2005, the original deadline for Williams to designate expert witnesses was May 2, 2005. After the deadline had already passed, Williams requested additional time to designate expert witnesses on May 9, 2005. To accommodate Williams, the court extended the deadline to June 20, 2005. Yet, Williams neglected to mention, much less designate, Newman as a potential expert witness until November 9, 2005, when he attached Newman's affidavit to a filing entitled Plaintiff's Opposition to Motion for Summary Judgment.

A trial court's decision to exclude experts not properly designated is reviewed for abuse of discretion. See Rushing, 185 F.3d at 509. In the Fifth Circuit, a trial court's decision to " 'exclude evidence as a means of enforcing a pretrial order' will not be disturbed "absent a clear abuse of discretion." ' Id. (quoting Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 572 (5th Cir.), cert. denied, 519 U.S. 811, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996)); see Hodges v. United States, 597 F.2d 1014, 1018 (5th Cir.1979) (holding that a trial court has "broad discretion to preserve the integrity and purpose of the pretrial order"). A trial court has "formidable case-management authority." Id. (citing Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315 (1st Cir.1998)); see FED. R. CIV. P. 16(f) (authorizing sanctions under Rule 37(b)(2) for non-

compliance with scheduling orders); FED. R. CIV. P. 37(b)(2) (authorizing a trial court to refuse to admit evidence or permit witnesses linked to a party's failure to follow a court order). Delay in obeying discovery deadlines is "a particularly abhorrent feature of ... trial practice," and causes "disrespect for lawyers and judicial process." Geiserman, 893 F.2d at 792. "Adherence to reasonable deadlines is critical to restoring integrity in court proceedings." Id.

**\*6** A trial court should consider the following four factors when determining whether to exclude expert testimony: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." Id. at 791 (citing Bradley v. United States, 866 F.2d 120, 124 (5th Cir.1989)); see Hamburger v. State Farm Mut. Auto. Ins. Co., 361 F.3d 875, 883 (5th Cir.2004); Rushing, 185 F.3d at 508; Barrett v. Atlantic Richfield Co., 93 F.3d 375, 380 (5th Cir.1996). The importance of a witness's testimony " 'cannot singularly override the enforcement of local rules and scheduling orders." ' Rushing, 185 F.3d at 508 (quoting Geiserman, 893 F.2d at 791); see Barrett, 95 F.3d at 381. Disruption of the court's discovery schedule and the opponent's preparation constitutes sufficient prejudice to militate in favor of the exclusion of testimony. See Geiserman, 893 F.2d at 791; see also Barrett, 95 F.3d at 381. Moreover, the possibility of continuance must be counterbalanced by the additional delay and increased expense that would result. See Hamburger, 361 F.3d at 883 ("[b]ecause of a trial court's need to control its docket, a party's violation of the court's scheduling order should not routinely justify a continuance") (citing Geiserman, 893 F.2d at 791). The goal of imposing the sanction of striking an expert witness is not to ameliorate prejudice, but rather to punish the offender and deter future dilatory conduct. See Rushing, 185 F.3d at 508 (citing Sierra Club, 73 F.3d at 573; Chilcutt v. United States, 4 F.3d 1313, 1324 n. 30 (5th Cir.1993), cert. denied, 513 U.S. 979, 115 S.Ct. 460, 130 L.Ed.2d 367 (1994)). Accordingly, the fact that potential prejudice may be cured by granting a continuance is not dispositive.

In balancing the factors under the Fifth Circuit's four-part test, the court is of the opinion that Newman's affidavit should not be considered as summary judgment evidence. First, Williams has proffered no explanation as to why he failed to designate Newman as an expert in a timely manner. In the absence of any mitigating excuse for the delay, the first factor must militate against the admission of Newman's affidavit.

51

*See Geiserman,* 893 F.2d at 792; *Robbins v. Ryan's Family Steak Houses E., Inc.,* 223 F.R.D. 448, 454 (S.D.Miss.2004) (holding that where a party offers no explanation for failing to designate an expert in a timely manner, this factor supports striking the expert). The second factor arguably favors the consideration of Newman's affidavit in view of the general dearth of evidence in this case of disparate treatment. The third factor supports striking Newman's affidavit because the defendant would otherwise be unduly prejudiced. Gonzales asserts that, had he known Williams intended to produce an expert affidavit, he would have retained an expert on statistics and presented a controverting affidavit. *See Geiserman,* 893 F.2d at 791 (holding that hindrance of an adverse party's preparation constitutes prejudice).

**\*7** As to the fourth factor, while continuing the case might diminish the prejudice to Gonzales, it would result in increased cost and delay. *See Hamburger,* 361 F.3d at 883. Additionally, a court should not condone dilatory conduct by routinely extending the deadline to designate expert witnesses. *See Geiserman,* 893 F.2d at 791; *see also Rushing,* 185 F.3d at 508. Therefore, due to the disruption of the court's scheduling order, which has already been adjusted to accommodate Williams, counsel's failure to provide any explanation for the delay, and the prejudice to Gonzales, the court will not consider Newman's affidavit in ruling on the motion for summary judgment.

### C. *Claims Brought Under 42 U.S.C. §§ 1981 and 1983*

It is well settled that "[T]itle VII provides the exclusive remedy for employment discrimination claims raised by federal employees." *Jackson v. Widnall,* 99 F.3d 710, 716 (5th Cir.1996) (finding constitutional claims to be preempted by Title VII). It has long been recognized that Title VII provides the sole remedy for racial discrimination claims asserted by federal employees. *See Brown v. General Servs. Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Jackson,* 99 F.3d at 716; *Perez v. FBI,* 71 F.3d 513, 515 (5th Cir.1995), *cert. denied,* 517 U.S. 1234, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996); *Rowe v. Sullivan,* 967 F.2d 186, 189 (5th Cir.1992); *Watkins v. Lujan,* 922 F.2d 261, 263 (5th Cir.1991); *Hampton v. IRS,* 913 F.2d 180, 182-83 (5th Cir.1990). There is abundant "Supreme Court and Fifth Circuit precedent to the effect that Title VII provides both the exclusive cause of action and the exclusive remedy for federal employees who wish to assert claims of employment discrimination." *Perez,* 71 F.3d at 515 (concluding that court lacked jurisdiction to address federal employee's *Bivens* claims); *see Rowe,* 967 F.2d at 189 (holding claims of racial

discrimination in employment brought by federal employee under §§ 1981, 1983, and 1985(3) to be preempted by Title VII; *Watkins,* 922 F.2d at 263 (rejecting federal employee's claim of racial discrimination under § 1981); *Hampton,* 913 F.2d at 182-83 (finding a claim for intentional infliction of emotion distress to be preempted by Title VII).

Indeed, as early as 1976, the United States Supreme Court acknowledged that Title VII constitutes the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown,* 425 U.S. at 829 (rejecting a § 1981 claim of racial discrimination brought by a federal employee). The Supreme Court distinguished the situation of a federal employee from a private sector employee, who may pursue a parallel claim under § 1981, noting the more comprehensive administrative and judicial enforcement scheme available to a federal employee under § 717 of Title VII, 42 U.S.C. § 2000e-16. *See id.* at 832-33. The court reasoned that "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Id.* at 833.

**\*8** The Fifth Circuit has "interpreted the Supreme Court's mandate in *Brown* to mean that, when a complainant against a federal employer relies on the same facts to establish a Title VII claim and a non-Title VII claim, the non-Title VII claim is 'not sufficiently distinct to avoid' preemption." *Pfau v. Reed,* 125 F.3d 927, 932 (5th Cir.1997), *judgment vacated on other grounds,* 525 U.S. 801, 119 S.Ct. 32, 142 L.Ed.2d 24 (1998) (holding intentional infliction of emotional distress claim to be preempted) (quoting *Rowe,* 967 F.2d at 189). Williams fails to articulate any factual distinction between the basis for his Title VII claim and his § 1981 and § 1983 claims. Because Williams's allegations of "constitutional violations arise out of the same facts as his employment discrimination claims, ... they are preempted by Title VII and cannot afford an independent ground for relief." *Jackson,* 99 F.3d at 716.

### D. *Title VII-General Burden of Proof*

Title VII provides that "[i]t shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Desert Palace, Inc. v. Costa,* 539 U.S. 90, 92-93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "The purposes of Title VII are to achieve equality of employment

52

opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.,* 845 F.2d 108, 111 (5th Cir.1988) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap, Inc.,* 333 F.3d 572, 578 (5th Cir.2003) (citing *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000), *cert. denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002)); *accord Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213, 1216 (5th Cir.1995); *see Desert Palace, Inc.,* 539 U.S. at 98-101. "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 ... (1973)." *Russell,* 235 F.3d at 222; *see Reeves,* 530 U.S. at 143; *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Laxton,* 333 F.3d at 578; *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 (5th Cir.2003). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *West,* 330 F.3d at 384 n. 3; *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2002) (citing *Mooney,* 54 F.3d at 1217). Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves,* 530 U.S. at 142; *Laxton,* 333 F.3d at 578; *Russell,* 235 F.3d at 222; *Wallace,* 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995)). " 'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.' " *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir.1985)).

**\*9** Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate-but not prove-a legitimate, nondiscriminatory reason for its employment decision. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 50, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *Reeves,* 530 U.S. at 142; *McDonnell Douglas Corp.,* 411 U.S. at 802; *Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 330 (5th Cir.2004); *Laxton,* 333 F.3d at 578 (citing *Wallace v. Methodist Hosp.*

*Sys.,* 271 F.3d 212, 219 (5th Cir.2001), *cert. denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002)); *West,* 330 F.3d at 384 (citing *Russell,* 235 F.3d at 222); *Okoye v. University of Tex. Houston Health Sci. Ctr.,* 245 F.3d 507, 512 (5th Cir.2001). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' " *Reeves,* 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see West,* 330 F.3d at 385; *Sandstad,* 309 F.3d at 898; *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact,*' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.,* 169 F.3d 962, 966 (5th Cir.1999) (quoting *Hicks,* 509 U.S. at 507) (emphasis in original); *accord Brown v. Bunge Corp.,* 207 F.3d 776, 781 (5th Cir.2000).

If the employer meets its burden, " 'the *McDonnell Douglas* framework-with its presumptions and burdens'-disappear[s], ... and the sole remaining issue [is] 'discrimination *vel non.*' " *Reeves,* 530 U.S. at 142-43 (quoting *Hicks,* 509 U.S. at 510; *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)); *see Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 253); *accord Hicks,* 509 U.S. at 507-08; *Wheeler v. BL Dev. Corp.,* 415 F.3d 399, 405 (5th Cir.2005), *pet. for cert. filed,* 74 U.S.L.W. 3232 (U.S. Sept. 27, 2005) (No. 05-406); *Laxton,* 333 F.3d at 578; *Crawford,* 234 F.3d at 902; *Walton v. Mississippi State Univ.,* 218 F.3d 365, 372 (5th Cir.2000), *cert. denied,* 531 U.S. 1113, 121 S.Ct. 859, 148 L.Ed.2d 772 (2001).

In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue of material fact " " 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative) or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative)." ' " *Rachid v. Jack In The Box,* 376 F.3d 305, 312 (5th Cir.2004) (quoting *Rishel v. Nationwide Mut. Ins. Co.,*

Williams v. Gonzales, Not Reported in F.Supp.2d (2005)

297 F.Supp.2d 854, 865 (M.D.N.C.2003) (quoting *Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180, 1197-98 (N.D.Iowa 2003))). If the plaintiff demonstrates that race was a "motivating factor" in the employment decision, the defendant must then prove " 'that the same adverse employment decision would have been made regardless of discriminatory animus." ' *Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 341 (5th Cir.2005) (quoting *Rachid,* 376 F.3d at 312). The plaintiff will prevail if the employer fails to carry this burden. *See id.*

 **\*10** Under the pretext alternative approach, the "plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence." ' *Laxton,* 333 F.3d at 578 (quoting *Reeves,* 530 U.S. at 1403; *Wallace,* 271 F.3d at 220). "An explanation is false or unworthy or credence if it is not the real reason for the adverse employment action." *Id.* (citing *Sandstad,* 309 F.3d at 899). "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 530 U.S. at 147 (emphasis in original); *see Kanida,* 363 F.3d at 537-74; *West,* 330 F.3d at 385; *Ratliff v. City of Gainesville,* 256 F.3d 355, 360-62 (5th Cir.2001). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination without further evidence of defendant's true motive." *Laxton,* 333 F.3d at 578; *see Sandstad,* 309 F.3d at 899; *Russell,* 235 F.3d at 223 (citing *Reeves,* 530 U.S. at 147). "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves,* 530 U.S. at 147; *accord Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385. Hence, the plaintiff need not, as a matter of course, introduce additional, independent evidence of discrimination to avoid summary judgment. *See Reeves,* 530 U.S. at 148; *Ratliff,* 256 F.3d at 362; *Blow v. City of San Antonio,* 236 F.3d 293, 298 (5th Cir.2001); *Russell,* 235 F.3d at 223.

Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case" ' that properly may be considered by the court when ruling on a motion for summary judgment. *Price v. Federal Express Corp.,* 283 F.3d 715, 720 (5th Cir.2002) (quoting *Reeves,* 530 U.S. at 148-49);

*accord Laxton,* 333 F.3d at 578; *Crawford,* 234 F.3d at 902. The determination must be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination." *Id.* at 903.

**E. Prima Facie** *Case of Disparate Treatment under Title VII*

To establish a *prima facie* case of disparate treatment, the plaintiff must show that:

 (1) he is a member of a protected class;

 (2) he is qualified for the position;

 (3) he suffered an adverse employment action; and

 (4) others outside the class who were similarly situated were treated more favorably than he.

 **\*11** *See Abarca v. Metropolitan Transit Auth.,* 404 F.3d 938, 941 (5th Cir.2005); *Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358, 360 (5th Cir.2004); *Okoye,* 245 F.3d at 512-13; *Rutherford v. Harris County,* 197 F.3d 173, 183 (5th Cir.1999); *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir.), *cert. denied,* 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998).

In this instance, Williams is undoubtedly a member of a protected class, is qualified for the position, and arguably suffered an adverse action by being suspended for one day without pay. To prevail, however, he must demonstrate that employees outside his protected class received preferential treatment in circumstances nearly identical to his. *See Bryant v. Compass Group USA Inc.,* 413 F.3d 471, 478 (5th Cir.2005), *pet. for cert. filed,* 74 U.S.L.W. 3248 (U.S. Oct. 10, 2005) (No. 05-478) (citing *Mayberry v. Vought Aircraft Corp.,* 55 F.3d 1086, 1019-92 (5th Cir.1995)); *Keelan,* 407 F.3d at 345; *Aldrup v. Caldera,* 274 F.3d 282, 287 n. 23 (5th Cir.2001); *Wallace,* 271 F.3d at 221; *Okoye,* 245 F.3d at 512-13; *Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304-05 (5th Cir.2000), *cert. denied,* 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001). Hence, he must demonstrate that "white [non-protected] employees were treated differently under circumstances nearly identical to his" involving violations of the BOP's Standards of Employee Conduct. *Mayberry,* 55 F.3d at 1090; *accord Bryant,* 413 F.3d at 478; *Okoye,* 245 F.3d at 514; *Wyvill,* 212 F.3d at 304; *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir.1991);

54

*see also Williams v. Trader Pub. Co.,* 218 F.3d 481, 484 (5th Cir.2000); *Bauer,* 169 F.3d at 968.

Williams, however, does not present sufficient evidence to support a finding that he was similarly situated to other employees who allegedly received less stringent discipline for participating in comparable activities. Specifically, he does not show that any non-minority employees went unpunished for engaging in nearly identical conduct. *See Mayberry,* 55 F.3d at 1090; *see also Aldrup,* 274 F.3d at 287 n. 23; *Wallace,* 271 F.3d at 221. Williams suggests that the statistical evidence in Newman's affidavit suffices to satisfy this prong of his *prima facie* case. The affidavit, however, even if the court were to consider it, does not demonstrate that similarly situated, non-class employees were treated differently for engaging in similar behavior.

First, statistics are insufficient, standing alone, to prove a disparate treatment case. *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079 (11th Cir.2004); *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 (11th Cir.1998) (citing *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1131 (11th Cir.1984)); *accord Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 349 (7th Cir.1997); *see also EEOC v. Texas Instruments, Inc.,* 100 F.3d 1173, 1185-86 (5th Cir.1996) ("statistics will have little direct bearing on the specific intentions of the employer when dismissing a particular individual") (quoting *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 848 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994)); *Walther v. Lone Star Gas Co.,* 977 F.2d 161, 162 (5th Cir.1992) ( "proof of ... discriminatory intent ... by statistics alone would be a challenging endeavor").

 **\*12** Second, Williams, in this context, is not merely an employee or supervisor of the BOP. Rather, he is an employee and supervisor of the BOP who, at the very least, engaged in behavior constituting a colorable disciplinary infraction. Williams asserts that he "does not have to show that a non-class member engaged in the identical conduct as he was treated differently." Williams's argument, however, would create a group of "similarly situated" individuals without the requisite bright-line to render the group analytically distinct in context, as there is no evidence as to how many of the group identified by Williams engaged in conduct similar to his. If the court were to adopt Williams's position, evidence that *any* non-class member employee of the BOP was not disciplined in the relevant time period, without regard to his or her behavior, would constitute evidence of disparate

treatment. Such "disparate treatment," premised not upon prohibited, discriminatory animus, but rather on performance and conduct, is entirely legitimate. *See Williams v. Staples, Inc.,* 372 F.3d 662, 668 (4th Cir.2004); *see also Raytheon,* 540 U.S. at 50; *Hockman,* 407 F.3d at 330. The proper inquiry is whether any non-class members who engaged in "nearly identical" behavior involving violations of the BOP's Standards of Employee Conduct were treated differently by receiving a less severe disciplinary sanction. *See Bryant,* 413 F.3d at 478 (quoting *Okoye,* 245 F.3d at 514).

Furthermore, a demonstration of substantial similarity generally requires a showing that a common supervisor was involved in the decision making. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (8th Cir.2000). "When 'different decision-makers are involved, two decisions are rarely similarly situated in all relevant aspects.' " *Id.* (quoting *Stanback v. Best Diversified Prods., Inc.,* 180 F.3d 903, 910 (8th Cir.1999)). Accordingly, decisions made by different supervisors "are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Id.* Williams claims that similar conduct was widely tolerated during his tenure at the BOP; Chandler, however, testified that he had never permitted such behavior to go unpunished. Significantly, Williams fails to provide factual details regarding a single incident of similar conduct that was permitted by Chandler. Hence, even if such conduct were condoned in the past, such evidence is unavailing to Williams if the relevant decision-maker was not Chandler.

Thus, Williams has not presented sufficient evidence to support a finding that he was similarly situated to any non-class member who received preferential treatment. *See Aldrup,* 274 F.3d at 287; *see also Wallace,* 271 F.2d at 221 (citing *Wyvill,* 212 F.3d at 304-05; *Polanco v. City of Austin,* 78 F.3d 968, 977 (5th Cir.1996)). Because Williams has failed to adduce adequate evidence to show that other, non-black employees who were similarly situated were treated more favorably, he has not established a *prima facie* case of disparate treatment, precluding an inference that the employer unlawfully discriminated against him. *Id.* (citing *Reeves,* 530 U.S. at 146-48). Accordingly, Gonzales is entitled to summary judgment on Williams's disparate treatment claim.

### F. Prima Facie *Case of Retaliation under Title VII*
 **\*13** Williams further asserts that Gonzales retaliated against him for participating in an action brought under the Fair Labor Standards Act ("FLSA") seeking back pay for

55

uncompensated overtime worked by BOP employees. *See 29 U.S.C. §§ 201-219.* Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

The anti-retaliation provision has two components-an opposition clause and a participation clause. *See Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 372 (5th Cir.1998), *cert. denied,* 525 U.S. 1068, 119 S.Ct. 798, 142 L.Ed.2d 660 (1999); *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1185 (11th Cir.1997). "The opposition clause of § 2000e-3(a) requires the employee to demonstrate that he had at least a 'reasonable belief' that the practices he opposed were unlawful." *Long v. Eastfield Coll.,* 88 F.3d 300, 304 (5th Cir.1996); *see Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir.2002); *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 969 (9th Cir.2002). The participation clause, however, does not include the "reasonable belief" requirement and provides broad protection to an employee who has participated in a Title VII proceeding. *See Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989); *see also Hashimoto v. Dalton,* 118 F.3d 671, 680 (9th Cir.1997), *cert. denied,* 523 U.S. 1122, 118 S.Ct. 1803, 140 L.Ed.2d 943 (1998). Under both clauses, the employee must demonstrate that his opposition to perceived unlawful activity was a motivating or determining factor in the adverse employment action taken by his employer, *i.e.,* there must be a causal connection. *See Baker v. American Airlines, Inc.,* --- F.3d ----, No. 04-11486, 2005 WL 3005487, at *4 (5th Cir. Nov.9, 2005); *Evans v. City of Houston,* 246 F.3d 344, 353-54 (5th Cir.2001); *Medina v. Ramsey Steel Co.,* 238 F.3d 674, 684-85 (5th Cir.2001).

The Fifth Circuit has held that "the familiar *McDonnell Douglas* burden-shifting framework applies in Title VII retaliation cases." *Mato v. Baldauf,* 267 F.3d 444, 452 (5th Cir.2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2587,

153 L.Ed.2d 777 (2002) (citing *Rios v. Rossotti,* 252 F.3d 375, 380 (5th Cir.2001); *Rubinstein v. Administrators of Tulane Educ. Fund,* 218 F.3d 392, 401-02 (5th Cir.), *cert. denied* 532 U.S. 937 (2001)); *see Septimus v. University of Houston,* 399 F.3d 601, 607-08 (5th Cir.2005); *Aldrup,* 274 F.3d at 286; *Medina,* 238 F.3d at 684. "The framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." *Rios,* 252 F.3d at 380; *accord Patrick v. Ridge,* 394 F.3d 311, 315 n. 10 (5th Cir.2004); *Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 325 (5th Cir.2002); *Aldrup,* 274 F.3d at 286; *Medina,* 238 F.3d at 684. Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions. *See Baker,* 2005 WL 3005487, at *4; *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir.2002); *Aldrup,* 274 F.3d at 286; *Rios,* 252 F.3d at 380; *Medina,* 238 F.3d at 684. If the employer meets its burden, the employee then bears the ultimate burden of showing that the reasons given by the employer are a pretext for retaliation. *See Septimus,* 399 F.3d at 608; *Aldrup,* 274 F.3d at 345; *Aldrup,* 274 F.3d at 286; *Rios,* 252 F.3d at 380; *Medina,* 238 F.3d at 684. To carry his ultimate burden, the plaintiff must demonstrate that the adverse employment action would not have occurred "but for" the employee's participation in the protected activity. *See Septimus,* 399 F.3d at 608; *Mato,* 267 F.3d at 450; *Rios,* 252 F.3d at 380; *Evans,* 246 F.3d at 354.

**\*14** To establish a *prima facie* case of retaliation, a plaintiff must show:

(1) he engaged in statutorily protected activity under Title VII;

(2) an adverse employment action occurred; and

(3) a causal connection exists between the protected activity and the adverse employment action.

*See Baker,* 2005 WL 3005487, at *4; *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 319 (5th Cir.2004); *Roberson v. Alltel Info. Sys.,* 373 F.3d 647, 655 (5th Cir.2004); *Pineda v. United Parcel Serv., Inc.,* 360 F.3d 483, 487 (5th Cir.2004); *Foley v. University of Houston Sys.,* 355 F.3d 333, 339 (5th Cir.2003); *Zaffuto v. City of Hammond,* 308 F.3d 485, 492 (5th Cir.2002); *Perez,* 307 F.3d at 325.

"An employee has engaged in protected activity when he has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding,

56

or hearing' under Title VII." *Douglas,* 144 F.3d at 372-73 (quoting 42 U.S.C. § 2000e-3(a)); *accord Baker,* 2005 WL 3005487, at *4; *Grimes v. Texas Dep't of Mental Health & Mental Retardation,* 102 F.3d 137, 140 (5th Cir.1996). Williams argues that he engaged in protective activity when he provided testimony during an investigation of an FLSA claim prior to his suspension. Providing testimony, however, in an overtime dispute, under a statute other than Title VII, does not constitute protected activity under Title VII. *See* 42 U.S.C. § 2000e(a); *Baker,* 2005 WL 3005487, at *4; *Douglas,* 144 F.3d at 372-73; *Martinez v. Bohls Bearing Equip. Co.,* 361 F.Supp. 608, 616-17 (W.D.Tex.2005).

Because he is unable to establish a *prima facie* case, Williams cannot prevail on his Title VII retaliation claim. As the record does not reflect that he engaged in protected activity under Title VII, Williams has not made the necessary showing to give rise to an inference that Gonzales retaliated against him for engaging in such activity. Therefore, summary judgment in favor of Gonzales is proper with respect to Williams's retaliation claim.

## G. *Hostile Work Environment Racial Harassment under Title VII* [1]

Williams contends that he was a victim of racial harassment. To establish a *prima facie* case of racial harassment by a supervisor with immediate or successively higher authority over the employee, a plaintiff must show that:

(1) he belongs to a protected class;

(2) he was subject to unwelcome harassment;

(3) the harassment was based on race; and

(4) the harassment affected a term, condition, or privilege of employment.

*See Frank v. Xerox Corp.,* 347 F.3d 130, 138 (5th Cir.2003); *Felton v. Polles,* 315 F.3d 470, 484 (5h Cir.2002); *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 353-54 (5th Cir.2001); *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir.1999); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 593 (5th Cir.), *cert. denied,* 516 U.S. 974 (1995). When a supervisory employee is involved, once the plaintiff satisfies these four elements, an " 'employer is subject to vicarious liability to a victimized employee.' " *Watts,* 170 F.3d at 509 (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 764, 118 S.Ct.

2257, 141 L.Ed.2d 633 (1998); *Ackel v. National Comm., Inc.,* 339 F.3d 376, 383 (5th Cir.2003); *Felton,* 315 F.3d at 484. [2]

**\*15** Racially " 'discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII." ' *Walker,* 214 F.3d at 626 (quoting *Wallace,* 80 F.3d at 1049 n. 9); *see Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997)). "Hostile work environment" racial harassment occurs when an employer's conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." ' *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a)). To survive summary judgment on a hostile work environment claim based on race, the nonmovant must create a fact issue as to each of the following elements: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker,* 214 F.3d at 625 (citing *DeAngelis,* 51 F.3d at 594); *accord Felton,* 315 F.3d at 485. Whether a work environment meets these criteria depends upon the totality of the circumstances. *See Harris,* 510 U.S. at 22; *Hockman,* 407 F.3d at 326; *Septimus,* 399 F.3d at 611; *Walker,* 214 F.3d at 625.

To be actionable, the challenged conduct must be sufficiently severe or pervasive as to create an environment that a reasonable person would find hostile or abusive considering all the circumstances. *See Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Septimus,* 399 F.3d at 611; *Felton,* 315 F.3d at 485; *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002); *Allen,* 165 F.3d at 410; *Wright-Simmons,* 155 F.3d at 1269; *Weller,* 84 F.3d at 194. "These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23; *see Septimus,* 399 F.3d at 611; *Walker,* 214 F.3d at 625; *Wright-Simmons,* 155 F.3d at 1269. Conduct in the workplace that could be labeled as "harassment" will not fall within the purview of Title VII, however, if (1) it fails to affect a term, condition, or privilege of employment or

57

(2) it is not based on a prohibited discriminatory animus. *See Trujillo v. University of Colo. Health Sci. Ctr.,* 157 F.3d 1211, 1213 (10th Cir.1998) (quoting *Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir.), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995) (citing *Vinson,* 477 U.S. at 67)); *see also Felton,* 315 F.3d at 485. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at *'discriminat[ion]* ... because of ... [plaintiff's protected status]." ' *Oncale,* 523 U.S. at 80 (emphasis in original) (quoting 42 U.S.C. §§ 2000e-2(a)(1)); *see Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001); *Haynes v. BlueCross & BlueShield of Tex., Inc.,* No. Civ. A. 3:97-CV-2881-R, 2000 WL 140744, at *12 (N.D.Tex. Feb.4, 2000).

**\*16** Moreover, to establish a viable racial harassment claim, the plaintiff must present " 'more than a few isolated incidents of racial enmity." ' *Bolden,* 43 F.3d at 551 (quoting *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417-18 (10th Cir.1987)); *see Chavez v. New Mexico,* 397 F.3d 826, 832 (10th Cir.2005); *Trujillo,* 157 F.3d at 1214. "Title VII 'was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace,' and therefore conduct that only 'sporadically wounds or offends but does not hinder' an employee's performance is not actionable." *Skinner v. Brown,* 951 F.Supp. 1307, 1322 (S.D.Tex.1996), *aff'd,* 134 F.3d 368 (5th Cir.1997) (quoting *Weller,* 84 F.3d at 194); *see also Hockman,* 407 F.3d at 326; *Shepherd v. Comptroller of Pub. Accounts of Tex.,* 168 F.3d 871, 874 (5th Cir.), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999). " '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." ' *Faragher,* 524 U.S. at 788 (quoting *Oncale,* 523 U.S. at 82) (citations omitted); *see Hockman,* 407 F.3d at 328; *Shepherd,* 168 F.3d at 874. The " 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher,* 524 U.S. at 787 (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)); *see Hockman,* 407 F.3d at 328; *Shepherd,* 168 F.3d at 874; *DeAngelis,* 51 F.3d at 595.

Here, Williams does not contend that another employee made any racially derogatory remarks to him or used any racial slurs in his presence. Williams's complaints of animosity, criticism, and threatened disciplinary action fall far short of actionable

racial harassment. *See Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1163-64 (7th Cir.1994). Discourtesy or rudeness should not be confused with racial harassment. *See Faragher,* 524 U.S. at 787. "The complained of conduct must have either a sexual or a racial character or purpose to support a Title VII claim." *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir.), *cert. denied,* 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999); *see Trujillo,* 157 F.3d at 551. "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Vinson,* 477 U.S. at 67. Moreover, a lack of racial sensitivity does not, alone, amount to actionable harassment. *See Faragher,* 524 U.S. at 807. Williams has failed to show that any purported racially-based conduct on the part of Gonzales, Chandler, or any other BOP employee was of such a severe and pervasive nature as to support a racial harassment claim. "[V]ague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment." *Huckabay v. Moore,* 142 F.3d 233, 241 (5th Cir.1998).

**\*17** Williams enumerates several incidents which he maintains constitute racial harassment. First, he complains that Chandler allegedly ordered African-American employees to disperse among the inmate population during meals, pursuant to policy, but permitted white employees to dine together, contrary to policy, on seven or eight separate occasions. While perhaps distasteful, such inconsistent implementation of otherwise legitimate workplace rules simply is not "so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." *Hockman,* 407 F.3d at 326.

Next, Williams alleges that, on December 13, 2000, Chandler threatened plaintiff with disciplinary action at a department head meeting. He further contends that Chandler instigated two separate disciplinary investigations into Williams's conduct. None of these incidents, however, led to any official sanction against Williams. Such sporadic conduct, resulting in no adverse employment consequences towards plaintiff, and without any evidence that they were motivated by racial animus, cannot form the basis for a hostile work environment claim. *See id.; Frank,* 347 F.3d at 138.

Additionally, Williams claims that Chandler undermined his performance by understaffing his department. Nonetheless, Williams acknowledges that he consistently received outstanding performance reviews during Chandler's tenure. Williams further complains that Chandler jeopardized his

performance review by pointing out certain sanitation problems in front of reviewers. Sanitation problems, however, are not listed as an area of concern on his performance review, which was largely favorable. Williams also alleges that Chandler offended him by permitting an associate warden to present a performance award to an African American, while Chandler himself presented performance awards to white employees. Finally, Williams's EEOC charge and affidavits are filled with conclusory allegations that Chandler harassed and encouraged a hostile work environment toward African Americans.

These alleged acts of harassment by Chandler are insufficient to support a *prima facie* case of racial harassment under Title VII. The purported harassment is simply not sufficiently severe to affect a term, condition, or privilege of employment such as to "[destroy] a protected classmember's opportunity to succeed in the workplace." *Hockman,* 407 F.3d at 326. Consequently, Williams is unable to raise a genuine issue of material fact in support of the fourth prong of a *prima facie* case of racial harassment, and summary judgment is mandated on this claim.

### III. *Conclusion*

Summary judgment is warranted on all of Williams's claims. Williams's causes of action under 42 U.S.C. §§ 1981 and 1983 are preempted by Title VII. His Title VII disparate treatment claim fails because the record is devoid of evidence that similarly situated, non-black employees were treated differently. Williams's retaliation claim must be rejected because he cannot establish that he engaged in activity protected by Title VII. Likewise, summary judgment is proper on his Title VII hostile work environment claim, as the purported harassment was not sufficiently severe to trigger the protections of the statute.

**\*18** Accordingly, Gonzales's Motion to Dismiss, or Alternatively, for Summary Judgment is GRANTED. Williams fails to present a claim that merits relief. There remain no material facts in dispute, and Gonzales is entitled to judgment as a matter of law.

---

Footnotes

1   Gonzales argues that Williams has failed to exhaust the required administrative remedies. Certainly, the AJ's decision is devoid of any reference to a racial harassment claim. Because Williams asserted a claim of racial harassment in his original EEO charge and alleged facts relevant to the issue, however, the court will assume *arguendo* that he satisfied the exhaustion requirement. *See Harris v. Parker Coll. of Chiropractic,* 286 F.3d 790, 795 (5th Cir.2002).

2   Although the Supreme Court's decisions in *Faragher* and *Ellerth* deal with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment. *See Walker,* 214 F.3d at 626 n. 13; *Allen,* 165 F.3d at 411; *Wright-Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1269 (10th Cir.1998).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1997867
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas.

Johnathan WILLIAMS, Plaintiff,
v.
CITY OF PORT ARTHUR, TEXAS, Chief
Mark Blanton, Officer Calvin Walker,
Lieutenant Martin Blitch, Major Dennis
Odom, and Sergeant Ken Carona, Defendants.

Civil Action No. 1:10–CV–823.   |   June 1, 2012.

**Attorneys and Law Firms**

Antoine L. Freeman, Antoine L. Freeman, Port Arthur, TX,
for Plaintiff.

Frank David Calvert, Calvert & Eaves, L.L.P., Beaumont,
TX, for Defendants.

**Opinion**

**MEMORANDUM AND ORDER**

MARCIA A. CRONE, District Judge.

**\*1** Pending before the court is Defendants City of Port
Arthur, Texas (the "City"); Chief Mark Blanton ("Chief
Blanton"); Officer Calvin Walker ("Walker"); Lieutenant
Martin Blitch ("Blitch"); Major Dennis Odom ("Odom");
and Sergeant Ken Carona's ("Carona") (collectively,
"Defendants") Amended Motion for Summary Judgment
(# 24). Defendants seek summary judgment as to Plaintiff
Johnathan Williams's ("Williams") claims brought pursuant
to 42 U.S.C. §§ 2000e–2000h–6 ("Title VII"), 42 U.S.C.
§ 1981, 42 U.S.C. § 1983, the Fifth and Fourteenth
Amendments to the United States Constitution, and state law.
Having reviewed the pending motion, the submissions of the
parties, the pleadings, and the applicable law, the court is
of the opinion that the summary judgment motion should be
granted.

**I. *Background*** [1]
On December 29, 2010, Williams, an African American who
is a former police officer with the Port Arthur, Texas, Police
Department (the "Department"), filed the instant lawsuit

against Defendants after his employment was terminated
through an indefinite suspension order issued on October
28, 2009. He asserts claims for race discrimination and
retaliation as well as state law causes of action for assault
and battery; intentional infliction of emotional distress;
libel; slander; negligent supervision, training, and retention;
tortious interference with a prospective business relationship;
and violation of the Texas Whistleblower's Act ("TWA").
Defendants filed a motion to dismiss Williams's original
complaint on February 1, 2011. After obtaining leave of court,
Williams amended his complaint on April 25, 2011, asserting
many of the same causes of action. [2]

In his Amended Complaint, Williams appears to seek
recovery under the following legal theories: employment
discrimination (disparate treatment based on race) and
retaliation in violation of Title VII; civil rights violations
under 42 U.S.C. §§ 1981 and 1983; procedural due process;
assault and battery; intentional infliction of emotional
distress; slander; tortious interference with a business
relationship; and violation of the TWA. He bases his claims
on several incidents (detailed below) that allegedly occurred
during his tenure as a Port Arthur police officer.

**A. *The Profanity Incident***
First, in July 2008, Williams was reportedly suspended for
five days after using profanity toward a citizen who physically
assaulted him. A witness described Williams, who was off-
duty at the time, as the initial aggressor. In his affidavit
dated January 27, 2012, Chief Blanton stated that, during the
investigation of this matter, it was revealed that Williams
"struck the individual on the face and pull[ed][out] his
gun." At a Disciplinary Review Board ("DRB") hearing held
August 3, 2009, Williams admitted fault for this incident and
appeared to concede that the discipline was warranted, stating
"[y]eah I messed up the first time, I did; I took that, I didn't
lie to you. I came in here and told the truth just like I'm telling
the truth in this DRB."

**\*2** Nonetheless, Williams complains that, with regard to
the Profanity Incident, he was treated differently than Joe
Paul ("Paul"), a white Port Arthur police officer, who was
not disciplined for his involvement in a "large biker gang
fight." Williams claims that he informed Chief Blanton of
Paul's actions but was told that: (1) only the incident involving
Williams was being investigated by the Department because
Williams's altercation was caught on video whereas Paul's
was not; and (2) Williams "need not worry about other

officers and how the Department investigates there [sic] misconduct." Contrary to these assertions, however, Chief Blanton testified that the Paul incident was investigated by the department, although no disciplinary action was taken. During that investigation, officers reviewed the video, which was inconclusive as to any wrongdoing on the part of Paul, a witness stated that Paul did not assault anyone, and the alleged victim refused to cooperate with the investigating officers.

### B. *The Beard Incident*

In September 2008, Williams allegedly visited his family doctor regarding facial bumps caused by shaving. He was reportedly told to keep his beard neatly trimmed at a "length no longer than 3/4 inch"[3] and was given a doctor's note excusing him from following the Department's policy requiring officers to be clean-shaven. According to Williams, his immediate supervisor, Blitch, required him to get a second opinion. After receiving the same recommendation, Blitch and Odom allegedly directed Williams to get a third opinion, warning him that if he failed to do so, he would face disciplinary action for disobeying a direct order. Williams contends that several unidentified white police officers were permitted to have beards and goatees without obtaining two doctor's excuses to prove they were unable to follow departmental policy. Defendants, however, insist that Williams was never disciplined for violating any such policy.

### C. *The Insurance Fraud Incident*

Williams next avers that, in December 2008, after he accidentally slammed his thumb in the door of his patrol car, Blitch and Odom had Williams investigated for insurance fraud. Several officers reportedly were asked to give written statements concerning this matter. Williams does not allege any facts about the written statements or the results of the fraud investigation. Chief Blanton testified that Tommy Gibson, a black officer, made the fraud allegations against Williams and that, in any event, "Williams was not disciplined, in any way, relating to the incident where he injured his thumb on the door of his patrol car, or for any alleged insurance fraud." Consistent with Chief Blanton's recollection, Williams later admitted the fraud investigation "didn't go anywhere."

Williams also asserts that, at an unspecified time, an unidentified white officer intentionally "shot up" his squad car and another unidentified white officer was banned from a fitness gym for spying on female patrons.[4] Neither officer

was disciplined or went before a DRB, according to Williams. In response to these averments, Chief Blanton stated in his affidavit:

> **\*3**  I am unaware of any complaints regarding a white officer who shot up a police car, or a white officer that was kicked out of a gym for spying on female patrons and a related trespass warrant. I am aware of an incident in 1978 where a civilian shot and his bullet grazed my patrol car, which was investigated, and I was cleared of any wrongdoing. I am also aware of a civilian employee who was spying on females, and he was either fired, or give [n], and took, the opportunity to resign.

### D. *The Game Warden Incident*

In January 2009, Williams was allegedly sent before a DRB for failing to place an arresting officer's name (the game warden) in a police report. According to Williams, it was not his duty to record the name of the arresting officer; rather, he claims it was an unidentified detective's responsibility. The detective, however, was reportedly not required to appear before a disciplinary review panel. In response, Chief Blanton testified that, although the Game Warden Incident was investigated, a "charge of neglect of duty [against Williams] was not sustained," and he was never disciplined for failing to place the game warden's name in a police report.

### E. *The Memorial High School Incident*

On June 1, 2009, Officer Walker filed a departmental complaint against Williams for his actions during an off-duty job at Memorial High School in Port Arthur that day. According to Walker, after he and Williams broke up a fight between two sixteen-year-old students, the officers disagreed over the proper police protocol. At some point, Williams cursed and shoved Walker. Nonetheless, Williams maintains that Walker grabbed and shoved him as well as cursed several times at Williams by calling him a "young punk."

During the Department's investigation of this incident, several reports and statements were collected and interviews were conducted, revealing, among other things, that Memorial High School administrators were disturbed by Williams's behavior that day. After reviewing the investigator's report, on July 28, 2009, a disciplinary review panel unanimously recommended Williams's termination, noting in its memorandum: "in Officer Williams['s] statement he said that if Anger Management was suggested he would not

61

attend because he stated he did not need it. To maintain his employment with this Police Department would be negligent supervision." The next day, Williams filed his own complaint against Walker arising out of the same incident at Memorial High School.

### F. *The August 3, 2009, DRB Hearing*

A DRB hearing concerning the Memorial High School Incident was held on August 3, 2009. During his interview, Williams acknowledged that Walker placed his hand on Williams's shoulder on two separate occasions in an attempt to talk about how to handle the situation. He also admitted "to refusing to talk to Walker about [their disagreement], [and] cursing at and pushing Officer Walker, knocking him into a cart and into a wall." According to Chief Blanton, "Williams's version of events, ... submitted in two separate statements written over [six] months apart, was ... contradictory, [and] could not be satisfactorily explained in the August 3rd DRB interview." Curiously, Williams stated during this same hearing that he killed seven people in a three-day span while serving in the military in Afghanistan. Williams later admitted to Chief Blanton that he lied about having served in Afghanistan and about having taken any lives.

 **\*4** Regarding this hearing, Williams alleges that he did not receive adequate notice of "the allegations" and complains that the board was not impartial because: (1) it was composed entirely of white employees in violation of the Department's policy requiring at least one minority board member; and (2) Odom and Blitch were permitted to participate as board members and recommend Williams's termination despite a complaint of discrimination allegedly filed against them with the Equal Employment Opportunity Commission ("EEOC") in February 2009, approximately six months previously. According to the hearing transcript, the DRB was composed of the following members: Sergeant Chris Boneau (white), Major Odom (white), Lieutenant Blitch (white), Detective Brian Cater (white), and Officer Heather Primm (white female). Williams appeared at the hearing with his attorney, Mitch Adams.

### G. *Williams's EEOC Complaints*

Williams maintains that he filed a complaint with the EEOC on February 20, 2009, against Defendants Blitch and Odom. Despite these allegations, however, there are only two EEOC charges before the court: one filed on October 6, 2009, and an amended complaint filed on November 18, 2009. Both were filed against the City of Port Arthur Police Department and

cite race discrimination and retaliation. Defendants maintain they have no record of an EEOC charge filed in February 2009.

### H. *Williams's Accusations Against Walker*

Williams next avers that, shortly after the Memorial High School Incident, in June 2009, he informed Defendants Blitch and Odom of reports from citizens accusing Walker (a black male) of having inappropriate relationships with underage girls. Chief Blanton reportedly accused Williams of fabricating the complaints; however, Williams insists that he reported Walker's suspected inappropriate and illegal behavior in good faith.

Defendants have countered with evidence that Debbie Beavers of the Jefferson County District Attorney's Office investigated the charges against Walker by interviewing all of the alleged female victims, none of whom corroborated Williams's story. The Department conducted a separate investigation, requesting reports from twelve officers supposedly possessing personal knowledge of Walker's alleged misconduct. This investigation similarly did not support Williams's accusations. In fact, Williams eventually admitted to Chief Blanton that he falsely accused Walker of illegal conduct with minors in retaliation for Walker's prior departmental complaint stemming from the Memorial High School Incident. Because Williams fabricated the complaints, Sergeant Boneau (who was a member of the DRB for the Memorial High School Incident) filed a charge against Williams on August 27, 2009, for vexatious/unnecessary complaints. The DRB later unanimously sustained this charge against Williams, with four of the five board members recommending termination and one recommending a 120–day suspension.

### I. *The Traffic Incident*

 **\*5** On August 6, 2009, Texas Department of Public Safety Trooper David Martinez ("Trooper Martinez") initiated a complaint against Williams for an incident that occurred the prior day. Williams, while off-duty and in the company of convicted felons, was issued a citation for speeding and two warnings for "failure to yield ROW to emergency vehicle-evading and unapproved/illegal equipment (blue lights)." According to Trooper Martinez, Williams initially evaded him, but he eventually returned. After reviewing memoranda and statements given by Martinez and Williams, Chief Blanton placed Williams on administrative leave on August 6, 2009, pending further investigation. On

62

August 18, 2009, a disciplinary review panel unanimously sustained the charge of nonconformance with laws and recommended a written reprimand against Williams. In light of Williams's checkered employment history, however, including the prior sustained charge of vexatious/unnecessary complaints (against Walker), Chief Blanton determined that indefinite suspension/termination of Williams's employment was appropriate, as reflected in a departmental memorandum dated September 11, 2009.

**J. *Order of Indefinite Suspension***

After concluding that indefinite suspension/termination was warranted, Chief Blanton claims he met with and afforded Williams the opportunity to discuss the charges and proposed punishment, even offering Williams the option of resigning. The indefinite suspension order was issued on October 28, 2009, though Williams appealed the decision to arbitration pursuant to a labor agreement between the City and the Port Arthur Police Association. The arbitrator upheld the indefinite suspension on April 12, 2010.

Williams complains that Chief Blanton's indefinite suspension order contained four unspecified accusations of which Williams "had no prior knowledge." Williams contends that he did not receive notice of these charges before "the DRB hearing" [5] and was never given an opportunity to respond or appear before the board. According to Williams, "white officers in the past always received notice of charges against them and were afforded the opportunity to respond to those charges." Williams does not identify the white officers or the specific charges to which he is referring.

**K. *Williams's Claims***

Based on the foregoing, it appears that Williams is asserting that Defendants Blanton, Blitch, Odom, and the City are liable for discriminating against him on the basis of his race (under a theory of disparate treatment) in violation of 42 U.S.C. §§ 1981, 1983, and 2000e. Williams also alleges that (1) Blanton, Blitch, Odom, and the City retaliated against him for asserting "his 1st Amendment rights when he filed an EEOC complaint against Defendants" and (2) the City retaliated against him for "exercising his rights by opposing a discriminatory practice, making a charge and testifying, assisting, or participating in an investigation or proceeding regarding an unlawful discriminatory practice." Williams further contends that these same defendants violated his procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. In addition

to his federal causes of action, Williams asserts numerous state law claims, including: assault and battery; slander; tortious interference with a prospective business relationship against Walker; intentional infliction of emotional distress against Walker and Carona; and violation of the TWA against Blanton, Blitch, Odom, and the City.

***6** On January 27, 2012, Defendants filed the instant motion, seeking summary judgment as to all of Williams's claims. Defendants assert myriad grounds for dismissal. Williams has neither responded to the pending motion nor proffered evidence in support of any of his claims.

**II. *Analysis***

**A. *Summary Judgment Standard***

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *QBE Ins. Corp. v. Brown & Mitchell, Inc.,* 591 F.3d 439, 442 (5th Cir.2009); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir.2006); *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir.2005).

"A fact is material only if its resolution would affect the outcome of the action ...." *Wiley v. State Farm Fire & Cas. Co.,* 585 F.3d 206, 210 (5th Cir.2009); *accord Cooper Tire & Rubber Co. v. Farese,* 423 F.3d 446, 454 (5th Cir.2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 F.3d 466, 471 (5th Cir.2001). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.,* 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *accord Bayle v. Allstate Ins. Co.,* 615 F.3d 350, 355 (5th Cir.2010); *Wiley,* 585 F.3d at 210; *EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.,* 438 F.3d 519, 523 (5th

63

Cir.2006); *Cooper Tire & Rubber Co.,* 423 F.3d at 454. The moving parties, however, need not negate the elements of the nonmovant's case. *See Bayle,* 615 F.3d at 355; *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir.2005) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)); *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.,* 390 F.3d 336, 339 (5th Cir.2004).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322 n. 3 (quoting FED. R. CIV. P. 56(e)); *Anderson,* 477 U.S. at 256; *Bayle,* 615 F.3d at 355; *EMCASCO Ins. Co.,* 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States,* 391 F.3d 621, 625 (5th Cir.2004). "[T]he court must review the record 'taken as a whole.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau,* 420 F.3d 378, 382 (5th Cir.2005). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves,* 530 U.S. at 150; *EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 615 (5th Cir.2009); *Lincoln Gen. Ins. Co.,* 401 F.3d at 350; *Smith,* 391 F.3d at 624; *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Groh v. Ramirez,* 540 U.S. 551, 562, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (citing *Anderson,* 477 U.S. at 255); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC,* 578 F.3d 255, 258 (5th Cir.2009); *Shields v. Twiss,* 389 F.3d 142, 150 (5th Cir.2004); *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir.2003). The evidence is construed " 'in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.' " *Boudreaux,* 402 F.3d at 540 (quoting *Little,* 37 F.3d at 1075).

**\*7** Furthermore, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner–Lambert Co.,* 581 F.Supp.2d 772, 779 (E.D.Tex.2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its

favor, and summary judgment should be granted." *Eastman Kodak Co.,* 504 U.S. at 468–69; *accord Shelter Mut. Ins. Co. v. Simmons,* 543 F.Supp.2d 582, 584–85 (S.D.Miss.), *aff'd,* 293 F. App'x 273 (5th Cir.2008). The nonmovant's burden is not satisfied by " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' " by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little,* 37 F.3d at 1075 (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)); *Matsushita Elec. Indus. Co.,* 475 U.S. at 586; *Hopper v. Frank,* 16 F.3d 92, 97 (5th Cir.1994); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1086 (5th Cir.1994)); *accord Thibodeaux v. Vamos Oil & Gas Co.,* 487 F.3d 288, 294–95 (5th Cir.2007); *Warfield,* 436 F.3d at 557; *Boudreaux,* 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown,* 337 F.3d at 541; *accord RSR Corp. v. Int'l Ins. Co.,* 612 F.3d 851, 857 (5th Cir.2010); *Hugh Symons Grp., plc v. Motorola, Inc.,* 292 F.3d 466, 468 (5th Cir.), *cert. denied,* 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002); *see Hockman v. Westward Commc'ns, LLC,* 407 F.3d 317, 332 (5th Cir.2004).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322; *EMCASCO Ins. Co.,* 438 F.3d at 523; *Cutrera v. Bd. of Supervisors of La. State Univ.,* 429 F.3d 108, 110 (5th Cir.2005); *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir.2004). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W & T Offshore, Inc.,* 626 F.3d 789, 793 (5th Cir.2010). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23.

Here, Williams, the nonmoving party, has filed no response and has proffered no evidence in opposition to Defendants' motion. Summary judgment may not be awarded by default, however, merely because the nonmoving party has failed to respond. *See Ford–Evans v. Smith,* 206 F. App'x 332, 334 (5th Cir.2006); *United States v. Wilson,* 113 F. App'x 17, 18 (5th Cir.2004); *Hibernia Nat'l Bank v. Administracion Cent.*

64

*Sociedad Anonima,* 776 F.2d 1277, 1279 (5th Cir.1985); *Settlement Capital Corp. v. Pagan,* 649 F.Supp.2d 545, 552 (N.D.Tex.2009). " 'A motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule. The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed.' " *Hetzel v. Bethlehem Steel Corp.,* 50 F.3d 360, 362 n. 3 (5th Cir.1995) (quoting *Hibernia Nat'l Bank,* 776 F.2d at 1279); *see Owens v. Town of Delhi,* 469 F.Supp.2d 403, 405–06 (W.D.La.2007); *Royal Surplus Lines Ins. Co. v. Brownsville Indep. Sch. Dist.,* 404 F.Supp.2d 942, 947–49 (S.D.Tex.2005).

**8** Nonetheless, the court may grant summary judgment if the movants have made a *prima facie* showing that they are entitled to such relief. *See* FED. R. CIV. P. 56(e); *see also Eversley,* 843 F.2d at 174; *Owens,* 469 F.Supp.2d at 405. The nonmovant is " 'under an obligation to respond ... in a timely fashion and to place before the court all materials it wishes to have considered when the court rules on the motion.' " *Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1293 n. 11 (5th Cir.) (quoting *Cowgill v. Raymark Indus., Inc.,* 780 F.2d 324, 329 (3d Cir.1985), *cert. denied,* 513 U.S. 926 (1994)). The court may also accept as undisputed the facts set forth in support of the unopposed motion for summary judgment. *See Eversley,* 843 F.2d at 174; *Lynch,* 2007 WL 211101, at *3; *Perry Williams, Inc.,* 47 F.Supp.2d at 809; *Rayha,* 940 F.Supp. at 1068; Local Rule CV–56(c).

**B.** *Race Discrimination*
In the case at bar, Williams alleges that Defendants Blanton, Blitch, Odom, and the City discriminated against him on the basis of his race. [6] At the outset, however, the court notes that it is unclear whether Williams intends to prosecute his race discrimination claims solely under Title VII or whether he also asserts violations of §§ 1981 and 1983. For example, in his Amended Complaint, Paragraph 10, entitled "NATURE OF ACTION," Williams states:

This is an action under Title 42 U.S.C. Section 1981, 1983, and 2000 to correct unlawful employment practices on the basis of race and color as well to prevent retaliation for the exercise of one's 1st amendment rights. (Title VII CLAIM). In any event, Defendants move for summary judgment as to all causes of action, asserting numerous grounds for relief.

It is well established that Title VII, § 1981, and § 1983 provide parallel causes of action for public employees alleging racial discrimination in employment and require essentially the same proof to establish liability. *See Davis v. Dallas Indep. Sch. Dist.,* 448 F. App'x 485, 490–91 (5th Cir.2011) (citing *Lauderdale v. Tex. Dep't of Crim. Justice,* 512 F.3d 157, 166 (5th Cir.2007)); *Lawrence v. Univ. of Tex. Med. Branch at Galveston,* 163 F.3d 309, 311 (5th Cir.1999). All three statutes require a showing of intentional discrimination. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (Title VII); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (§ 1981); *Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 657 (5th Cir.2012) (Title VII & § 1981); *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.,* 629 F.3d 450, 451 (5th Cir.2010) (§ 1983); *Cox v. City of Dallas,* 430 F.3d 734, 749 (5th Cir.2005), *cert. denied,* 547 U.S. 1130, 126 S.Ct. 2039, 164 L.Ed.2d 783 (2006) (§§ 1981 & 1983); *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (§ 1981, § 1983, & Title VII). In cases where a plaintiff invokes Title VII, § 1981, and § 1983 within the same lawsuit, " 'specific consideration of these alternate remedies for employment discrimination ... is necessary only if their violation can be made out on grounds different from those available under Title VII.' " *Johnston v. Harris Cnty. Flood Control Dist.,* 869 F.2d 1565, 1575 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990) (quoting *Parker v. Miss. State Dep't of Pub. Welfare,* 811 F.2d 925, 927 n. 3 (5th Cir.1987)).

**9** Claims of employment discrimination brought under §§ 1981 and 1983 are generally governed by the same evidentiary framework applicable to claims brought under Title VII. *See, e. g., Hernandez,* 670 F.3d at 650 (Title VII & § 1981); *Jackson v. Watkins,* 619 F.3d 463, 466 (5th Cir.2010) ( Title VII & § 1981); *Davis,* 448 F. App'x at 490–91 (§ 1981 & § 1983); *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 281 n. 7 (5th Cir.2004) ( § 1981 & Title VII); *Harrington v. Harris,* 118 F.3d 359, 367 (5th Cir.1996), *cert. denied,* 522 U.S. 1016, 118 S.Ct. 603, 139 L.Ed.2d 491 (1997) (§ 1981 & Title VII); *Wallace,* 80 F.3d at 1047 (§ 1981, § 1983, & Title VII). Because the same evidentiary burdens apply, a claim that fails on the merits under Title VII, likewise, fails under §§ 1981 and 1983.

In employment discrimination cases, a plaintiff may rely on direct or circumstantial evidence. *See Black v. Pan Am. Labs., L.L. C.,* 646 F.3d 254, 279 (5th Cir.2011); *Jackson,* 619 F.3d at 466; *Lauderdale,* 512 F.3d at 166; *Jones v. Robinson Prop.*

*Grp., L.P.,* 427 F.3d 987, 992 (5th Cir.2005); *Laxton v. Gap Inc.,,* 333 F.3d 572, 578 (5th Cir.2003). " 'Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.' " *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 n. 3 (5th Cir.2003) (quoting *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.2002), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003) (citing *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1217 (5th Cir.1995))); *accord Fahim v. Marriott Hotel Servs., Inc.,* 551 F.3d 344, 349 (5th Cir.2008); *Jones,* 427 F.3d at 992. "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 ... (1973)." *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000); *see Reeves,* 530 U.S. at 142–43; *Fahim,* 551 F.3d at 349; *Nasti v. CIBA Specialty Chems. Corp.,* 492 F.3d 589, 593 (5th Cir.2007); *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 345, 346 (5th Cir.2007).

Where, as here, there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Reeves,* 530 U.S. at 142–43; *Turner v. Kan. City S. Ry. Co.,* 675 F.3d 887, 892 (5th Cir.2012); *Alvarado v. Tex. Rangers,* 492 F.3d 605, 611 (5th Cir.2007); *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 411 (5th Cir.2007). " 'To establish a *prima facie* case, a plaintiff need only make a very minimal showing.' " *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.,* 760 F.2d 633, 639 (5th Cir.1985)); *accord Turner,* 675 F.3d at 892 ("The burden of establishing a *prima facie* case of disparate treatment is not onerous."); *Bauer v. Albemarle Corp.,* 169 F.3d 962, 967 (5th Cir.1999). To establish a *prima facie* case of discrimination under Title VII, a plaintiff may show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was discharged or suffered some adverse employment action; and (4) he was replaced by someone outside the protected class or was treated less favorably than other similarly situated employees outside the protected group. *See Fahim,* 551 F.3d at 350; *Alvarado,* 492 F.3d at 611; *McCoy v. City of Shreveport,* 492 F.3d 551, 556 (5th Cir.2007); *Turner,* 476 F.3d at 345; *Wheeler v. BL Dev. Corp.,* 415 F.3d 399, 405 (5th Cir.), *cert. denied,* 546 U.S. 1061, 126 S.Ct. 798, 163 L.Ed.2d 627 (2005). For a disparate

treatment claim, a plaintiff must demonstrate that employees outside his protected class received preferential treatment in circumstances nearly identical to his. *See Turner,* 675 F.3d at 893; *Bryant v. Compass Grp. USA Inc.,* 413 F.3d 471, 478 (5th Cir.2005), *cert. denied,* 546 U.S. 1090, 126 S.Ct. 1027, 163 L.Ed.2d 855 (2006); *Keelan v. Majestic Software, Inc.,* 407 F.3d 332, 345 (5th Cir.2005); *Perez v. Tex. Dep't of Crim. Justice,* 395 F.3d 206, 210 (5th Cir.2004), *cert. denied,* 546 U.S. 976, 126 S.Ct. 545, 163 L.Ed.2d 459 (2005) (emphasizing that assessment of similarity of employees must be viewed from employer's perspective); *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 221 (5th Cir.2001), *cert. denied,* 535 U.S. 1078, 122 S.Ct. 1961, 152 L.Ed.2d 1022 (2002).

**\*10** Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *Raytheon Co. v. Hernandez,* 540 U.S. 44, 49 n. 3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003); *Reeves,* 530 U.S. at 142; *McDonnell Douglas Corp.,* 411 U.S. at 802; *Moss v. BMC Software, Inc.,* 610 F.3d 917, 922 (5th Cir.2010); *Fahim,* 551 F.3d at 349; *Alvarado,* 492 F.3d at 611; *Nasti,* 492 F.3d at 593. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.' " *Reeves,* 530 U.S. at 142 (quoting *Hicks,* 509 U.S. at 509); *accord Vaughn v. Woodforest Bank,* 665 F.3d 632, 636 (5th Cir.2011); *Alvarado,* 492 F.3d at 611. "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, *'if believed by the trier of fact,'* would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer,* 169 F.3d at 966 (quoting *Hicks,* 509 U.S. at 507) (emphasis in original); *accord Vaughn,* 665 F.3d at 636; *Brown v. Bunge Corp.,* 207 F.3d 776, 781 (5th Cir.2000).

If the employer meets its burden, " 'the *McDonnell Douglas* framework—with its presumptions and burdens'—disappear[s], ... and the sole remaining issue [is] 'discrimination *vel non.*' " *Reeves,* 530 U.S. at 142–43 (quoting *Hicks,* 509 U.S. at 510); *Black,* 646 F.3d at 271; *Nasti,* 492 F.3d at 593; *Wheeler,* 415 F.3d at 405; *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir.2005). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089,

66

67 L.Ed.2d 207 (1981)); *accord Hicks,* 509 U.S. at 507; *Nasti,* 492 F.3d at 593; *Baker v. Am. Airlines, Inc.,* 430 F.3d 750, 753–54 (5th Cir.2005); *Vadie v. Miss. State Univ.,* 218 F.3d 365, 372 (5th Cir.2000), *cert. denied,* 531 U.S. 1150, 121 S.Ct. 1092, 148 L.Ed.2d 966 (2001).

In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must offer sufficient evidence to create a genuine issue of material fact " 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).' " *Rachid,* 376 F.3d at 312 (quoting *Rishel v. Nationwide Mut. Ins. Co.,* 297 F.Supp.2d 854, 865 (M.D.N.C.2003)); *accord Vaughn,* 665 F.3d at 636; *Fahim,* 551 F.3d at 349; *Berquist v. Wash. Mut. Bank,* 500 F.3d 344, 349 (5th Cir.2007), *cert. denied,* 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008); *Keelan,* 407 F.3d at 341. If the plaintiff demonstrates that race was a "motivating factor" in the employment decision, the defendant must then prove " 'that the same adverse employment decision would have been made regardless of discriminatory animus.' " *Keelan,* 407 F.3d at 341 (quoting *Rachid,* 376 F.3d at 312); *accord Black,* 646 F.3d at 269 n. 6; *Machinchick,* 398 F.3d at 352. The plaintiff will prevail if the employer fails to carry this burden. *Keelan,* 407 F.3d at 341; *Machinchick,* 398 F.3d at 352; *Rachid,* 376 F.3d at 312.

**\*11**  Under the pretext alternative approach, the "plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.' " *Laxton,* 333 F.3d at 578 (citing *Reeves,* 530 U.S. at 143; *Wallace,* 271 F.3d at 220); *accord Nasti,* 492 F.3d at 593. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton,* 333 F.3d at 578 (citing *Sandstad,* 309 F.3d at 899); *accord Vaughn,* 665 F.3d at 637; *Burrell,* 482 F.3d at 412. "[I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves,* 530 U.S. at 147 (emphasis in original); *accord Carmona v. Sw. Airlines Co.,* 604 F.3d 848, 861 (5th Cir.2010); *Bryant,* 413 F.3d at 476; *Kanida v. Gulf Coast Med. Pers. LP,* 363 F.3d 568, 574 (5th Cir.2004); *West,* 330 F.3d at 385; *Ratliff v. City of Gainesville,* 256 F.3d 355, 360 (5th Cir.2001). "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case,

is likely to support an inference of discrimination without further evidence of defendant's true motive." *Laxton,* 333 F.3d at 578 (citing *Sandstad,* 309 F.3d at 897); *accord Black,* 646 F.3d at 276; *Machinchick,* 398 F.3d at 351 (citing *Reeves,* 530 U.S. at 147–48). " '[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.' " *Russell,* 235 F.3d at 223 (quoting *Reeves,* 530 U.S. at 147); *accord Black,* 646 F.3d at 276; *Laxton,* 333 F.3d at 578; *West,* 330 F.3d at 385. Hence, the plaintiff need not, as a matter of course, introduce additional, independent evidence of discrimination to avoid summary judgment. *See Reeves,* 530 U.S. at 148; *Ratliff,* 256 F.3d at 361–62; *Blow v. City of San Antonio,* 236 F.3d 293, 298 (5th Cir.2001); *Russell,* 235 F.3d at 223.

Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case' " that properly may be considered by the court when ruling on a motion for summary judgment. *Price v. Fed. Express Corp.,* 283 F.3d 715, 720 (5th Cir.2002) (quoting *Reeves,* 530 U.S. at 148–49); *accord Machinchick,* 398 F.3d at 351 n. 14; *Laxton,* 333 F.3d at 579; *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000).

Because the plaintiff has the ultimate burden of proving intentional discrimination, "[a]n employer is entitled to judgment as a matter of law on this ultimate question 'if the evidence taken as a whole would not allow a jury to infer that the actual reason for the [employer's decision] was discriminatory.' " *Brown v. Kinney Shoe Corp.,* 237 F.3d 556, 565 (5th Cir.), *cert. denied,* 534 U.S. 817, 122 S.Ct. 45, 151 L.Ed.2d 17 (2001) (quoting *Vadie,* 218 F.3d at 372). "A mere scintilla of evidence of pretext does not create an issue of material fact in all cases." *Crawford,* 234 F.3d at 902 (citing *Wyvill,* 212 F.3d at 301). "It is, therefore, possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." *Crawford,* 234 F.3d at 903 (citing *Travis v. Bd. of Regents of the Univ. of Tex. Sys.,* 122 F.3d 259, 263 (5th Cir.1997), *cert. denied,* 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998)). "The determination must be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence, as to whether a jury could reasonably infer discrimination." *Id.*

67

**\*12** In his Amended Complaint, Williams details several occurrences which form the bases of his race discrimination claims; however, none are viable. First, regarding the Profanity Incident in July 2008, Williams presents no evidence to rebut Chief Blanton's explanation that Williams was suspended for five days because he not only used profanity, but also was the initial aggressor and "struck the individual on the face and pull[ed][out] his gun." This uncontested evidence demonstrates that race played no part in Williams's suspension. Notably, because Williams later admitted fault for this incident, stating "[y]eah I messed up the first time, I did," he appears to concede that the City suspended him because he "messed up," not because of his race. Moreover, Williams's comparison of the Profanity Incident to Paul's "large biker gang fight" does not save his claim, as that situation—involving an inconclusive investigation and a witness stating that Paul was not at fault—is not factually similar to the circumstances presented here (*i.e.*, where Williams is characterized as the initial aggressor). *See Turner,* 675 F.3d at 893; *Davis v. Farmers Ins. Exch.,* 372 F. App'x 517, 520 (5th Cir.2010); *Taylor v. Peerless Indus. Inc.,* 322 F. App'x 355, 365–66 (5th Cir.2009); *Fahim,* 551 F.3d at 350. Even assuming that Williams makes out a *prima facie* case for alleged discrimination, he has neither produced evidence suggesting that race was a motivating factor in the City's decision to suspend or discharge him nor evidence rebutting the City's proffered reasons therefor. As a result, Williams's claim of race discrimination based upon the July 2008 suspension is legally infirm under both the pretext and mixed-motive theories. *See Taylor,* 322 F. App'x at 368; *Coronado v. San Patricio Cnty.,* No. C–10–178, 2011 WL 923458, at \*5 (S.D.Tex. Mar.15, 2011).

Williams's next race discrimination claim, based on the Beard incident in September 2008, also fails for lack of evidence. Defendants contend that Williams was never disciplined for violating the Department's shaving policy, and Williams presents no evidence to substantiate his assertions. Consequently, he has failed to show that he suffered an adverse employment action. *See Sarwal v. Principi,* 226 F. App'x 334, 336 (5th Cir.2007) (holding that letter counseling of a dress code that had no disciplinary effect was not an "adverse employment action" required to make out a *prima facie* case of discrimination); *see also Lewis v. United Parcel Serv., Inc.,* 252 F. App'x 806, 808 (9th Cir.2007) (finding no adverse employment action where employee was threatened with discipline for not following the employer's grooming policy, but never actually disciplined).

Similarly, regarding the Insurance Fraud Incident—in which Williams complains that he was wrongfully investigated for insurance fraud after he slammed his thumb in the door of his patrol car—Chief Blanton testified that Williams was investigated only after a black officer reported suspicions of insurance fraud, but that, in any event, Williams was never disciplined. Williams's later concession that the fraud investigation "didn't go anywhere" is consistent with Chief Blanton's account. It appears, therefore, that not only was the investigation without racial animus, but also that he was not treated less favorably than similarly situated employees outside his protected class and did not suffer an adverse employment action. *See Sarwal,* 226 F. App'x at 336; *Robison v. Tex. Dep't of Crim. Justice,* 94 F. App'x 225, 228 (5th Cir.2004) (affirming district court's grant of summary judgment as to plaintiff's Title VII claim on the basis that plaintiff suffered no adverse employment action where he failed to submit evidence that he was "fired, reassigned, denied promotion, suffered a change in benefits, or disciplined"); *Davila v. FedEx Trade Sys., Inc.,* No. L–08–74, 2010 WL 346139, at \*6 (S.D.Tex. Jan.22, 2010) (stating that because plaintiff provided no evidence that he was disciplined for being tardy, he was unable to show that he was treated less favorably than similarly situated employees outside his protected group); *accord Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund,* 349 F.3d 300, 306 (6th Cir.2003) (reasoning that plaintiff was unable to show she suffered adverse employment action where she was not terminated, disciplined, or demoted).

**\*13** Williams's complaint that he was sent before a disciplinary review panel for failing to place an arresting officer's name (the Game Warden) in a police report meets a similar fate. It is undisputed that Williams was not disciplined for failing to place an arresting officer's name in a police report, and any "charge of neglect of duty" was not sustained by the Department. Therefore, Williams did not suffer an adverse employment action. *See Sarwal,* 226 F. App'x at 336; *Robison,* 94 F. App'x at 228; *Davila,* 2010 WL 346139, at \*6; *accord Gettings,* 349 F.3d at 306.

Regarding Williams's indefinite suspension/discharge from the police force, even assuming he has made out a *prima facie* case of race discrimination,[7] he does not point to any evidence refuting the City's reasons for terminating his employment. *See Nasti,* 492 F.3d at 593; *Laxton,* 333 F.3d at 578. Williams also produces no evidence that his race was a motivating factor in the City's decision. *See*

68

*Taylor,* 322 F. App'x at 368; *Coronado,* 2011 WL 923458, at *5. Rather, the uncontroverted evidence demonstrates that Williams was indefinitely suspended for numerous rule violations relating to nonconformance to laws, misconduct, unbecoming conduct, untruthfulness, vexatious/unnecessary complaints, and conduct prejudicial to good order within the police department. According to Chief Blanton, all of these charges stemmed from four primary situations: (1) the Memorial High School Incident; (2) Williams's admittedly false accusation that Walker had inappropriate relationships with underage girls; (3) the Traffic Incident with Trooper Martinez; and (4) Williams's fabrication in the DRB hearing about his military service (*i.e.,* killing seven men in a three-day period in Afghanistan). Because the record is devoid of evidence suggesting that the City's proffered reasons for terminating Williams's employment were pretextual or that race was a motivating factor in the City's decision, summary judgment is warranted as to all of Williams's race discrimination claims. [8] *See Davis,* 372 F. App'x at 520 (affirming summary judgment in favor of defendant where plaintiff presented no competent summary judgment evidence suggesting that her employer's reason for her discharge was a pretext or that a discriminatory motive played any role in the employer's decision); *McCoy,* 492 F.3d at 562 (affirming district court's grant of summary judgment where plaintiff adduced no evidence that her employer's reasons for placing her on administrative leave were pretextual); *Ochoa v. BP Am., Inc.,* No. H–09–1226, 2012 WL 1230186, at *13 (S.D.Tex. Mar. 29, 2011) (granting summary judgment where plaintiff proffered no evidence of discriminatory motive or pretext).

## C. Retaliation

Defendants also move for summary judgment as to Williams's retaliation claims, which appear to be founded solely on Title VII's statutory provisions. [9] Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act:

   **\*14** It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
   42 U.S.C. § 2000e–3.

As with discrimination claims, the *"McDonnell Douglas* burden-shifting framework applies in Title VII retaliation cases." *Mato v. Baldauf,* 267 F.3d 444, 452 (5th Cir.2001), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2587, 153 L.Ed.2d 777 (2002) (citing *Rios v. Rossotti,* 252 F.3d 375, 380 (5th Cir.2001); *Rubinstein v. Adm'rs of Tulane Educ. Fund,* 218 F.3d 392, 401–02 (5th Cir.2000)); *accord Strong v. Univ. Health Care Sys., L.L. C.,* 482 F.3d 802, 805 (5th Cir.2007); *Turner,* 476 F.3d at 348; *Septimus v. Univ. of Houston,* 399 F.3d 601, 607–08 (5th Cir.2005). Further, "[t]he framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." *Rios,* 252 F.3d at 380; *accord Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 325 (5th Cir.2002); *Aldrup v. Caldera,* 274 F.3d 282, 286 (5th Cir.2001); *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 684 (5th Cir.2001). Therefore, after the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions. *Hernandez,* 670 F.3d at 657; *Strong,* 482 F.3d at 805; *Baker,* 430 F.3d at 754–55; *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir.2002). If the employer meets its burden, the employee may rebut a defendant's legitimate, nondiscriminatory reason for an adverse employment action by demonstrating that " '(1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative).' " *Hollins v. Premier Ford Lincoln Mercury, Inc.,* 766 F.Supp.2d 736, 756 (N.D.Miss.2011) (quoting *Davis,* 372 F. App'x at 519). Under a pretext theory, to carry his ultimate burden, the plaintiff must demonstrate that the adverse employment action would not have occurred "but for" the employee's participation in the protected activity. *See Nunley v. City of Waco,* No. 11–50119, 2011 WL 3861678, at *5 (5th Cir. Sept.1, 2011); *Hernandez,* 670 F.3d at 658; *Strong,* 482 F.3d at 806; *Septimus,* 399 F.3d at 608.

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) he engaged in statutorily protected activity under Title VII; (2) action was taken by the employer against the plaintiff that a reasonable employee would consider materially adverse; and (3) a causal connection exists between the protected activity and the adverse action. *See McCoy,* 492 F.3d at 556–57, 559; *Lemaire v. La. Dep't of Transp. & Dev.,* 480 F.3d 383, 388 (5th Cir.2007); *Turner,* 476 F.3d at 348.

   **\*15** In his Amended Complaint, Williams alleges that the City "instituted a campaign of retaliation which included

69

having co-workers document all actions by client that could be used against him for termination as well as forcing [Williams] to go before the Disciplinary Review Board regarding minor infraction" because he exercised his rights "by opposing a discriminatory practice, making a charge and testifying, assisting, or participating in an investigation or proceeding regarding an unlawful discriminatory practice." Although it is unclear what incident Williams maintains prompted the City to engage in such activity, in same section of his Amended Complaint, Williams claims he was retaliated against because he "exercised his 1st amendment rights when he filed an EEOC complaint." A reading of Williams's complaint indicates that Defendants' purported retaliation is based upon the EEOC charge Williams states he filed in February 2009 against Blitch, Odom, and the City. As previously noted, however, despite Williams's assertion to the contrary, there is no evidence that any such charge exists. The only two EEOC charges before the court were filed on October 6, 2009, and November 18, 2009, respectively. Defendants counter that they have no record of an EEOC charge filed in February 2009. Indeed, Chief Blanton testified as follows:

> Neither I, nor my office, has ever received Williams's alleged February 2009 EEOC Charge of Discrimination, or any type of notice thereof, which is allegedly focused on Lt. Blitch and/ or Major Odom. I further had never heard of this alleged February 2009 EEOC charge prior to reviewing the Complaint in this lawsuit. I have also spoken with Blitch and Odom, and they state they were not aware of, and have never seen, a February 2009 EEOC Charge alleged against them by Williams.

Moreover, Chief Blanton swore under oath that the decision to discharge Williams was made prior to the October 6, 2009, EEOC charge. Specifically, Chief Blanton explained that, although the indefinite suspension order was issued on October 28, 2009, the decision to discharge Williams was made more than a month earlier, as evidenced by a departmental memorandum issued by the DRB on August 18, 2009. In a space provided at the bottom of this document is Chief Blanton's hand-written decision to terminate Williams's employment, followed by his signature and the date, "9/11/09." In fact, Chief Blanton stated that he

only became aware of Williams's October 6, 2009, EEOC charge on November 4, 2009, when he was notified by the City's attorney. Again, Williams makes no argument and points to no evidence to refute Blanton's assertions. Under these circumstances, Williams's retaliation claims fail under the third *prima facie* element—causal connection between the protected activity (the filing of the EEOC charge) and the adverse action (Williams's termination). Indeed, under the causation prong, "a plaintiff must show that the decisionmaker who committed the adverse employment action was aware of the plaintiff's protected activity." *Perches v. Elcom, Inc.,* 500 F.Supp.2d 684, 692 (W.D.Tex.2007) (citing *Manning v. Chevron Chem. Co.,* 332 F.3d 874, 883 (5th Cir.2003), *cert. denied,* 540 U.S. 1107, 124 S.Ct. 1060, 157 L.Ed.2d 892 (2004)); *see Gollas v. Univ. of Tex. Health Sci. Ctr.,* 425 F. App'x 318, 325 (5th Cir.2011); *Ackel,* 339 F.3d at 385–86; *Medina,* 238 F.3d at 684; *Smith v. Potter,* 629 F.Supp.2d 644, 656 (S.D.Miss.2009). "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 168 (5th Cir.1999); *accord Gollas,* 425 F. App'x at 325; *Ackel,* 339 F.3d at 385–86; *Manning,* 332 F.3d at 883.

**\*16** To the extent Williams asserts a § 1983 First Amendment retaliation claim, it is not actionable here for the same reason—the undisputed evidence demonstrates that the decision to indefinitely suspend/terminate Williams was made before he filed a complaint of discrimination with the EEOC. *See Garrett v. Judson Indep. Sch. Dist.,* 299 F. App'x 337, 346 (5th Cir.2008) (recognizing that to sustain a First Amendment retaliation claim, a plaintiff must show that his speech motivated the adverse employment action); *Alexander v. Eeds,* 392 F.3d 138, 142 (5th Cir.2004) (stating that protected speech must precipitate the adverse employment action).

### D. *Procedural Due Process* [10]

Williams also asserts procedural due process claims against Defendants Blanton, Blitch, Odom, and the City. He maintains that he was deprived of his employment [11] without due process of law because his indefinite suspension order allegedly contained four unidentified charges of which Williams allegedly had no knowledge prior to the DRB hearing. [12] He also complains that he was denied a fair DRB hearing, reasoning that (1) Blitch and Odom, as board members, could not be impartial in light of the EEOC charge

Williams purportedly filed against them in February 2009, and (2) according to Williams, his DRB panel did not include a minority member, which he contends is a violation of departmental policy.

The Due Process Clause of the Fourteenth Amendment provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Procedural due process claims require a two-part analysis: (1) whether the plaintiff has a life, liberty, or property interest that is entitled to procedural due process protection; and (2) if so, what process is due. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Bd. of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Baldwin v. Daniels,* 250 F.3d 943, 946 (5th Cir.2001); *Findeisen v. N.E. Indep. Sch. Dist.,* 749 F.2d 234, 237 (5th Cir.1984) (pointing out that a court reviewing a procedural due process claim must determine if the plaintiff was "deprived of a protected property interest" and, if so, whether the deprivation was accomplished "without adherence to due process minimums"); *Givs v. City of Eunice,* 512 F.Supp.2d 522, 545 (W.D.La.2007), *aff'd,* 268 F. App'x 305 (2008). "The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Browning v. City of Odessa,* 990 F.2d 842, 844 (5th Cir.1993) ("before dismissing [a public] employee, the employer need only provide the employee with written or oral notice of the charges raised against him, explain to the employee the nature of the evidence of those charges, and afford the employee an opportunity to respond"); *Price v. Brittain,* 874 F.2d 252, 261 (5th Cir.1989) (same) (citing *Glenn v. Newman,* 614 F.2d 467, 472 (5th Cir.1980)). Procedural due process does not require that plaintiffs be afforded all the procedural safeguards found in a "trial-type" hearing, and plaintiffs must allege specific insufficiencies in the process afforded them to prevail on a denial of due process claim. *See Robison v. Wichita Falls & N. Tex. Cmty. Action Corp.,* 507 F.2d 245, 252 (5th Cir.1975); *accord Rodriguez v. Ysleta Indep. Sch. Dist.,* No. EP05–CV–0112, 2006 WL 1544604, at *5 (W.D.Tex. May 30, 2006), *aff'd,* 217 F. App'x 294 (5th Cir.2007).

**\*17**  As with Williams's other causes of action, his procedural due process claims fail for lack of evidence. As set forth above, Williams asserts that his indefinite suspension order contained four charges of which he had no prior knowledge. First, Williams does not identify these "four charges," and, in any event, the record belies this contention. As set forth above, Williams was terminated for several rule violations stemming from the Memorial High School Incident, his false accusation against Walker (regarding inappropriate behavior with minors), the Traffic Incident with Trooper Martinez, and Williams's false statement about his military service. Prior to his termination, Williams participated (with his attorney) in the DRB hearing on August 3, 2009. [13] Williams was also sent written notification on August 7, 2009, placing him on administrative leave pending an independent investigation of the Traffic Incident. In addition, Williams submitted written correspondence regarding the investigations of the Memorial High School Incident, Officer Walker's alleged activity with minors, and the Traffic Incident. Importantly, before issuing the indefinite suspension order, Chief Blanton met with Williams to discuss each charge and the proposed punishment of indefinite suspension/termination, providing Williams an opportunity to respond. According to Chief Blanton, he discussed these charges with Williams "on at least two occasions" and offered Williams the option of resigning. Further, pursuant to the labor agreement between the City and the Port Arthur Police Association, Williams's indefinite suspension was not final the day it was issued. Williams was allowed to, and did, appeal to the City Manager and to binding, final arbitration. It was not until April 12, 2010, after a full arbitration proceeding (on February 3 and 4, 2010) in which Williams was represented by counsel, that the arbitrator upheld Williams's indefinite suspension. *See Browning,* 990 F.2d at 844 (finding short informal meeting with superior officer sufficient to satisfy due process where plaintiff was given notice of his possible termination, the reasons therefor, an opportunity to respond, and plaintiff could avail himself of elaborate post-termination procedural safeguards). Because Williams has presented no contrary evidence raising a fact issue, the court finds that he received constitutionally adequate notice and an opportunity to be heard. As a consequence, Defendants are entitled to summary judgment as to Williams's due process claims.

**E.** *State Law Claims*

**1.** *TWA*

Williams v. City of Port Arthur, Tex., Not Reported in F.Supp.2d (2012)

Next, Defendants seek summary judgment on Williams's TWA claims brought against Defendants Blanton, Blitch, Odom, and the City [14]—which are based upon Williams's reporting Walker's allegedly inappropriate behavior with underage girls. Section 554.002 of the TWA prohibits retaliation against an employee for reporting a perceived violation of the law. *See* TEX. GOV'T CODE ANN. § 554.002; *accord Moreno v. Tex. A & M Univ.-Kingsville,* 339 S.W.3d 902, 907 (Tex.App.-Corpus Christi, 2011, pet. filed). "To establish a whistleblower claim, an employee must demonstrate that (a) the employee reported an alleged violation of law to an appropriate law enforcement authority; (b) the employee made the report in good faith; (c) the employer took an adverse employment action against the employee because the employee made the report; and (d) the employer's action proximately caused the employee's injuries." *Forsyth v. City of Dallas,* 91 F.3d 769, 775 (5th Cir.1996), *cert. denied,* 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997); *Jackson v. Singh,* No. H–06–2920, 2008 WL 2690357, at *16 (S.D.Tex. July 8, 2008); *Moreno,* 339 S.W.3d at 907. "A public employee whose employment is suspended or terminated or who is subjected to an adverse personnel action in violation of [the Act]" is entitled to sue for injunctive relief, actual damages, court costs, and reasonable attorneys' fees. TEX. GOV'T CODE ANN. § 554.003(a); *accord Bates v. Randall Cnty.,* 297 S.W.3d 828, 834–35 (Tex.App.-Amarillo 2009, no pet.); *City of Houston v. Levingston,* 221 S.W.3d 204, 231 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

**\*18** The purpose of the Whistleblower Act is twofold: (1) to "protect public employees from retaliation by their employer when, in good faith, they report a violation of law, and (2) to secure lawful conduct by those who direct and conduct the affairs of government." *Bates,* 297 S.W.3d at 837 (citing *City of New Braunfels v. Allen,* 132 S.W.3d 157, 161 (Tex.App.-Austin 2004, no pet.)). "Because the Act is remedial in nature, it should be liberally construed to effect its purpose." *Id.*

For purposes of the TWA, the Texas Supreme Court has held that " 'good faith' means that (1) the employee subjectively believed that the conduct reported was a violation of law, and (2) the employee's belief was reasonable in light of the employee's training and experience." *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 320 (Tex.2002) (citing *Wichita Cnty. v. Hart,* 917 S.W.2d 779, 784 (Tex.1996)). "The test's first element-the 'honesty in fact' element-ensures that an employee seeking a Whistleblower Act remedy believes he was reporting an actual violation of law." *Needham,* 82 S.W.3d at 320 (citing *Hart,* 917 S.W.2d at 784–85). "The test's second element ensures that, even if the reporting employee honestly believed that the reported act was a violation of law, the reporting employee only receives Whistleblower Act protection if a reasonably prudent employee under similar circumstances would have believed the facts, as reported, were a violation of law." *Needham,* 82 S.W.3d at 320 (citing *Hart,* 917 S.W.2d at 785). Here, Williams's admission that he falsely accused Officer Walker of criminal conduct with minor girls at Memorial High School dooms his TWA claim. Because this undisputed fact illustrates Williams's lack of good faith, Defendants are entitled to summary judgment on Williams's whistleblower claim.

## 2. *Tort Claims*

Williams next asserts claims for assault and battery, slander, and tortious interference with a prospective business relationship against Walker and intentional infliction of emotional distress against Walker and Carona. Defendants seek the dismissal of these claims pursuant to Texas Civil Practice and Remedies Code § 101.106(a) and (e). Pursuant to § 101.106 of the TTCA, a plaintiff must "decide at the outset [of a lawsuit] whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable." *Mission Consol. Indep. Sch. Dist. v. Garcia,* 253 S.W.3d 653, 657 (Tex.2008). The purpose behind this election of remedies provision, the Texas Supreme Court has reasoned, is to "reduc[e] the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery." *Id.* Section 101.106 of the TTCA provides in relevant part:

(a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

\* \* \*

**\*19** (e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

72

Williams v. City of Port Arthur, Tex., Not Reported in F.Supp.2d (2012)

TEX. CIV. PRAC. & REM.CODE § 101.106; *accord Mission Consol. Indep. Sch. Dist.,* 253 S.W.3d at 656–57. Thus, "when TTCA claimants elect to include the governmental unit as a party to a suit, whether alone or in conjunction with a governmental employee, TTCA claimants have made an irrevocable election of remedies that they will look solely to the governmental unit for compensation for [the] injury." *Villasan v. O'Rourke,* 166 S.W.3d 752, 759 (Tex.App.-Beaumont 2005, pet. denied); *accord Mission Consol. Indep. Sch. Dist.,* 253 S.W.3d at 657–59; *Kamel v. Univ. of Tex. Health Sci. Ctr.,* 333 S.W.3d 676, 688 (Tex.App.-Houston [1st Dist.] 2010, pet. denied). " '[A]ll [common-law] tort theories alleged against a governmental unit ... are assumed to be "under [the Tort Claims Act]" for purposes of section 101.106.' " *Franka v. Velasquez,* 332 S.W.3d 367, 369 (Tex.2011) (quoting *Mission Consol. Indep. Sch. Dist.,* 253 S.W.3d at 659); *accord Bustos v. Martini Club Inc.,* 599 F.3d 458, 463–64 (5th Cir.2010).

In the case at bar, Williams filed his Original Complaint on December 29, 2010, asserting claims for intentional infliction of emotional distress, slander, and tortious interference with prospective business relationship against the City as well as one or more of the individual defendants named in the Amended Complaint. These causes of action are identical to those asserted in Williams's Amended Complaint and are based upon the same subject matter. Therefore, despite Williams's decision to drop such claims against the City in his Amended Complaint, upon filing his initial Complaint, he made an irrevocable election under § 101.106(a) and forever relinquished his right to recover "against any individual employee of the governmental unit regarding the same subject matter." *See* TEX. CIV. PRAC. & REM.CODE § 101.106; *see also Alcala v. Tex. Webb Cnty.,* 620 F.Supp.2d 795, 807–08 (S.D.Tex.2009) (holding in the context of a motion to amend the complaint, that once the plaintiff makes an election under § 101.106, the decision cannot be rescinded by a subsequent amendment) (citing *Flores v. Sanchez,* No. EP–04–CA–056–PRM, 2005 WL 1404163, at *3 n. 6 (W.D.Tex. June 14, 2005) (stating that plaintiffs must abide by their initial decision and its consequences under § 101.106)).

Regarding the assault and battery claim against Walker, Defendants argue that Williams previously asserted (in his Original Complaint) this same cause of action against the City through his allegation of *respondeat superior* and ratification. The court disagrees. The Original Complaint states in relevant part:

**RESPONDEAT SUPERIOR AND RATIFICATION**

25. Whenever in this complaint it is alleged that the Defendant, City of Port Arthur, Texas, did any act or thing, it is meant that the Defendant's officers, agents, servants, employees or representatives did such act/or that at that time such act was done with the full authorization or ratification of the Defendant or was done in the normal course and scope of employment of Defendant's officers, agents, servants, employees, or representatives.

### ASSAULT AND BATTERY BY OFFICER CALVIN WALKER

**\*20** 26. Defendant Officer Calvin Walker intentionally, knowingly, or recklessly made contact with Plaintiff's person or threatened Plaintiff with imminent bodily injury which caused injury to Plaintiff. Defendant, Calvin Walker grabbed Plaintiff several times while at the same time calling Plaintiff a young punk. Defendant, Calvin Walker caused Plaintiff to suffer pain and embarrassment. Plaintiff suffered damages for which Plaintiff herein sues.

The express language of Williams's Original Complaint limits the assault and battery claim to Officer Walker and does not appear also to assert this cause of action against the City via Paragraph 25. As a result, this claim is not barred against Officer Walker. *See Green v. Nueces Cnty.,* No. C–09–316, 2010 WL 918972, at *5 (S.D.Tex. Mar.15, 2010) (citing *Kelemen v. Elliot,* 260 S.W.3d 518, 523 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (stating that § 101.106(e) only applies where a plaintiff files claims against the government and individuals); *Bohmfalk v. City of San Antonio,* No. SA–09–CV–0497, 2009 WL 4263352, at *3–4 (W.D.Tex. Nov.3, 2009). Nevertheless, as Williams's sole remaining state law claim, the court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367 (stating that a district court may decline to exercise supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction"). [15]

### III. *Conclusion*

In accordance with the foregoing analysis, Defendants' Motion for Summary Judgment is GRANTED. Williams fails to present a claim that warrants relief. There remain

73

no material facts in dispute, and Defendants are entitled to judgment as a matter of law.

Footnotes

1    Williams did not file a response to this motion. Accordingly, the court accepts as undisputed the facts set forth by Defendants. *See Eversley v. MBank Dallas,* 843 F.2d 172, 175 (5th Cir.1988); *Lynch v. Jet Ctr. of Dallas, LLC,* No. 3:05–CV–2229–L, 2007 WL 211101, at \*3 (N.D.Tex. Jan.26, 2007); *Perry Williams, Inc. v. FDIC,* 47 F.Supp.2d 804, 809 (N.D.Tex.1999); *Rayha v. United Parcel Serv., Inc.,* 940 F.Supp. 1066, 1068 (S.D.Tex.1996); Local Rule CV–56(c).

2    Defendants' Motion to Dismiss the Original Complaint was denied as moot on April 26, 2011.

3    Presumably, Williams means that he was advised by his physician to keep his beard no *shorter* than 3/4 inch.

4    Williams apparently makes these allegations in an effort to show that he was treated differently than similarly situated white employees.

5    Presumably, Williams refers to the DRB hearing held on August 3, 2009.

6    To the extent Williams asserts Title VII claims against the individual defendants, they are dismissed, as these individuals do not fit the statutory definition of employer set forth in 42 U.S.C. § 2000e(b). *See Walters v. Metro. Educ. Enter., Inc.,* 519 U.S. 202, 205, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997); *Oden v. Oktibbeha Cnty.,* 246 F.3d 458, 465 (5th Cir.), *cert. denied,* 534 U.S. 948, 122 S.Ct. 341, 151 L.Ed.2d 258 (2001); *see also Baldwin v. Layton,* 300 F. App'x 321, 322 (5th Cir.2008) (stating that the Fifth Circuit has "repeatedly rejected any individual liability under Title VII") (citing *Ackel v. Nat'l Commc'ns, Inc.,* 339 F.3d 376, 382 n. 1 (5th Cir.2003)); *accord Upchurch v. City of Moss Point,* No. 1:10–CV–228, 2011 WL 5082224, at \*3–4 (S.D.Miss. Oct. 26, 2011) (dismissing former police officer's Title VII claims against several municipal employees, including police chief, and reasoning that such individuals were not "employers" for purposes of the statute); *Preacely v. City of Houston,* No. H–10–0492, 2010 WL 1903754, at \*1 (S.D.Tex. May 11, 2010) (dismissing individual city employees as defendants in Title VII case); *Pena v. City of Colony,* No. 4:08–CV–50, 2008 WL 4642256, at \*1 (E.D.Tex. Oct.8, 2008) (same); *Harris v. City of Carrollton,* No. 3:01–CV–1249, 2002 WL 1489533, at \*1 (N.D.Tex. July 10, 2002) (same).

7    Williams does not, in fact, make out a *prima facie* case of race discrimination, as he fails to show that he was replaced by someone outside his protected class or identify a similarly situated employee outside his protected group who was not terminated under nearly identical circumstances. *Turner,* 675 F.3d at 893; *Fahim,* 551 F.3d at 350.

8    In light of this determination, the court need not discuss Defendants' alternative grounds for summary judgment with regard to his race discrimination claims.

9    In the four retaliation sections of his Amended Complaint, Williams references § 1983, but only for various propositions relating to municipal liability and the immunity of police officers from civil liability under § 1983. Further, in his response to Defendants' prior motion to dismiss, Williams attempted to clarify the legal theories upon which he relies: "Plaintiff contends that his complaint does in fact allege sufficient facts to state a cause of action against Defendants, and does state several causes of action, namely, ... Plaintiff['s] claims under Title VII for race discrimination and retaliation for filing an EEOC claim against the City of Port Arthur's Police Department as well as certain City employees individually." For these reasons, it appears that Williams's retaliation claims are based entirely on Title VII.

10   To the extent Williams seeks to recover for due process violations pursuant to the Fifth Amendment, such claims are barred. "The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor." *Jones v. City of Jackson,* 203 F.3d 875, 880 (5th Cir.2000); *Wakat v. Montgomery Cnty.,* 471 F.Supp.2d 759, 766 (S.D.Tex.), *aff'd,* 246 F. App'x 265 (5th Cir.2007). Williams makes no argument that Defendants were acting under the authority of the federal government, and the record contains no hint of federal involvement. Accordingly, Williams may not recover, as a matter of law, on any Fifth Amendment due process claims.

11   Williams asserts a property interest (but not a liberty interest) in his job.

12   Williams's complaint states:

> In October of 2009 Plaintiff received an indefinite suspension letter that contained [four] charges that Plaintiff had no knowledge of nor had they been properly investigated according to Sgt. Ken Carona. Department policy states that employees shall receive notice of all investigations pending against them, and shall have the right to a disciplinary review board. Plaintiff did not receive notice of these charges before the Disciplinary Review Board hearing. White Officers in the past always received notice of charges against them and were afforded the opportunity to respond to those charges. Plaintiff never received due process regarding those additional charges and was terminated in violation of Police Department policy.

74

**13**   Williams also claims that the August 3, 2009, DRB hearing panel was unfair because it did not conform to departmental policy, purportedly requiring a minority member. Williams, however, has not identified or produced the relevant policy and has not contradicted Chief Blanton's testimony that Officer Primm, a female, qualifies as a minority for purposes of DRB membership. According to departmental practice, Chief Blanton and the president of the local law enforcement union collaborate months in advance and jointly select officers to serve on DRB panels for a three-month term. Regardless, in light of the fact that no record evidence suggests that Williams engaged in any protected activity prior to the board's assembly or the hearing on August 3, 2009, there is no basis on which to conclude that the DRB panel was biased against Williams.

**14**   "The [TWA] 'does not create a cause of action against employees of a public agency. Instead, the statute creates a cause of action against state[,] local or governmental agencies.' " *Hoskins v. Kaufman Indep. Sch. Dist.,* No. 3:03CV 130, 2003 WL 21517830, at *4 (N.D.Tex.2003) (quoting *Rodriguez v. Laredo Indep. Sch. Dist.,* 82 F.Supp.2d 679, 688 (S.D.Tex.2000)); *see also Crabtree v. Ibarra,* No. H–10–1118, 2011 WL 649997, at *7 (S.D.Tex. Feb.10, 2011); *Nairn v. Killeen Indep. Sch. Dist.,* No. 08–10–00303–CV, 2012 WL 561015, at *11 (Tex.App.-El Paso Feb.22, 2012, no pet.); *Moore v. City of Wylie,* 319 S.W.3d 778, 783–84 (Tex.App.-El Paso 2010, no pet.). Consequently, Williams's TWA claims are dismissed against the individual Defendants Blanton, Blitch, and Odom.

**15**   To the extent any other state law claims survive, the court declines to exercise supplemental jurisdiction over them. Where, as here, all federal claims are eliminated from a case prior to trial, the general rule is for the federal court to decline to exercise jurisdiction over pendent state law claims. *See Priester v. Lowndes Cnty.,* 354 F.3d 414, 425 (5th Cir.), *cert. denied,* 543 U.S. 829, 125 S.Ct. 153, 160 L.Ed.2d 44 (2004); *Smith v. Amedisys Inc.,* 298 F.3d 434, 446–47 (5th Cir.2002); *Jones v. Adam's Mark Hotel,* 840 F.Supp. 66, 69 (S.D.Tex.1993). The rule, however, is "neither mandatory nor absolute." *Enochs v. Lampasas Cnty.,* 641 F.3d 155, 161 (5th Cir.2011); *Batiste v. Island Records, Inc.,* 179 F.3d 217, 227 (5th Cir.1999), *cert. denied,* 528 U.S. 1076, 120 S.Ct. 792, 145 L.Ed.2d 668 (2000). In determining whether to retain jurisdiction over the state law claims, the court takes into account the provisions of 28 U.S.C. § 1367(c) and considers the factors of judicial economy, convenience, fairness, and comity. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish,* 373 F. App'x 438, 442 n. 10 (5th Cir.2010); *MCW, Inc. v. Badbusinessbureau. com, L.L. C.,* No. Civ. A. 3:02–CV–2727–G, 2004 WL 833595, at *19 n. 17 (N.D.Tex.2004). "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Montegut v. Williams Commc'ns, Inc..,* 109 F.Supp.2d 496, 499–500 (E.D.La.2000) (quoting *Guzzino v. Felterman,* 191 F.3d 588, 594 (5th Cir.1999)); *accord Cudd Pressure Control Inc. v. Roles,* 328 F. App'x 961, 966 n. 2 (5th Cir.2009). Here, all federal causes of action have been dismissed, and neither the parties nor the court appear to have engaged in any preparation for trial, which is set more than five months in the future. In the absence of any valid federal claims and any justification stemming from judicial economy concerns or issues of convenience or fairness to the litigants (which might be present if this litigation were more advanced), the court "should not needlessly make decisions concerning state law." *Montegut,* 109 F.Supp.2d at 500.

---